IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

RUSSELL HANDJIS, INDIVIDUALLY, AND ON BEHALF
OF THE WRONGFUL DEATH BENEFICIARIES OF
LACEY ROBINETTE HANDJIS; AND
SHERRY HANDJIS, ON BEHALF OF JACK HANDJIS
AND TYLER HANDJIS, MINOR CHILDREN OF
LACEY ROBINETTE HANDJIS                                    PLAINTIFFS

      v.                                    CAUSE NO. 5:25-cv-0000-KS-BWR

ADAMS COUNTY, MISSISSIPPI; ADAMS COUNTY
MISSISSIPPI SHERIFF'S DEPARTMENT; SHERIFF
TRAVIS PATTEN; CHIEF STANLEY SEARCY;
LIEUTENANT CHARLES CLEMONS; MASTER
SEARGENT BRENDA RUSSELL; JAILER
SHARTA TYMS; OFFICER WANILA WILLIAMS;
OFFICER VATISHA COLLINS; OFFICER CLEOPHUS
ROBINSON; CORPORAL MICHAEL KRACEK;
JOHN DOES 1-5; AND ABC CORPS. 6-10                          DEFENDANTS

## FIRST AMENDED COMPLAINT
### (Jury Trial Requested)

COME NOW, Russell Handjis, individually, and on behalf of his minor children, Jack

Handjis and Tyler Handjis, as the wrongful death beneficiaries of Lacey Robinette Handjis,

deceased; and Sherry Handjis, also on behalf of Jack Handjis and Tyler Handjis, the minor

children of decedent Lacey Robinette Handjis, and hereby file this, their First Amended

Complaint against Adams County, Mississippi, Adams County Mississippi Sheriff's Office,

Sheriff Travis Patten, Chief Stanley Searcy, Lieutenant Charles Clemmons, Master Sargant

Brenda Russell, Sharta Tyms, Officer Wanila Williams, Officer Vatisha Collins, Corporal

Micheal Kracek, Officer Cleophus Robinson, John Does 1-5 and ABC Corps. 6-10, and, in

support thereof, state the following:

# I.

## <u>PARTIES</u>

1.      Plaintiff Russell Handjis is an adult citizen of the State of Mississippi.  He lives in Adams County, Mississippi.  Mr. Handjis and decedent Lacey Robinette Handjis were married until her death.  He and Lacey Robinette Handjis had two children together, Jack Handjis and Tyler Handjis, both of whom are minors.

2.      Sherry Handjis is an adult citizen of the State of Louisiana.  She lives in Concordia Parish, Louisiana.  At the time of the filing of this lawsuit, Sherry Handjis has legal and physical custody of the minor children of Plaintiff Russell Handjis and her deceased daughter-in-law, Lacey Robinette Handjis, the aforesaid Jack Handjis and Tyler Handjis.

3.      Adams County, Mississippi is a political subdivision of the State of Mississippi. Process on Adams County, Mississippi may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j).

4.      Adams County Mississippi Sheriff's Office is a political subdivision of Adams County, Mississippi.  Process on Adams County Sheriff's Office may be served on the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j).

5.      Sheriff Travis Patten is the duly-elected Sheriff of Adams County, Mississippi.  He is is being sued in his individual and official capacity.   Process on Sheriff Travis Patten in his official capacity may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j). He may be served in his individual capacity at the Adams County Sheriff's Department or where he may be found.

6.      Chief Stanley Searcy is the administrator for the Adams County Jail and is being sued

in his individual and official capacity.  Process on Chief Stanley Searcy in his official capacity, may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j). He may be served in his individual capacity at the Adams County Sheriff's Department or where he may be found.

7.   Lieutenant Charles Clemmons is believed to be in a supervisor capacity at the Adams County Jail and is being sued in his individual and official capacity.  Process on Lieutenant Charles Clemmons in his official capacity may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j). He may be served in his individual capacity at the Adams County Sheriff's Department or where he may be found.

8.   Master Sargant Brenda Russell is believed to be in a supervisor capacity at the Adams County Jail and is being sued in her individual and official capacity.  Process on Brenda Russell in her official capacity may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j). She may be served in her individual capacity at the Adams County Sheriff's Department or where she may be found.

9.   Sharta Tyms is a jailer at the Adams County Jail and is being sued in her individual and official capacity.  Process on Sharta Tyms in her official capacity may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j). She may be served in her individual capacity at the Adams County Sheriff's Department or where she may be found.

10. Officer Wanila Williams is an officer at the Adams County Jail and is being sued in her individual and official capacity.  Process on Wanila Williams in her official capacity may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j).  She may be served in her individual capacity at the Adams County Sheriff's Department or where she may be found.

11. Officer Vatisha Collins is an officer at the Adams County Jail and is being sued in her

individual and official capacity. Process on Vatisha Collins in her official capacity may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j). She may be served in her individual capacity at the Adams County Sheriff's Department or where she may be found.

12. Officer Cleophus Robinson is an officer at the Adams County Jail and is being sued in his individual and official capacity. Process on Cleophus Robinson in his official capacity may be served upon the Adams County Chancery Clerk pursuant to F.R.C.P. 4(j). He may be served in his individual capacity at the Adams County Sheriff's Department or where he may be found.

13. Defendants John Does 1-5 are individuals whose identities cannot be determined at this time. These defendants' actions and/or inactions were the proximate cause of the Plaintiffs' damages. Upon discovery of the identities of said individual Defendants, they will be substituted.

14. Defendants ABC Corps. 6-10 are corporations whose identities cannot be determined at this time. These defendants' actions and/or inactions were the proximate cause of the Plaintiffs' damages. Plaintiffs will amend and insert the exact name and identity of each of the defendant corporations when they have been ascertained.

## II.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction over this action pursuant to 28 U.S.C §§ 1331, and 1343 because this action is brought pursuant to 42 U.S.C. § 1983, for the deprivation of Decedent Lacey Robinette Handjis' civil rights under the Fourteenth Amendment. Further, this Court has jurisdiction over the state law claims pursuant to 28 U.S.C § 1367.

16.     Venue is proper in this Court because acts and omissions occurred in Adams County, Mississippi.

### III.

### <u>FACTS</u>

17.     This action is brought under 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

18.     This case arises out of the death of Lacey Robinette Handjis ("Lacey") while she was being held at the Adams County Mississippi Jail in Natchez, Mississippi.  Lacey was being held overnight there due to a mental health crisis she was experiencing.  She was scheduled to appear at a hearing the following afternoon before the Chancery Court of Adams County where that court would determine whether to enter an Order of Commitment, so that Lacey could receive psychiatric care at the Mississippi State Hospital at Whitfield.  *See* Chancery Court of Adams County's Order to Hold, attached hereto as <u>Exhibit A</u>.

19.     At the time of her death, Lacey was a resident of Natchez, Mississippi, and was married with two young children.

20.     As a background matter, Lacey was a graduate of Trinity Episcopal Day School in Natchez, Mississippi.  Thereafter, she attended Central Louisiana Technical Community College where she earned a degree in nursing.   She served as a nurse in her community.  At the time of her death, Lacey was employed as a hospice care consultant for Hospice Compassus in Natchez.  Prior to that, Lacey worked at the Adams County Correctional Facility as a nurse.

21.     Unfortunately, Lacey suffered from a mental health condition, bi-polar disorder, that became symptomatic in August 2023.

22.     Lacey had traveled to Winona, Mississippi sometime in mid-August with her children.  During this time, Lacey was exhibiting symptoms of her aforesaid mental health condition.

23.     On August 23, 2023, Lacey arrived at her brother's house in the Mississippi Delta. She spent two nights at her brother's house during which time she exhibited signs of being manic and paranoid.

24.     On August 24, 2023, Lacey took a drug test at a clinic in Sumner, Mississippi, which was negative for illicit substances.

25.     On August 25, 2023, Lacey returned to Winona and continued exhibiting symptoms of a mental health condition, which caused the Winona Police to conduct a wellness check.

26.     On August 26, 2023, the decision was made to take Lacey into custody, so that a mental hold order could be obtained.

27.     On August 28, 2023, a Monday, Lacey's brother attempted to get a mental hold order from the Montgomery Chancery Clerk.  But, the Clerk directed him to the Adams County Chancery Clerk, who directed him back to Montgomery County.  Eventually, the Adams County Chancery Clerk accepted the mental hold affidavit.

28.     Montgomery County contacted the Adams County Jail to advise them of Lacey's mental condition and that they were going to transport her to the Adams County Jail.  The Adams County Jail accepted the transfer and understood that Lacey was being held due to a mental condition.

29.     Later the same day, Lacey was transported by a Winona Police Sargent to the Adams County Jail.

30.    Lacey was booked in the Adams County Jail, mugshots were taken, and she was given a jail issued suit by 14:27 hours.  *See* Adams County Sheriff's Department Jail Administrator Incident Statement of Master Seargent Brenda Russell, attached hereto as <u>Exhibit B</u>.

31.    The Plaintiffs obtained via Initial Disclosures of the Defendants named in the original Complaint video surveillance footage of the Holding Cell in which Lacey was placed.  This video captures the entire time Lacey was in the Holding Cell.  Plaintiffs also obtained surveillance footage of the Control Room and the Hallway of the Jail.  Military time is referenced throughout each video.  So, Military time will be referenced in the First Amended Complaint.  Due to the graphic nature of the video of Holding Cell, it is being filed under seal.  It will be marked as <u>Exhibit C</u>.  The Control Room and Hallway videos, which capture video and audio, as well, will also be submitted under seal as exhibits to this Complaint.  They will be marked as <u>Exhibits D and E</u>, respectively.

32.    It is evident from these videos that Lacey became in dire need of medical attention while she was in the Holding Cell.  It is also evident that the Defendants deliberately ignored Lacey's serious medical conditions and needs and refused to provide her with the medical care, to which she was entitled.

33.    She was placed in a Holding Cell at or around 15:05 hours.  There, she was under the exclusive care, custody, and control of Defendants.

34.    At or around 15:20, Lacey announced that she needed her medicine, and that she was having withdrawals from not haven taken it.

35.    At or around 15:43, Lacey had removed her clothes; she washing in the toilet water.  And, she was talking through the Holding Cell door to a black male officer and a black

female officer.  She states at or around 15:51 that she had been off her medications for the

previous three days.

36.     At or around 16:33, Lacey, again, announces that she needs her medications.

37.     At or around 16:33, Lacey states that she had been pepper sprayed three times the

previous night, which was when she was in the custody of the Grenada County Sheriff's Office.

38.     At or around 17:03, Lacey announces, again, that she needed her medications.

39.     At or around 20:42 hours, Lacey yelled for an officer to help her.  She asked that

someone call 911.  She screamed that her chest was hurting.

40.     At or around 20:44, Officer Robinson can be seen talking with Lacey. She tells

him about needing her medication. Officer Robinson tells her she put herself in this situation and

would not be in the cell if she was not supposed to be.

41.     At or around 21:42, Corporal Kracek is seen through the Hallway video sitting

outside of the Holding Cell door talking to Lacey.  Lacey tells him she is afraid of dying in the

cell and he reassures her she will not die tonight.  During this time, Lacey tells Kracek that she

needs to take her medications.

42.     At or around 22:13, Kracek tells her that he'll check on her later.

43.     At or around 22:14, she began drinking water at a substantial rate and in a

substantial amount.  She vomited water within a minute thereafter and continued to drink water.

She vomited water, again, at or around 22:15 and continued to drink water.  At or around 22:16,

she was coughing water; and within a minute thereafter she vomited water.  Still, she continued

to drink water.  Over the following two minutes, she repeated the pattern of vomiting and

drinking water in an excessive amount.   Officers Robinson and Williams are in the control room

with Kracek watching the monitor and discussing getting her hygiene supplies and a mat.

44.    She took her shirt off and her pants off her body at or around 22:18, at which point she was nude.  At or around 22:18, she yelled for an officer to help her.  Officer Williams was watching the monitor at that time.  At or around 22:19, she continued drinking water heavily.  At or around 22:21, she exclaimed that she felt dizzy.  Around this time, the Hallway video shows Officer Robinson enters the Hallway.  Lacey tells him that she does not feel good at all.  Officer Robinson, in response, tells her to put her clothes back on.  She tells him her heart is racing and she feels dizzy.

45.    At or around 22:22, she screamed that she needed to go to the hospital because she felt so bad.  At or around 22:23, she was drinking more water.

46.    Around this time, Officer Williams can be seen and heard in the Hallway video.  Officer Williams enters the Hallway and tells Lacey to put her clothes back on.  Lacey yelled that she felt dizzy and asked someone to call 911 because her heart was racing.  At or around 22:25, she screamed that her heart was racing.  Seconds later, she vomits and, thereafter, continues to drink water.

47.    At or around 22:29, Lacey exclaims that she feels dizzy.  At or around 22:30, she hollered that she needed to go to the hospital, and pleaded that the Jail staff call 911 for her.  Lacey said that she could feel her heart racing.   She said this to Officers Williams and Robinson.

48.    At or around 22:38, Lacey says, "Officer, I need to go to the hospital.  I am hot."  At or around 22:39, Lacey vomited again.  At or around 22:40, Lacey vomits and also dry heaves.  Corporal Kracek, who is observing Lacey from the Control Room, comments at or around 22:40, "She'll be hurting for a while with the pepper spray."  At or around 22:42 she vomits.  Again, at or around 22:43, she vomits.

49.    At or around 22:43, Lacey yelled, "Officer, call 911. I had an allergic reaction to pepper spray." At or around 22:44, she exclaimed, I am having an allergic reaction because I am thirsty and throwing up." She also said, "I am thirsty and throwing up and sweating so bad." At this time Corporal Kracek and Officer Robinson, who were both in the Control Room, and who had both been listening to Lacey and watching her through the video surveillance camera(s), talked. Corporal Kracek tells Officer Robinson that Lacey was merely having a panic attack, and that she was drinking lots of water in order to make herself sick, so that she could be taken to the hospital. Officer Robinson said, "Ain't nothing wrong with her." Corporal Kracek told Officer Robinson to tell her to stop drinking water because it will make her sick.

50.    At or around 22:44, Officer Robinson tells Lacey, "Pepper spray will make you throw up." He goes on to say, "*We aren't going to take you anywhere tonight*." And, he tells Lacey to drink *more* water. At or around 22:45, Officer Robinson gives Lacey *more* water to drink. Lacey is fanning herself because she is so hot.

51.    At or around 22:48, Lacey washes her hair again in the sink, which she did to most likely to cool herself.

52.    At or around 22:49, Corporal Kracek, still in the Control Room, says for the jail staff to call him "if she gets *crazy* crazy," and he will talk to Lacey.

53.    At or around 22:52, Lacey vomits again.

54.    At or around, 22:53, <u>Lacey vomits blood in the sink. This blood filled the sink bowl. At this time, she yells out, "I am throwing up blood, officer! Officer, I'm throwing up blood!" The blood is clearly visible in the sink bowl. And, the blood remains in the sink bowl. Lacey scoops a handful of the bloody water out of the sink bowl and places that hand full of bloody water through the hole in the door to show the jail staff.</u> She obviously did this to prove

that she was, in fact, experiencing a significant health issue in the hopes that she would be provided medical care. Lacey says, "Officer Mike, I am throwing up blood! I'm throwing up blood! Officer Mike, I need to go to the ER! I am throwing up blood!" The blood remains in the sink bowl. While this is occurring, Officer Williams, who hears Lacey's words, chooses to ignore Lacey. Instead of even looking at the Holding Cell video monitor too see if Lacey had vomited blood, Officer Williams, instead, ignores Lacey's obvious and urgent need for medical care. Officer Willaims, who had been sitting at her desk, merely gets up to staple some papers and returns to her chair.

55.    At or around 22:54, Lacey exclaims, "I am dying in here."

56.    As Lacey is trying her best to communicate to the jail staff these things, Officer Robinson is at the end of the hallway from the Control Room and does not address Lacey's pleas. Williams is in the control room, ignoring Lacey's cries for help at this time.

57.    At or around 22:54, Lacey is own her knees next to the door. She has positioned her head, so that she may see through the door hole and also be heard even more. Then and there, she repeats, "Help me, Officer Mike. I'm throwing up blood, Officer Mike! Please help me. I am fixing to die in here!"

58.    At or around 22:55, Officer Vatisha Collins signs in at the Control Room and watches the monitors. Lacey's blood is still clearly visible at this time in sink of the Holding Room. And, her blood is clearly visible at this time on the Hallway floor along the outside of the door of the Holding Room. In response, Officer Collins ignores Lacey's obvious and urgent need for medical care.

59.    Lacey continues to gulp water out of the cup provided to her by Officer Robinson.

60.    At or around 22:57, <u>Lacey places her blood from the sink bowl and her bloody clothes in the hallway</u>, which she most likely does to show the jail staff that she was in need of urgent medical care.

61.    At or around 22:59, <u>Lacey, for the second time, vomits blood in the Holding Cell sink bowl.  The blood is clearly visible in the surveillance video.  She also vomits blood onto the Holding Cell floor</u>.  This, too, is visible in the video.  Lacey's vomiting blood can clearly be heard from the Control Room.  There, Officer Collins is watching Lacey in the Holding Cell through the surveillance monitor.

62.    At or around 23:00, <u>Lacey vomits blood for a third time into the sink.  This time, the amount of blood is especially heavy.  This blood in the sink bowl is clearly visible in the video surveillance camera.  The sink full of blood remains for a period of time and can easily be seen through the Holding Cell surveillance video</u>.  Officer Collins provides no help to Lacey in response.  Officer Wanila Williams, who is also in the Control at this time, looks at the surveillance monitor and does nothing to help Lacey in response to witnessing all of the blood and hearing Lacey's pleas for medical care.

63.    At or around 23:14, Lacey is breathing very heavily.  This is seen and heard by all of the people in the Control Room charged with the duty of monitoring Lacey.

64.    Lacey's blood she vomited in the Holding Cell sink remained clearly visible there and also on the floor of the Holding Cell from 22:53 until 23:14—a total of twenty-one (21) minutes.  During this period of time, Officers Robinson, Williams, and Collins all observed this blood and heard Lacey telling them, repeatedly, that she had been throwing up blood and needed medical care.  Yet, they did nothing to help her.

65.    At or around 23:17, Lacey vomits again.

66.     At or around 23:21, Officer Robinson is seen in the Hallway video monitor walking past Lacey's blood that she had placed on the Hallway floor outside of the Holding Cell to show Defendants that she was in urgent need of medical care.  Laceys' blood is clearly visible.

67.     The sequence of events set forth heretofore in paragraphs 57 through 71 (Lacey's vomiting blood, telling the officers repeatedly that she had vomited blood, the officers seeing the blood, and the officers providing no medical care to Lacey in response--are captured in <u>Exhibit F</u>, which is a collection of digital stills of the Holding Cell, Hallway, and Control Room videos.

68.     Lacey breathes very heavily again at or around 23:26.

69.     At or around 23:28, Officer Robinson goes to the outside of Holding Cell door and talks to Lacey.  Lacey tells him, "I am sick.  I am dying in here.  My heart is racing.  My mouth is numb.  I am throwing up blood."  <u>Robinson tells her, "I don't know what to do."</u>  In response, <u>Lacey says to him, "I need your help.  Call 911."</u>  <u>Robinson replies, "I can't."</u>

70.     At or around 23:29, Robinson returns to the Control Room and announces to the others there, "She says she is dying," and resumes his place in his chair.

71.     Lacey continues to beg for help, which can be heard in the Hallway and also heard and seen through the surveillance monitor located inside the Control Room.

72.     At or around 23:32, Lacey says, "I am sick.  My heart's beating.  I'm getting really weak.  My mouth is numb."

73.     At or around 23:32, Lacey begs, "Help me.  I am going to die in here.  Please, help me."  Williams and Robinson remain in their chairs.

74.     At or around 23:35, <u>Lacey either sneezes into her right arm.  She wipes her nose with her hand.  Then, Lacey notices blood in her hand.  And, she says, "Oh, God, more blood."</u> She checks her pulse rate.  Lacey recites The Lord's Prayer.  Robinson is watching this unfold on

the monitor. Officer Robinson tells Officer Williams that Lacey is naked and stepping in water. He says to Officer Williams, "there is something wrong with her," but does nothing to help her. Neither does Officer Williams.

75.    At or around 23:37, Lacey checks her pulse rate, again.

76.    At or around 23:40 Officer Robinson is eating food and returns to his chair around 23:44.

77.    At or around 23:47, Lacey checks her pulse rate on her wrist. And, she checks her pulse rate on her chest. Lacey's hands are visibly shaking at this time.

78.    Lacey's blood she placed in the Hallway is clearly visible there from 22:56 until 23:47—a total of fifty-one (51) minutes. During this period of time, Officers Robinson, Williams and Collins all observed this blood and heard Lacey's telling them that she had been throwing up blood and needed medical care. Yet, they did nothing to help her.

79.    At or around 23:50, Lacey cries out, "My heart rate is stopping. Officer, I need help!" Lacey begins to pray, again. Meanwhile, Officer Robinson is eating food in the Control Room and watching the monitors. Officer Williams is also sitting in her chair in the Control Room. They are observing Lacey.

80.    At or around 23:51, Lacey checks her pulse. She says a prayer for her two young children.

81.    At or around 23:56, Lacey checks her pulse, again.

82.    At or around 23:59, Officer Robinson is, as he has been, in the Control Room; he is still enjoying a meal while he is watching and listening to Lacey suffer in the Holding Cell through the surveillance monitor.

83.    At or around 00:00, Lacey sits on the toilet seat and checks her pulse.

84.    At or around 00:29, Lacey prays the following: "God forgive them, they know not what they do." Lacey then says another prayer to her two young children.

85.    At or around 00:31, Lacey exclaimed, "I'm fixing to die in here. I'm losing consciousness. Someone, call 911 immediately. I can't breathe! I'm having a heart attack."

86.    At or around 00:32, <u>Lacey screams, "I barely have a pulse. I guess y'all don't care."</u>

87.    At or around 00:33, Lacey says another prayer. She says, "I barely have a heartbeat."

88.    At or around 00:34, Lacey screams, "I'm dying! I can't breathe."

89.    At or around 00:36, Lacey again screams, "Help me, I'm dying in here. I'm getting dark."

90.    At or around 00:40, Lacey says, "I'm losing consciousness. My heart rate is barely palatable."

91.    At or around 00:42, Lacey says, "I can't breathe." Lacey prays, again.

92.    At or around 00:43, <u>Lacey screams, "Someone, call 911. I'm losing my bowels. I'm losing consciousness."</u> Lacey pounds her chest.

93.    At or around 00:51, Lacey prays.

94.    At or around 00:53, Lacey pounds on the left side of her chest.

95.    At or around 00:54, she wipes toilet water on herself, while still pounding her chest.

96.    At or around 00:57, Lacey says, "I'm too weak. I'm losing feeling in my legs." By this time, Officer Robinson was sleeping in the control room and Officer Williams was still sitting in her chair.

97.     At or around 00:58, Lacey yells, "I'm dying!  Someone, call 911.  My ears are ringing.  Death is near.  Someone, call 911!"

98.     At or around 00:58, she smears her defecation onto her body.  Meanwhile, Officer Robinson, after finishing his meal, has gone to sleep.

99.     At or around 01:05, Lacey exclaims, "please call 911!  I need an ambulance.  I'm fixing to throw up."

100.    At or around 01:07, Lacey prays, "I'm fixing to die for my sins.  Lord, please forgive me for my sins.  I am not perfect.  Please forgive me for my sins and all that sin against me.  Messiah, forgive me.  I love you, Lord."

101.    At or around 01:10, Lacey is standing and pounding her chest.

102.    At or around 01:13, Lacey is making the motion with her arm as if pounding her chest, but her arm is no longer making contact with her chest.

103.    At or around 01:14, Lacey frantically bangs on the door of the Holding Cell.

104.    At or around 01:14, Lacey is now speaking incoherently.  She is praying, incoherently.

105.    At or around 01:18, Lacey, again, bangs on the door of the Holding Cell.

106.    Officer Robinson has awakened from his sleep and goes to get a snack.  Officer Williams remained in her chair.

107.    At or around 01:23, Lacey is marching in place at the door and is being watched on the monitor by Officer Robinson.

108.    At or around 01:24, Lacey is speaking in what seemingly sounds like a language other than English.

109.    At or around 01:28, Lacey vomits.  She is mumbling.

110.    At or around 01:28, Lacey defecates loose stool onto the floor while standing there on the floor.

111.    At or around 01:29, Lacey defecates, again, loose stool onto the floor while she is standing there.  Lacey begins to loose her balance while standing. Officer Robinson is sitting in his chair.

112.    At or around 01:30, Lacey vomits, again.  Her body sways.  She sits on the mat on the floor of the Holding Cell.

113.    At or around 01:33, Lacey lays down on the mat.

114.    At or around 01:38, Lacey appears unconscious.  She is taking very shallow breaths.

115.    At or around 02:09 Officer Robinson is watching the monitors and calls Officer Williams over to look at says, "Why is she laying there in the water?  I think her head hit the door." Officer Williams leaves the Control Room.  Officer Robinson says, "she shit on the floor" and again proclaims, "she has a serious problem."

116.    At or around 02:12, Officer Williams is now in the Hallway; she approaches the Holding Cell door.  There, she looks through port hole of the door.  She sees the horrible and graphic scene.  She sees Lacey laying nude on the floor in her feces.  Lacey is obviously in urgent need of medical care.  *See* the digital still images of Officer Williams peering into the Holding Cell and seeing Lacey on the floor in dire need of medical care, a copy of which is being submitted under seal, due to its graphic nature—marked as <u>Exhibit G</u>.

117.    Incredibly, and with deliberate indifference to Lacey's medical needs, Officer Williams never attempted to communicate with Lacey, or help her in any way.  Instead, Officer Williams merely walks back to the Control Room, sits down and does nothing else.

118.     At or around 02:15, Lacey remains on her stomach in the loose feces on the floor, with her head on the floor facing the door of the Holding Cell.  Officer Robinson, still watching the monitor, says "she is wallowing in it; she has a serious problem; I never seen anyone wallowing in their shit." Officer Robinson tells Officer Williams, "you can smell it out in the hall," then proceeds to resume his position in his chair.

119.     At or around 02:29, Officer Robinson, again, looks at Lacey through the video monitor for several minutes, but does nothing to help her.

120.     Around 02:51, Officer Williams leaves the Control Room for the night.  Officer Robinson then moves to her chair, so he can apparently slide it out of camera view.  He proceeds to go to sleep and remains sleeping until around 05:00.

121.     At or around 03:27, Lacey appears to be barely breathing.

122.     At or around 03:37, Lacey is breathing, but in a convulsive-like manner.

123.     At or around 03:47, Lacey continues to breath, but, still in a convulsive-like manner.

124.     At or around 04:08, Lacey is breathing very lightly.

125.     At or around 04:30, Lacey remains on her belly, face down.  Her movement is very slight.

126.     At or around 04:25, Lacey begins to grunt loudly.  Her loud grunting continued until around 04:38.

127.     At or around 05:00 Officer Robinson awakes from his slumber.

128.     At or around 06:26, a jail guard closes the port opening of the door of the Holding Cell.

129.     At or around 06:49, a jail staff member attempts to open the Holding Cell door.

130.    The Jail staff finally entered Lacey's room and discovered she was dead some time later.

131.    The September 7, 2023, toxicology report was negative for any illicit substances.

132.    In the Mississippi Crime Lab autopsy report the cause of death is listed as undetermined.  But, her labs show a hyponatremic dehydration pattern, which would be consistent with the symptoms she was experiencing in the cell prior to her death.

133.    An independent autopsy report prepared on March 20, 2024, found the cause of death to be hyponatremia dehydration (low sodium).  *See* Independent Autopsy Report prepared on March 2024, attached hereto as Exhibit H.

134.    Lacey's cause of death could have been easily prevented had the Defendants timely provided medical treatment for her.

135.    The video footage taken from the Holding Cell, the Control Room, and the Hallway show that Officers Robinson, Williams, and Collins observed Lacey's obvious and serious medical distress and heard her begging for medical care and, in response, took no action to provide medical care for Lacey.

136.    After Lacey died, and in the late evening of August 29, 2023, investigators within the Adams County Sheriff's Department interviewed each of the employees of the County who worked at the Jail that night and who were responsible for Lacey's safety, health, and well-being. These interviews were recorded.  Plaintiffs obtained a copy of each of them in the Initial Disclosures.

137.    In addition to her actions and inactions as documented in the videos of the Holding Cell, the Control Room, and the Hallway, it is clear from the statements made by Officer Collins in her interview that pre-trial detainees such as Lacey who had mental conditions are not

to be provided medical care. The following statements of Officer Collins evidence these things. When asked if Lacey appeared to have a medical condition or health issues, Collins responded, "She was just like a mental patient. Would scream. Took off clothes. Throwing water in the cell." *See* Adams County Sheriff's Department Jail Administrator Incident Statement of Officer Collins, attached hereto as <u>Exhibit I</u>, beginning at or around the 3:50 mark of the video.

138.    Another alarming statement was in response to when she was asked if she ever spoke with Officer Robinson about what was going on with Lacey while Officer Collins was in the Control Room. Collins responded, "We didn't speak much about it. Like, as far as we know, she was just a mental patient." *See* <u>Exh. I</u>, beginning at or around the 10:30 mark of the video. At another point during this interview, after being asked if anybody ever said anything about what was going on with Lacey, about taking it seriously, Officer Collins said, "we get mental patients all the time, and you just don't know what you gonna get with these people." *See* <u>Exh. I</u>, beginning at or around the 11:50 mark of the video.

139.    And, when asked if there was anything about Lacey that caused Officer Collins concern, she said, "I thought she was tiring herself out and went to bed. She was a mental patient. They'll sleep how they want to sleep. They don't know no better. She had been up all night and was tiring herself. Like, she was fine." *See* <u>Exh. I</u>, beginning at or around the 13:15 mark of the video.

140.    Further, when asked if she noticed Lacey's mood had changed during Officer Collins' work shift, Collins responded, "Between 2:00 and 4:00 o'clock, I think maybe she had just burnt out and wanted to rest. She kind of went down." *See* <u>Exh. I</u>, beginning at or around the 6:25 mark. Officer Collins went on to state in her interview "You know how a person be hyper all day long and just burn herself out? I assumed she got tired because she was a ticking

time bomb." *See* <u>Exh. I</u>, beginning at or around 9:45 mark of the video. Officer Collins went on

to say, "Being a mental patient, you never know how they will go to sleep. Some go to sleep

naked. Some go to sleep with pants on or shirt on. I just thought, she is a mental patient, she

might be asleep." *See* <u>Exh. I</u>, beginning at or around 10:00 mark of the video.

      141.    Further, Officer Collins was asked the following question: "So, when she was

laying on the floor and all that, you didn't have any reason to be concerned, or you weren't

concerned. You just thought she had burned herself out, to used your words?" Officer Collins

answered, "I thought she had everything she needed outside of medicine. She had water. She

had clothes. She had soap for her to wash up. She was like Shawn Keith or Michael

Washington. One of those inmates. And, you never know what you are gonna get with them."

*See* <u>Exh. I</u>, beginning at or around the 14:35 mark of the video. Officer Collins also said, "You

are supposed to take it serious every time they say something. But, they'll burn you out after a

while when they continue to call you to a cell and ain't nothing wrong. They'll do that." *See*

<u>Exh. I</u>, beginning at or around the 15:15 mark of the video.

      142.    Officer Collins also stated in her interview that, <u>"We can't move nobody at night</u>

<u>time. We are not allowed to move people at night time…"</u>. *See* <u>Exh. I</u>, beginning at or around

the 16:15 mark of the video.

      143.    Officer Robinson---In addition to his actions and inactions as documented in the

videos of the Holding Cell, the Control Room, and the Hallway, and as set forth heretofore, it is

clear from the statements made he made in the interview that pre-trial detainees such as Lacey

who had mental conditions are to be provided with no medical care. For example, Officer

Robinson said, "We have people come in here who take off their clothes and act crazy. Say they

ain't supposed to be here and all that stuff." *See* Adams County Sheriff's Department Jail

Administrator Incident Statement of Officer Robinson, attached hereto as Exhibit J, beginning at or around the 4:25 mark of the video. Officer Robinson was then asked, "You thought that was normal?" He replied, "Yeah, I thought it was normal. Since eight months I been here, we had Mike and couple other guys--they take off their clothes, and piss. Watson, he done did it before. I didn't think nothing of it." *See* Exhibit J, beginning at or around the 4:30 mark of the video.

144.    Officer Robinson went on to say in his interview that Lacey was, "getting noisy all the way to about 12:30 this morning. She just kept talking. She said she needed to get out. Said that her husband killed somebody. She was saying all kinds of stuff. When I hear that, I say, she's crazy." *See* Exh. J, beginning at or around the 5:15 mark of the video.

145.     Officer Robinson wrote in the Incident Report that night following his interview that when Lacey told him that she needed to see a doctor, he responded to her, "that she would have to check with morning shift because we could not get her a doctor tonight." A copy of Robinson's Incident Report is attached hereto as Exhibit K.

146.    At all times material, the Adams County Jail was supervised by the County's elected sheriff, Travis Patton, and the administrator for the Adams County Jail, Chief Stanley Searcy. At all times material, they had the responsibility and duty to supervise, oversee and control the training and job performance of jail staff and the operation of the jail. They had the duty to see that the jail was maintained in a safe and sanitary condition, suitable for human occupation and compliant with constitutional requirements. They had the duty to ensure that the jail officials, jailers, and jail staff acted in compliance with the laws and the Constitutions of the State of Mississippi and of the United States, and did not deprive pretrial detainees of their rights guaranteed under the United States Constitution and laws. This included the duty to ensure that

the conditions of confinement of pre-trial detainees did not deprive those detainees of their right to reasonable, adequate and timely medical care.

147.    In March of 2022, at the request of Sheriff Patton, a person named Kathryn A Bryan, on behalf of Detention Operations, LLC, prepared a document called Operational Assessment of Adams County Jail.  Plaintiffs obtained a copy of this report.  And, a copy of it is attached hereto as Exhibit L.  This operational assessment of the Jail included, among other things, the following areas:  1) conditions of confinement; 2) safety and security; and 3) inmate supervision.  (Exh. L, unnumbered p. 2).  The stated goal of the assessment was "to provide the Sheriff's Office with suggestions and recommendations both operationally and functionally, to include training and/or further technical assistance ….".  Id.

148.    In the Operational Assessment of Adams County Jail report, there is a section called Medical/Mental Health Services.  There, the jail technical expert wrote the following:

> Of particular concern was the lack of any medical staff on-site for a facility this size.  It was reported that at one time (previous administra-tion) there was a contract medical vendor who provided some type of on-site medical service(s) to the inmates.  Currently inmate medical care is outsourced to the health department. …. There are still no medical staff on duty at any time in the jail.  Inmate medical claims (to include those filed by their estates) are a high-liability and often-litigated area.  Under these circumstances, the first hurdle that the Sheriff's Office and/or County would perhaps have to overcome is the utter lack of in-house medical staff, leaving medical decisions/diagnoses to unqualified detention officers.

149.    In the section of the aforesaid report called Section B Operations:  Staffing, the jail technical expert wrote that "Adequate staffing suggests that there must be the right number and type of staff, in the right place, at the right time, doing the right thing.".  This expert went on to state in this section of the report that, "the current staffing level of four officers per shift is insufficient."

150.    In the Central Center section of said report, the jail expert writes, "I have never

seen a more poorly-designed Control Room.  The security concerns here are numerous."

151.    In the <u>Conclusion</u> section of the report, the jail expert wrote the following:

> It is my unequivocal position that operations in the current facility are un-
> tenable and not able to be relieved or significantly mitigated by minor
> changes in operations.  I have significant experience with constitutional
> liability issues arising from local confinement facilities.  I have significant
> experience with the management and the improvement of local confinement
> facilities.

152.    On information and belief, none of the significant deficiencies contained in the

Report regarding the Adams County Jail were corrected between the March 2022, which was the

date the report was generated and presented to Sheriff Patton and others, and August 28-29,

2023, which was the date Lacey died in the Holding Cell.

153.    On information and belief, the conditions of confinement, at all times material,

included many policies, practices, procedures, and customs that deprived inmates, including

Lacey, of their right to reasonable, adequate, and timely medical care, and their right not to be

punished during their pretrial confinement.  On information and belief, these included policies,

practices, procedures and customs, *whether written or unwritten*, that were, on information and

belief, expressly announced, sanctioned and/or implemented by Sheriff Patton in his position as

the final policymaker of the Adams County Jail, and that were on information and belief,

condoned and/or carried out by Chief Searcy.  On information and belief, these policies,

practices, procedures and customs, which, though possibly not formally adopted, had become so

widespread, well-settled and deeply imbedded in their application, use, employment, and

acceptance in the jail to have become the policies of these Defendants.

154.    On information and belief, some of the policies, procedures, practices and

customs which constituted an element of the conditions of confinement of the Adams County Jail included, but were not limited to, not promptly providing reasonable medical care and treatment to pre-trial detainees were in clear and urgent need of medical care.

## IV.

## CAUSES OF ACION

### Count I -- 42 U.C.A. Sec. 1983

### Violation of Fourteenth Amendment Rights

### A. Unconstitutional Conditions of Confinement

155.    Plaintiffs adopt and incorporate each of the foregoing paragraphs as if restated herein.

156.    Pre-trial detainees have a constitutional right to medical care and protection from harm during their confinement.  The Fourteenth Amendment to the U.S. Constitution guarantees pretrial detainees a right to not have their serious medical needs met with deliberate indifference on the part of confining officials.  A Court will find a constitutional violation where an officer: (1) subjectively knew of a substantial risk of serious harm to the detainee; and (2) responded to that risk with 'deliberate indifference.'  A factfinder may conclude that a jail official knew of a substantial risk from the very fact that the risk was obvious.

157.    The Defendants Sherrif Patton and Chief Stanley Searcy were at all times material government officials and/or employees acting under the color of law.  Each were acting in an official capacity of Adams County and/or the Adams County Sheriff's Department while exercising responsibilities pursuant to State law at all times material.

158.    Defendant Sheriff Patten, as the acting Sheriff at all times material, was

responsible for the hiring, training, supervision, discipline, and control of the deputies and jailers under his command.  He was responsible for all actions of staff and employees of the Adams County Sheriff's Department.  He was also responsible for the supervision, administration, policies, practices, customs, and operations, both written and unwritten, of the Adams County Jail, including access to medical care.  He, at all times material, was the policy maker. Consequently, he is liable both directly and vicariously for the actions set forth in this Complaint.

159.    Defendant Chief Searcy was responsible for carrying out the policies, practices, customs and procedures, both written and unwritten, of the Adams County Sheriff's Department, which included the hiring, training, supervision, discipline, and control of the deputies and jailers.  He is liable both directly and vicariously for the actions set forth in this Complaint.

160.    Lacey Handjis' death and pre-death suffering, on information and belief, were the direct result of unconstitutional polices, practices, procedures, and customs for pre-trial detainees such as Lacy at the Adams County Jail regarding the provision of medical care.  Pre-trial detainees such as Lacey who were known to have, or believed to have, a mental condition were simply not afforded medical care at the Adams County Jail; or, certainly they were to not be promptly afforded medical care there.   Those inmates were considered to be "crazy," and nothing those inmates could say about their need for medical care would be taken seriously. And, even when they vomited blood repeatedly, as Lacey did, and when the lost their bowels like Lacey did, they were not to be taken seriously; and they were to be afforded no medical care.

161.    Further, as the evidence demonstrates, no pre-trial detainees, whether they suffered from a mental condition or not, were allowed medical care for their urgent and significant medical needs, at least during the overnight shift.  For example, and as set forth heretofore, when, at 23:28, Officer Robinson went to the outside of Holding Cell door and talked

to Lacey, she told him that she was sick, she was dying, her heart was racing, her mouth was numb, and that she had been throwing up blood. In response, Officer Robinson told her that he didn't know what to do. Lacey told him that she needed him to help her and for him to call 911. Officer Robinson replied that he could not do that. Officer Robinson also wrote in his Incident Report that night following his interview that when Lacey told him that she needed to see a doctor, he responded to her that she would have to check with morning shift because the nightshift officers could not get her a doctor that night. Exh. K.

162. Yet, another example no pre-trial detainees, whether they suffered from a mental condition or not, were allowed medical care for their urgent and significant medical needs, at least during the overnight shift is Officer Collins statement in her interview taken after Lacey died in the Holding Cell---Officer Collins said that the officers are not allowed to move any pre-trial detainees at nighttime. *See* Exh. I, beginning at or around the 16:15 mark of the video.

163. Alternatively, if it were, at all times material, that the policies, practices, procedures, and customs at the Jail did allow for pre-trial detainees such as Lacey to be provided medical care for their urgent and significant medical needs during the overnight shift period, then Defendants Adams County, Sheriff Patten, and Chief Searcy clearly failed in hiring, training, supervising, and, on information and belief, disciplining Officers Robinson, Williams, and Collins. This is evidenced by, among other things, the fact that each of those three individual defendants knew or should have known of Lacey's urgent and obvious need for medical care and failed to provide her with it.

164. Defendants Adams County, Sheriff Patten, and Chief Searcy knew or should have known of serious and obvious deficiencies in the policies, practices, procedures, and customs at the Jail related to medical care and observation of pre-trial detainees, generally, such as Lacey.

27

This is further evidenced by, among other things, the 2022 Operational Assessment of Adams County Jail report discussed heretofore.  Some of the findings in that report written by the jail technical expert were that there was still no medical staff on duty at any time in the jail.  She wrote that under those circumstances at the jail, "the first hurdle that the Sheriff's Office and/or County would perhaps have to overcome is the utter lack of in-house medical staff, leaving medical decisions/diagnoses to unqualified detention officers." *See* Exh. L, Medical/Mental Health Services Section.   She went on to opine that was her, "unequivocal position that operations in the current facility are un-tenable and not able to be relieved or significantly mitigated by minor changes in operations." Exh. L, Conclusion Section.

165.    Despite their knowledge of these serious deficiencies, these Defendants failed to make necessary changes to policies, practices, and procedures or to intervene to ensure that Lacey Handjis and others in their custody were provided adequate treatment for their serious health needs.

166.    The Defendants' breach of their duty to provide Lacey with medical care that she clearly and urgently needed violated her Fourteenth Amendment to the U.S. Constitution to not have her serious medical needs met with deliberate indifference on the part of Defendants Adams County, Sheriff Patton, and Chief Searcy.  These Defendants' breach of their aforesaid duties directly and proximately caused Lacey to experience pain and suffering and, ultimately, death.

**B.    Unconstitutional Episodic Acts or Omissions**

167.    Plaintiffs adopt and incorporate each of the foregoing paragraphs as if restated herein.

168.    As stated heretofore, pre-trial detainees have a constitutional right to medical care and protection from harm during their confinement.  The Fourteenth Amendment to the U.S.

Constitution guarantees pretrial detainees a right to not have their serious medical needs met with deliberate indifference on the part of confining officials. A Court will find a constitutional violation where an officer: (1) subjectively knew of a substantial risk of serious harm to the detainee; and (2) responded to that risk with 'deliberate indifference.' A factfinder may conclude that a jail official knew of a substantial risk from the very fact that the risk was obvious.

169.   Defendants Officers Robinson, Williams, and Collins were at all times material government officials and/or employees acting under the color of law. Each were acting in an official capacity of Adams County and/or the Adams County Sheriff's Department while exercising responsibilities pursuant to State law at all times material.

170.   **Officer Robinson**: Officer Robinson was assigned to the Adams County Jail overnight shift on August 28-29 of 2023, which was when Lacey was being held overnight at the Jail as she was awaiting her commitment hearing on the afternoon of August 29, 2023. His primary job was to monitor the continuous video surveillance feed coming from the Holding Cell where Lacey was being held and to periodically check on Lacey. As evidenced throughout this Complaint, Officer Robinson observed Lacey's obvious medical distress via the surveillance video coming from the Holding Cell. This included the blood on in the Holding Cell sink and floor that Lacey had vomited; it included the blood Lacey placed in the Hallway Floor by Lacey to prove she was in urgent need of medical care; it included the feces Lacey released on the Holding Cell floor and Lacey laying in it; and it included, through audio, all of Lacey's pleas for medical care. However, Officer Robinson took no action to obtain medical help for Lacey despite his awareness of Lacey's obvious and serious medical distress.

171.   **Officer Williams** was assigned to the Adams County Jail overnight shift on August 28-29 of 2023, which was when Lacey was being held overnight at the Jail as she was

awaiting her commitment hearing on the afternoon of August 29, 2023.  Officer Williams'

primary job was to monitor the continuous video surveillance feed coming from the Holding Cell

where Lacey was being held and to periodically check on Lacey.  As evidenced throughout this

Complaint, Officer Williams observed Lacey's obvious medical distress via the surveillance

video coming from the Holding Cell.  This included the blood on in the Holding Cell sink and

floor that Lacey had vomited; it included the blood Lacey placed in the Hallway Floor by Lacey

to prove she was in urgent need of medical care; it included the feces Lacey released on the

Holding Cell floor and Lacey laying in it; and it included, through audio, all of Lacey's pleas for

medical care.  However, Officer Williams took no action to obtain medical help for Lacey

despite her awareness of Lacey's obvious and serious medical distress.

172.    **Officer Collins** was assigned to the Adams County Jail overnight shift on August

28-29 of 2023, which was when Lacey was being held overnight at the Jail as she was awaiting

her commitment hearing on the afternoon of August 29, 2023.  One part of Officer Collins' job

was to monitor the continuous video surveillance feed coming from the Holding Cell where

Lacey was being held and to periodically check on Lacey.  As evidenced throughout this

Complaint, Officer Collins observed Lacey's obvious medical distress via the surveillance video

coming from the Holding Cell.  This included the blood on in the Holding Cell sink and floor

that Lacey had vomited; it included the blood Lacey placed in the Hallway Floor by Lacey to

prove she was in urgent need of medical care; it included the feces Lacey released on the

Holding Cell floor and Lacey laying in it; and it included, through audio, Lacey's pleas for

medical care.  However, Officer Collins took no action to obtain medical help for Lacey despite

her awareness of Lacey's obvious and serious medical distress.

173.    Moreover, independent of the Lacey's ultimate cause of death, which was low sodium, the failure of Defendants Robinson, Williams, and Collins to take the steps necessary that would have led to timely medical treatment, including transport to the emergency room of a hospital, which was nearby, caused or contributed to cause, Lacey's death and her pre-death pain and suffering.  Lacey's pain and suffering and her death would have been avoided had Lacey been timely properly transported to an emergency room for lifesaving treatment.

174.    Defendants Robinson, Williams, and Collins' breach of their duty to provide Lacey with medical care that she clearly and urgently needed violated her Fourteenth Amendment to the U.S. Constitution to not have her serious medical needs met with deliberate indifference on the part of these Defendants.  These Defendants' breach of their aforesaid duties directly and proximately caused Lacey to experience pain and suffering and, ultimately, death.

## Count II

## State Law Claim: Negligence

175.    Plaintiffs adopt and incorporate each of the foregoing paragraphs as if restated herein.

176.    All of the named Defendants owed a duty to Lacey to exercise reasonable and ordinary care in their treatment of her while she was at the Adams County Jail and under the care, custody, and control of Defendants.

177.    Defendants breached their duties, through acts and omissions, by, among other things, failing or refusing to provide any medical treatment or obtain medical treatment for Lacey while she was clearly in serious medical distress and required urgent medical care, as set forth heretofore.

178.    As a direct and proximate result of Defendants' breach of their duties as set forth

heretofore, Lacey experienced pain and suffering and death.

## Count III

### State Law Claim: Gross Negligence

179.    Plaintiffs adopt and incorporate each of the foregoing paragraphs as if restated herein.

180.    The repeated actions and omissions, as described heretofore, of the Defendants constitute gross negligence, which evidences a willful, wanton, and reckless disregard for the safety and well-being of Lacey.

181.    Defendants' willful, wanton, and reckless disregard for the safety and well-being of Lacey directly and proximately caused Lacey to experience pain and suffering and, ultimately, death.

182.    The actions and inactions of Defendants warrant punitive damages.

## IV.

## <u>DAMAGES</u>

183.    The Plaintiffs demand all damages available including, but not limited to: personal injuries, pain and suffering, loss of enjoyment of life, lost wages, lost earning capacity, and the loss of consortium, attention, guidance, care, protection, companionship, cooperation, society, services, affection, and love of Lacey, the pecuniary value of life of Lacey, the present net cash value for her life expectancy, all expenses related to the death and burial of Lacey, attorney fees pursuant to 42 U.S.C. § 1988 and contract, punitive damages, and all other damages allowable by law as the fact finder may determine to be just, taking into consideration all the damages of every kind to Lacey, all damages of every kind to any and all parties interested in the

suit, pursuant to all federal laws and the laws of the State of Mississippi, and any other relief that

the Court may deem appropriate.

Respectfully submitted,

 /s/ Jonathan P. Barrett
Jonathan P. Barrett, MSB#102426
Eric Dillon, MSB#100958


ERIC DILLON LAW FIRM, PLLC
216 West Jackson Street
Ridgeland, Mississippi 39157
601.906.5336
eric@ericdillonlawfirm.com


BARRETT LAW, PLLC
121 Colony Crossing, Suite D
Madison, Mississippi 39110
601.790.1505
jpb@barrettlawms.com