# Operational Assessment
# Adams County Jail



Prepared by:
KATHRYN A  BRYAN
DETENTION OPERATIONS, LLC
March 30, 2022

## Executive Summary

The Adams County Jail was originally constructed in the 1970's [1]

The jail operates under the Sheriff's Office with a Jail Administrator-Major assigned to oversee the day-to-day operations. The mission of a detention center is to balance inmate safety and security with solid stewardship of county and community resources.

On the day of this site visit, there were a total of 88 inmates detained with an average length of stay in jail of 218 days. Of these, 31% had misdemeanor charges and 69% had felony charges. All were pre-trial inmates. Pre-trial inmates enjoy many of the same constitutional protections as private citizens and it is critical that they are afforded all the rights due to them while held in the custody of the Sheriff.

Sheriff Travis Patten contacted me to request my technical assistance in providing an assessment of the jail facility and jail operations. This request was made due to the Sheriff's concerns about the facility not meeting the needs of Adams County. Specifically, Sheriff Patten was concerned about the lack of, outdated, and failing facilities and systems and the safety and security issues it poses to the community, staff, and inmates. In addition, the Sheriff has expressed his desire to seek input on how to improve operations.

Due to the above request, I conducted an operational assessment of the facility that was to include a review of the following areas: (1) intake and release (2) housing units (3) conditions of confinement and overall sanitation (4) programs and inmate services (5) safety and security (6) inmate supervision. The goal of this assessment is to provide the Sheriff's Office with suggestions and recommendations both operationally and functionally, to include training and/or further technical assistance as well as facility renovation or possible replacement.

Due to time limitations, a full justice assessment was not conducted as part of this project. The jail is a vital component of the criminal justice system. The importance of the jail to the criminal justice system cannot be understated and likewise the importance of the criminal justice system in assessing the jail cannot be underestimated.

This report did not overly focus on the mold/water problems, the sewage coming from the floor drains, nor the deteriorating and functionally outdated infrastructure. These issues appear to be widely-known and historically documented

---

[1] A building operating 24 hours per day, 365 days per year is the equivalent of 4.2 years for each year of operation. The existing jail is approximately 44 years old with a functional age of 184 years.

# Operational Assessment

### A. Physical Plant

Generally, it was reported to and observed by this technical assistance provider that the overall jail physical plant is not adequately meeting the needs of Adams County. Specifically, the facility is not providing the necessary safety and security to the community, staff, and inmates. The facility insufficiencies are also creating an increased liability risk to the county. The facility lacks adequate space in many areas necessary to carry out necessary jail operations safely and efficiently. In addition, areas of the facility are outdated and worn to a point where they are no longer suitable for safe and reliable detention use. Due to either the lack of facilities, the condition of the facilities, or the poor layout of the facility, daily operations and subsequently the overall safety and security of the staff, inmates, and community are negatively impacted. It must be acknowledged that the existing housing and support areas must also be examined to determine if renovations can be done within the current facility to meet the needs, or if it would be more cost effective to replace the facility.

Listed below, each facility area and operational aspect that was reviewed and/or observed will be discussed and suggestions will be provided, if possible. It should be noted that many of the operational issues needing attention are due to compounding effects of the poor facility. Sheriff Patten has reached the maximum optimization of systems within his scope and authority. Suggestions will be provided for improvements, some which may be necessary to mitigate the current facility inadequacies until renovation or replacement can take place. Suggestions will not include items specific to what facility renovation or new construction would contain as this requires additional assessment and planning.

Visitor Entry/Lobby

The current main lobby serves as the primary access point for the jail, sheriff's office, 911 center and emergency management. Black mold and water-damaged ceiling tiles were visible. This area contains a small inmate visitation room, 2 public restrooms, and 2 service windows for the sheriff's office and for the jail. As such, the lobby serves a multitude of functions. For the jail alone, it is a place for:

- Bondsmen to post bond and/or inquire about bonds,
- Law enforcement officials to inquire about warrants,
- The public to ask questions concerning inmates, etc.,
- The public to come in for fingerprints,
- County nurses to drop off medications for inmates (more on this later in the report),
- Attorneys and their staff to come for visitation with their clients,
- The public to come for visitation with inmates,
- The public to wait for the release of inmates,

This area does not allow for staff to inspect visitor property or conduct searches of those that may need to enter the secure portion of the jail. Modern jail lobbies and entrances allow for a controlled space for direct contact with the public and a processing area so that all persons and items to be brought into the jail can be properly scanned and searched. The current lobby area does not provide space for detection equipment, regardless of size, which is customary for jail entrance security. The lack of necessary space and equipment in this area is a significant security concern.

Inmate Visitation

The inadequate size and configuration of the visitation room is of concern. Attorney visits are to be private and confidential, thus only one attorney at a time can visit and there can be no public visitation during this period. There are no distinct spaces for male and female visitation, thus they must be conducted on different days, significantly reducing the amount of time allocated to each inmate for visitation. Many modern jails utilize video visitation for security and efficiency reasons. Such visitation can take place without having to move inmates from the housing area as kiosks or tablets are used. Visitors may also visit from a remote kiosk or from home using a PC. Video visitation also allows for the recording of visits for enhanced security, monitoring, and investigation abilities.

For the Adams County jail, this would be problematic at best. Due to the poor design of the building, the ceilings are low, forcing conduit to be run within easy reach of inmates. Additionally, there is no room to securely mount a kiosk or wall station in an area of the housing units that would allow for privacy of the public visitors (which could be minor children) on the monitor from the other inmates in the unit.

Inmates' ability to "associate" is protected under the First Amendment of the Constitution. Limiting inmate visitation without a legitimate penological interest can be viewed as taking away a "liberty interest" and result in an unnecessary exposure to liability for stakeholders.

Administration

While not a constitutional issue, the lack of basic function in what serves as the "administration," area is concerning. As an experienced jail administrator, I have a deep understanding and appreciation for the critical component of jail management. I have had the unique experience of managing three facilities as well as providing technical assistance to countless other local confinement facilities. This experience has proven that a lack of, an insufficiency of, or poorly-designed administrative space can have serious detrimental effects on the overall operation of a jail, no matter how skilled or agile the staff are in "making do."

The administration space is so limited that the Jail Administrator shares an office with a subordinate. His office also serves other functions:

- Staff run computer checks for wants and warrants,
- Storage for inmate supplies
- Staff counseling area.
- Staff break area

When staff counseling is conducted by someone other than the Jail Administrator, space is so limited that he must leave his office. His work is also interrupted by staff needing supplies. His work is also interrupted by requests for computer warrants searches.

The second in command of the jail is not co-located with the Administrator. Rather, that office is in a multi-use area of the administration section. This office is an example of Sheriff Patten's administration optimizing what they have as there previously wasn't this office space until he had it built. Even so, it is inadequate and the location of it is a safety and security concern. This office opens directly into a very small hallway (see attached floor plan) where the intoxilizer machine is located because there is no other viable option for its placement. Arrestees are brought to this machine by the arresting agencies for the purposes of determining the amount of alcohol in the system for criminal charging purposes. To be clear, these are arrestees, not yet detainees in the custody of the jail. As such, if there is an altercation with a combative arrestee (as is sometimes the case) and detention officers respond (or the Lieutenant from his office adjacent to the machine), and the detention officers use force on a subject not lawfully in their custody, they may be liable for operating outside the scope of their legal authority to apply force.

This administrative space lacks a conference area, sufficient records storage and processing, a training room, locker rooms, and storage areas for staff. Since there is no locker room for staff, they are not able to shower off, wash their boots, etc. should they come into contact with body fluids or other contaminants. This forces them to get into their personal vehicles and go home to clean up. This potentially contaminates their vehicles and their homes and takes them off of shift for the duration of the time it takes for them to clean blood, urine, feces, vomit, etc. off of them and return to work.

If jail staff have need of a conference table for meetings, etc., they use the table in the Sheriff's Office. This table is located in the office of the Sheriff's Administrative Assistant and is another space that was cobbled together at the behest of Sheriff Patten. Again, this does not allow for the proper functioning of either the Assistant or whatever meeting is being conducted. This conference table also must serve as de facto training area as there is no proper space for the on-boarding of new officers or for in-service training. There is an off-site training room, however there is no ability for wi-fi, thus limiting its use.

> SUGGESTION: There is no viability for expansion to the current facility for conference or training space. The County rents or purchases an off-site space to be used for training, meetings, etc.

Sally Port

Access to the facility for new arrests is unsecure. The sally port (a vestibule for law enforcement vehicles to park and offload their arrestees) is poorly designed and rife with security issues.

Vehicles with arrestees approach the sally port through a narrow drive behind the jail that is filled with vehicles, cleaning equipment, etc. and must pass directly next to the maintenance shed filled with tools, mower equipment, etc. This area also serves as the food delivery access, so law enforcement officers bringing in arrestees must wait if there is a food delivery truck offloading supplies to the kitchen. The maintenance shed gates are open if county workers are in this area and inmate workers (trustees) are often here as well. Should an arrestee get away from the arresting officer during this process (as can occur), they would be mere steps away from items easily used as weapons. There is a gas pump immediately outside of the sally port and while it is kept minimally filled, it is a fire safety hazard (more on fire safety later in the report). There is no room for a scanner or metal detector for arrestees or for the inmate workers who leave and re-enter the jail via the sally port or the kitchen. Even if there was room, the equipment could not be placed near the entrance to the kitchen or the sally port as it would be exposed to the elements through the decorative slits in the brick façade. There is room for only one vehicle in the sally port, so other law enforcement officers with arrestees or transport officers picking up inmates must wait their turn. While this waiting might seem a trivial matter, any unnecessary waiting on the cumbersome jail process keeps these officers off of the street and away from their patrol or other duties.

As with most areas of the jail, the poor design forces areas that should be single-purposed to be multi-purposed. This is not faulty management; this is evidence of many jail functions being compromised by poor design. A sally port can be one of the most dangerous areas during the arrest process. Here, inmates may realize they are in a point of no return, may have a fear of incarceration, may realize what they have to lose (kids, job, future) and they may become combative. In addition to receiving newly-admitted inmates, the sally port serves other functions:

- As a trash storage area-at the time of the site visit for this report, there were approximately 20 bags of trash stacked up in a narrow sally port. It was reported that there is only one trash dumpster shared by several buildings with no room in the parking lot for additional bins. This storage practice is unhygienic, causes issues with pests, and is a safety hazard while dealing with arrestees in this area.

- Inmates who are put in a "restraint chair" for behavioral or mental health reasons are "parked" in this area, regardless of the weather. There is simply no other area to place this chair. This is problematic for several reasons. It is outside of the secure confinement area. It is away from the consistent supervision of staff.

- There are no medical or mental health staff on site to conduct the recommended wellness checks of the inmate, it is a security and privacy issue as this area is easily visible to the public from the street, it is a safety concern with arrestees in close proximity to an inmate in the restraint chair as they enter the jail, and it is a safety concern for the easy passage of contraband from the outside as there are gaps designed in the exterior walls of the sally port that are steps away from the street.

- The one-vehicle sally port is also used to transport inmates to outside medical appointments, to other facilities, to court out of the county, etc.

Booking / Release

"Limited"[2] space is available to process an arrestee and conduct necessary reporting requirements. The arresting officer processing space is non-existent. The facility lacks a pre-booking area that would allow for a space for law enforcement processing or interviewing. A Pre-booking space is common in modern day jails. No metal detector or body scanner is present in this area, nor is there sufficient space for these devices. Due to the ability of arrestees and reporting weekenders to secrete contraband such as drugs, weapons and lighters, such detection devices are paramount to safety and security.

An appropriate area for detention officers to begin processing is non-existent. Detention officers are forced to strip search arrestees in the stairwells in plain view of anyone on the stairs of the opposite sex, in plain view of anyone walking down the hall as there is a window in the door into the stairwell, and are in peril of being pushed down the stairs by a combative or non-compliant inmate. This area is not sterile and does not provide for video observation of staff during the process which can also present a PREA issue (more on this later in the report).

The jail lacks the typical intake space and holding cells necessary to separate, supervise, and efficiently process arrestees. Due to lack of appropriate housing, the two padded cells in this area are also used for special needs and special management inmates (i.e., suicide watch, administrative segregation, medical, etc.). This is especially concerning as the intake area is a high-risk area because many unstable inmates are processed here. Sufficient means to separate, house and directly observe inmates in this area is paramount to safety and security.

This facility also does not provide shower facilities for newly-admitted inmates. This is of concern as inmates are not showered before they enter general housing which can assist in controlling lice, checking for injuries, decontamination from dirt, blood, other body fluids, etc.

---

[2] During my 30 years as a jail practitioner, as a law enforcement officer processing arrestees, and as a consultant, I have seen over 100 local confinement facilities. I have asseen very well-desdned and very poorly-designed intake and booking areas and those in between. It is not often experts can speak in absolutes about any issue. However, I can definitively assert that I have never seen any jail intake/booking/receiving area remotely as ill-conceived as in the Adams County Jail.

The booking process takes place in a separate room next to a common corridor that is also used by the public who have come to be fingerprinted, causing a security concern. This booking space is small and unsafe as it cannot be observed by staff not directly inside of the room. The immediate booking area lacks the typical change over and shower areas necessary to shower inmates, exchange clothing, and conduct further searching such as strip searches.

The area also lacks property storage normally located in this area. The jail has improvised and utilized several storage areas within the jail, within the administrative areas and within the Sheriff's Office to store inmate property. This creates inefficiencies and accountability issues due to the different locations and because the areas are not monitored by video or card access as expected in a proper detention setting. Additionally, these storage areas have black mold and water leaks which can damage property. The lack of appropriate storage is a concern – both in terms of volume of storage and the types of items stored together. It is very difficult to keep vermin at bay when there is insufficient storage capacity in appropriate locations.

Again, this area serves multiple purposes which is not congruent with best practices for a booking/processing/release area. The room is so small that only one inmate at a time can be booked into jail or released from jail. This area also serves as space for video arraignment where the inmate is brought down from housing, placed in front of the computer monitor and "Skypes" with court officials. Of course, this presents the following regular and on-going difficulties :

- If multiple arrests come in, they must all wait their turn, even though there is not sufficient space for waiting.

- If a male inmate is in this room, that male inmate not only has to finish being processed in that room, but he must also be escorted up the common elevator and placed in his housing unit before the officer can go to female housing and take a female down the common elevator to be processed. This is extraordinarily time-consuming and burdensome for the officers.

- If the room is otherwise occupied and an inmate has been released from custody, whether by serving the duration of a misdemeanor sentence, post-adjudication, or by posting bond, they must be released expeditiously, or jail staff may be infringing on an inmate's constitutional protection of due process. This may not happen due to the detention officers being forced to wait to use this room.

- If the room is otherwise occupied and an inmate has been summoned to a video court appearance, the inmate must be produced to court expeditiously, or jail staff may be infringing on an inmate's constitutional protection of due process and the inmate may face court sanctions for failing to appear when called. This may not happen due to the detention officers being forced to wait to use this room.

It is clear that the poor space planning of this area forces jail staff between several rocks and a hard place when trying to decide in which order they should address these various priorities.

Which is the least deleterious choice here?

Housing

Current housing consists of 9 dorms with a total of 108 beds. There are an additional 2 padded cells, but they are not categorized as housing bed space. Operational capacity accounts for peaking (unusually high arrest rates due to drug arrests, and other city or county events, etc.) and classification factors (allowing space for inmates to be housed according to their classification – gender, security, special needs). Operational capacity is expressed as a percentage of design capacity – commonly 80% of the design capacity. This percentage, which accommodates the peaking and classification factors, will vary from one facility to another, based on factors such as the types of inmates held, housing unit design, and proximity of staff.[3] Given this calculation, the operational capacity of the Adams County 108-bed facility is <u>86</u> inmates. Any population count *over* this figure should be considered "overcrowding." Overcrowding itself is not a constitutional issue, however if the overcrowding results in "serious deprivation of basic human needs," then constitutional concerns are raised.[4]

The Adams County jail is a multi-storied structure. There are 5 housing units on the third floor and 4 housing units on the second floor. All housing units must be accessed by either a stairway or one elevator. The dorms are similar in size and layout. There are no outside exercise yards, nor is there sufficient recreation space inside the facility. The dayroom areas also contain the inmate telephone, the showers, and the benches where inmates eat, write letters, play cards, watch tv, etc. And of course, these dayrooms are all inside, so inmates have no opportunity for outside recreation. Thus, there is no opportunity for fresh air or direct sunlight, both which are important to physical and mental well-being.

---

[3] Sources: Martin, M. D., & Rosazza, T. A. (2004). Resource Guide for Jail Administrators. Washington, DC (320 First St., NW, Washington 20534): U.S. Dept. of Justice, National Institute of Corrections; Beyond the Myths (U.S. Justice Department).
[4] *Bell v. Wolfish*, 441 U.S. 520 (1979)

The 4th Circuit Court of Appeals has set precedence on the issue of a lack of "constitutionally adequate" recreation. The court found that the jail did violate the due process rights of pre-trial detainees under the 5th and 14th Amendments and the 8th Amendment protection against cruel and unusual punishment for convicted inmates. Additionally, the courts have not allowed these unconstitutional conditions to exist *because it would be financially burdensome to correct*.[5]

## Special Management Housing

The number and design of special management cells is inadequate. The single "isolation" cells adjacent to the entrance from the sally port do not provide for inmate visibility. Inmates here to not have the opportunity for large-muscle exercise. The cells in this area are not conducive to supervision. Inmates in these cells for behavioral reasons still have to be taken to general housing for a shower, which is a safety concern. Inmates in these cells can see and hear intake and release inmates, officer movement in and out of the Control Room, and are within reach of inmates "parked" in this area awaiting court, processing, etc. Special management cells are an important part of safe inmate management in a jail. These cells are used to house and manage those that are under the influence of drugs, are suicidal, are actively disruptive and/or assaultive and those that need medical isolation. One of the housing units is used for the seriously mentally ill (SMI) inmates. This housing is also inadequate for housing, programming, and the adequate supervision needs of this population.

## Prison Rape Elimination Act

On September 3, 2003, a federal law was enacted to address the problem of rape and sexual abuse in confinement facilities. The Prison Rape Elimination Act (PREA) became effective in 2012 and the standards apply to all correctional and detention facilities, including federal, state, and local jails, prisons, police lockups, private facilities, and immigration and detention facilities. [6]

PREA Standard 115.15 states that, "The facility shall implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Such policies and procedures shall require staff of the opposite gender to announce their presence when entering an inmate housing unit."

The layout of the housing units in the Adams County jail creates a privacy issue for inmates. The toilets and showers are exposed to other inmates as well as staff of the opposite gender. Dorms are lacking privacy curtains or stall doors for the showers and/or toilet areas. Due to this, the inmates are misusing sheets, towels, and clothing by hanging them in these areas for privacy.

---

[5] *Parnell v. Waldrep*, 511 F. Supp. 764.
[6] https://www.prearesourcecenter.org/about/prison-rape-elimination-act

SUGGESTION: Install "pony walls" in between the shower stalls and toilets. This will not completely address the privacy issues but will mitigate their effects.

PREA standards apply to the Adams County Detention Facility even though they have not undergone a PREA Audit. Inmates still have the ability to file a PREA-related complaint and litigate PREA issues in federal court. Indeed, not being PREA-compliant with an audit and having a facility with design flaws that exacerbate non-compliance increases the exposure to liability. I have conducted PREA audits as well as having PREA audits conducted on facilities under my command. Therefore, I can say with a certainty that the current structural design of the Adams County Detention facility will be a nearly insurmountable barrier to PREA compliance, regardless of any possible modifications made to it.

SUGGESTION: Assign a PREA Coordinator and begin to implement the policy and standard provisions. Fully document where facility and resource allowance hinder compliance.

SUGGESTION: Consider resources of the PREA Resource Center to further assess opportunities to improve prevention, reporting, response, and audits. www.prearesourcecenter.org

## Medical/Mental Health Services

Of particular concern was the lack of any medical staff on-site for a facility of this size. It was reported that at one time (previous administration) there was a contract medical vendor who provided some type of on-site medical service(s) to the inmates. Currently inmate medical care is outsourced to the health department. This can be a beneficial partnership as it keeps the money between county entities instead of to an outside (possibly out-of-state) vendor and I have experience with the successful development and oversight of this inmate medical management model. However, in this case, there are still no medical staff on duty at any time in the jail. Inmate medical claims (to include those filed by their estates) are a high-liability and often-litigated area. Under these circumstances, the first hurdle that the Sheriff's Office and/or County would perhaps have to overcome is the utter lack of in-house medical staff, leaving medical decisions/diagnoses to unqualified detention officers. The difficulty is that if a contract vendor was to resume services, or if the County nurse were to be in-house, there is no space adequate, nor an opportunity for expansion of the current footprint, to provide inmate medical care.

SUGGESTION: Conduct a cost-benefit analysis of on-site medical and mental health care, to include:
- Man-hours for transport and wait time
- Transportation costs
- Increase in the quality and timeliness of services
- Reduction of related inmate issues (behavioral, etc.)

Inmates are isolated from the mainstream of our healthcare system. Proportionally, they are a population with more health issues than the general population as they have not been recipients of other than sporadic health services prior to entering the detention facility. This, coupled with histories of substance abuse, poor diets, and/or mental health issues, make this an at-risk population for a range of issues.

The Supreme Court has held that we have an obligation under the 8th and 14th Amendments to provide "adequate" medical care that meets a "community standard." [7]

Three basic rights guaranteed by *Estelle:*
1. The right to access to care
2. The right to care that is ordered
3. The right to a professional medical judgement

There is no "firewall" between the County and a private company or with another County entity (i.e., Health Department). "Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner. Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." [8] In other words, the County and the Sheriff do not in any way reduce their liability or responsibility for care by an agreement with a county nurse or with a medical vendor.

Inmates needing medical care in the Adams County jail put in a request for services. Once they have an appointment, an officer takes the inmate out of the secure confines of the jail, out the front door of the jail, and down the sidewalk in front of the jail. While conducting the on-site visit, I observed vehicle traffic, walking traffic, and buggy tours for tourists along this same street where an inmate wearing a jail jumpsuit, shackled, and handcuffed was escorted to the medical appointment. This practice raises several privacy and safety concerns. Additionally, it was reported that in inclement weather, appointments can be delayed which raises concern under *Estelle*.

When newly-admitted inmates are processed, it is the detention officer (medical layperson) alone who asks the requisite medical and mental health screening questions. These inmates are not seen by any medical provider for 48-72 hours after they are admitted to the facility. Further, detention officers are not able to take simple vital signs from these new inmates. It is common practice in jails to take vitals at intake as they are useful in promptly detecting or monitoring medical problems. Taking vital signs can prevent the often unnecessary need to send an inmate out to the emergency room.

---

[7] *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50L. Ed. 2d 251 (1976)

[8] West v. Atkins, 487 U.S. 42 (1988)

A few times a week (not every day), the county nurse will come to the jail and will take the vital signs of inmates she is alerted to by detention staff. Again, these officers are laypersons for the purposes of making medical determinations of which inmates need to have their vitals taken by the nurse. If the nurse has to take vital signs, the area in which she must do this is problematic. The nurse must use the same very small space that is used to initially process new arrestees. There is a small bench (see attached floor plan-purple circle), and this area is approximately 3' x 3'. This area is adjacent to a holding cell where inmates wait for court, etc. There is a safety and privacy concern with this practice. There must be confidentiality every time a medical provider engages with an inmate, for whatever reason. There is no privacy in this area whatsoever. Additionally, there is the safety aspect in that there is no way to secure the inmate should they become agitated or combative, thus the nurse's safety cannot be assured. Further, even though the current provider is a Nurse Practitioner, if, while taking vitals, the inmate needs more advanced care, she would not have the equipment with her or available to her in the jail to stabilize the inmate. Thus, even though there is a well-qualified medical professional there, there will still be costs incurred with a trip to the emergency room.

Inmate medications are another area of concern. Several times a week, the nurse brings inmate medications to the jail. They are appropriately packaged in pill packs however the jail lacks sufficient space to provide for their secure storage. During the site visit, I observed that the inmate medications are kept in a cookie tin in the Control Center. Even though there is an agreement between the Sheriff's Office and the county nurse, passing medications to inmates is not one of her assigned duties. Detention officers pass inmate medications. This is concerning. Assuming that records are maintained to show that the proper inmate got the proper medication at the proper time, this practice should pass constitutional muster.[9] However, this case was decided on the issue of deliberate indifference, not on negligence. Detention officers require specific training on medication pass to ensure inmates take their medications and do not hide it by "cheeking," secreting it between their fingers, etc. They are not medically trained on actions to take if an inmate has an adverse reaction to a medication. They are not able to answer an inmate's questions on the medication.

During the site visit, I also observed "PRN"[10] meds on the counter in the Control Center. These are medications we would refer to as "over the counter" such as an antacid, analgesic, etc. It was reported that detention officers give these out at will since there is no nurse on duty. This is concerning as inmates can experience adverse reactions to these and/or they can be contraindicated with other medications an inmate may be prescribed.

> SUGGESTION: Implement inmate identification bands for the accurate identification of inmates for medication pass.
>
> SUGGESTION: In the absence of an on-site medical provider, obtain "Standing Orders" from the nurse for PRN medications.

---

[9] *Zentmyer vs. Kendall County*, 220 F.3d 805 (7th Cir. 2000)
[10] Pro Re Nata (as needed)

Inmate Programming

Except for the inmate workers, inmates remain in the housing unit for the entire day with the dayroom being considered the recreation area. Any person left with so much unoccupied time will often find counterproductive activities to fill that time. This is very apparent based on inmate climate and the current damages to the housing units. If the reduction of recidivism becomes part of a new collaborative criminal justice initiative, then it is critical that there is thoughtful planning and meaningful implementation of a process to address inmates' criminogenic needs.

As noted earlier in this report, there is no program space in the jail. The benefit of providing access to programs, work opportunities, and leisure activities is it keeps inmates productively occupied, but also has the potential to address inmate needs. The goal would be to fill the inmates' day with productive activities. This can be in the form of expanded work crews, structured activities, and unstructured activities. The only activity noted in the housing units was watching TV and playing cards. It was clear during the site visit that there was a lack of any spare space that could be used for programming.

Central Center

The Control Center is the hub of operations in a jail. Movement is controlled from this area, surveillance of the facility via camera monitors is conducted here, and sensitive items are maintained in this space. As such, it should be designed to be the most impenetrable of rooms. This is not the case in Adams County.

The Central Control does not have a secure vestibule at either door to provide for the necessary maximum security of this area. Due to this location and lack of secure vestibule this area is vulnerable to an inmate take-over. The control center does have the necessary space and equipment to perform critical control, communications, and monitoring. To speak again in absolutes, I have never seen a more poorly-designed Control Room. The security concerns here are numerous.

With the current staffing levels, it was reported that the Control Center is staffed with one detention officer while the three other officers on a shift (should) perform duties throughout the facility. The design of this facility forces the other three officers to spend significant parts of their time in the Control Center which takes them away from inmate-focused duties. This is problematic. If the jail were more appropriately designed, it would be reasonable for this to be a one-officer post given the size of the facility. Officers should be assigned very few duties here: watching the cameras and operating the doors. As this is not the case in this facility, the following additional duties/activities occur here:

- Officers answer the main jail phone
- Officers issue keys
- Officer issue inmate restraints
- The public come to the window to ask questions, get fingerprinted, etc.
- Bondsmen come to the window to post bond
- Officers use this space to write their reports
- Officers use this area to eat their meals
- Officers store inmate property here
- Weapons/compliance tools are stored and issued here
- Officers watch the two holding cells from this area
- The county nurse comes to the window to drop off inmate medication, which is stored here
- Law enforcement officers come to the window to requests active warrants
- Attorneys come to the window to request to see their clients

Another security concern with the Control Center/Lobby is that anyone coming to the lobby window of the Control Center can see directly into the Control Room. They can see the camera monitors, the locations of keys, tools, weapons boxes, etc. There are two other windows in the Control Center that look into the jail. These windows have vertical blinds mounted on them. Staff are compelled to keep the blinds closed as inmates are regularly directly outside the windows waiting to be processed or are talking on the inmate phone mounted adjacent to a window. If the blinds are open, inmates can see the cameras (and can determine where the blind spots are with no camera coverage), see the locations of keys, tools, weapons boxes, valuable property, etc. If the blinds are closed to prevent this, staff cannot see what is going on in the jail.

Which is the least deleterious choice here?

General Security

Perimeter security- each perimeter opening (exterior access) should have sally ported (security vestibule) doors to prevent inmates from overtaking staff in an attempt to escape. This should include access from the kitchen, the laundry room, Sheriff's Office, etc. There were several areas llacking a security vestibule.

Interior movement- As evidenced by the attached floorplan, the corridor adjacent to the Control Center poses a safety and security concern. Private citizens coming to be fingerprinted (for a background check , etc.) must traverse this hallway. Arrestees must traverse this hallway to get to the intoxilyzer machine .

Emergency Response

Medical event: If an inmate has a medical event and is not ambulatory and EMS responds with a gurney, the hope is that the elevator is working. Otherwise, EMS personnel must negotiate the gurney and the inmate down several flights of stairs. If the elevator is operable, it is very tight quarters for medical personnel, the gurney, and security staff.

Fire: In the event of a fire, the elevator will be inoperable and the stairwells the only avenue of egress. The current structure provides no sprinkler system, no air evacuation system, and it was not determined on the site visit if there are operable dampers in the duct work. If an evacuation is required, there is no perimeter fencing so there is no containment area outside of the jail. There is not enough room in the sally port to evacuate the entire population of inmates to and there are safety issues with whatever might be stored in there or laying about at the time of evacuation. If there are inmates who are overcome by the smoke, officers would have to traverse several flights of stairs (if the stairs are not in flames), manipulate keys to manually unlock the doors (if the officers themselves are not overcome with smoke/exertion and they can see the keys and the locks), locate the inmate(s), drag/carry them out of the unit, down the hall, down the stairs, and out of the facility. It would be difficult to account for all inmates in this scenario. This scenario is not fantastical and well within the realm of a possible event. Fire can be ignited from systems failure(s) or from inmates (common occurrence). I have no suggestions to mitigate this risk to life.

In 2002, a jail in western North Carolina burned and 8 inmates were killed. The circumstances in that event are remarkably similar to Adams County. That jail was a two-story brick facility built in 1955 and had no sprinkler system or air evacuation system. A detention officer smelled smoke and fireman were at the scene just a few minutes later. Already, inmates on the first floor were unconscious and had to be carried to safety. Smoke was so thick in the stairwell, firefighters could not use it and had to gain access to the upper jail floor via a walkway from an adjacent structure. Smoke and heat made further passage towards the inmates on the upper floor impossible. One inmate in the first floor holding cell died as well as 7 inmates trapped on the upper floor. All died of smoke inhalation. The jail has never reopened. The county sends their arrestees out to other counties and pays for their housing.[11]

Laundry

The laundry consists of a single washer and dryer. The space lacks a bathroom for inmate workers, chemical storage space, clothing and linen storage and space for laundry processing. Laundry must be transported through the kitchen to access the washer area. At the time of the site visit, there was standing water in the floor drain. It was reported that this was a regular occurrence.

Kitchen/Food Service

The kitchen lacks sufficient space for food preparation, dry storage , cold storage, and freezer. It lacks adequate lighting and ventilation.

---

[11] https://historycollection.com/10-deadliest-prison-asylum-fires-time/7/ accessed 3/28/2022.

Sanitation

The operational assessment included an assessment of life, health, and safety-related issues. Problems or shortcomings in these areas may result in illness or injury to inmates, staff or others who are associated with the facility. The connection between some of these types of conditions and illness/injury is obvious:

- Unsanitary facilities may cause a variety of medical conditions.
- The presence of pests or vermin may cause injuries, such as an insect bite or rodent bite.
- Inadequate or contaminated ventilation may cause illness.
- Mold can cause illness and breathing problems.
- Excessive amounts of combustible materials in cells creates a potential firehazard.

Sufficient lighting- artificial and natural-also promotes health and may increase safety for inmates, staff, and others. Metal plates over the windows in the housing units may address the broken panes, but it also diminishes natural light to the point that inmates are not able to distinguish day from night. This sensory deprivation is not ideal for anyone, especially those who linger months or years in this facility awaiting adjudication. Ventilation and temperature systems may become less effective over time, especially if routine and preventive maintenance are not consistently provided. In addition to a breakdown in the equipment, other factors may reduce the effectiveness of these systems, such as dirty air vents that become clogged and restrain air movement.

### *Section B Operations:*

Staffing

Adequate staffing suggests that there must be the right number and type of staff, in the right place, at the right time, doing the right thing. The right number of and having staff at the right place is a product of a staffing analysis. A staffing analysis will not only determine the number of staff positions needed to fill the necessary posts, but it will also map out activity levels and determine if there is a need to adjust where staff are allocated to ensure you have the right staff in the right place at the right time.

Given the type of officer-intensive supervision required by the poorly-designed facility, the current staffing level of four officers per shift is insufficient. Without a formal needs assessment, I would still posit that the following posts, at a minimum, need to be covered on a shift:

- Control Center      2 officers
- 2nd Floor Supervision      1 officer
- 3rd Floor Supervision      1 officer
- Detention Supervisor      1 officer
- Floor runner[12]      1 officer
- Fire Safety[13]      1 officer
  **TOTAL PER SHIFT**      **7 officers**

SUGGESTION: Conduct a staffing analysis / needs assessment. Consider resources of the National Institute of Corrections to assist. https://nicic.gov/staffing-analysis-workbook-jails-0

Conclusion

The Sheriff and his administrative team are committed to meeting the requirements to operate a safe and secure jail- as evidenced by the Sheriff's request for this Technical Assistance. While the facility currently provides many challenges and obstacles, it is the goal of this report to offer some suggestions on how to mitigate the facility challenges and improve overall operations.

It is my unequivocal position that operations in the current facility are untenable and not able to be relieved or significantly mitigated by minor changes in operations. I have significant experience with constitutional liability issues arising from local confinement facilities. I have significant experience with the management and the improvement of local confinement facilities. It is with this depth of practical and academic understanding that I assert that the only feasible path forward for Adams County is with a new jail facility.

---

[12] Assigned to escort inmates to areas outside of the housing units so the officer conducting security rounds does not leave the area. Also assigned for intake and booking procedures, med pass, meal service, mail call, and visitation.

[13] Assigned to travel the facility checking for smoke, fire hazards like combustibles and fuel spills.

