IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

RUSSELL HANDJIS, INDIVIDUALLY, AND ON BEHALF
OF THE WRONGFUL DEATH BENEFICIARIES OF
LACEY ROBINETTE HANDJIS; AND
SHERRY HANDJIS, ON BEHALF OF JACK HANDJIS
AND TYLER HANDJIS, MINOR CHILDREN OF
LACEY ROBINETTE HANDJIS                                       PLAINTIFFS

V.                                          CAUSE NO. 5:25-cv-00005-KS-BWR

ADAMS COUNTY, MISSISSIPPI; ADAMS COUNTY
MISSISSIPPI SHERIFF'S DEPARTMENT; SHERIFF
TRAVIS PATTEN; CHIEF STANLEY SEARCY;
OFFICER WANILA WILLIAMS; OFFICER VATISHA
COLLINS; OFFICER CLEOPHUS ROBINSON;
JOHN DOES 1-5; AND ABC CORPS. 6-10                            DEFENDANTS

<u>MEMORANDUM OF AUTHORITIES IN SUPPORT OF
DEFENDANTS OFFICER WANILA WILLIAMS, OFFICER VATISHA COLLINS,
AND OFFICER CLEOPHUS ROBINSON'S
MOTION FOR JUDGMENT ON THE PLEADINGS</u>

**COME NOW**, Defendants, Officer Wanila Williams, Officer Vatisha Collins, and Officer

Cleophus Robinson, in their official and individual capacity, by and through counsel, and submit this,

their Memorandum of Authorities in Support of their Motion for Judgment on the Pleadings pursuant

to Rule 12(c) of the *Federal Rule of Civil Procedure*.

I.      **PREMISE**

        Lacey Handjis ("Decedent") died of hyponatremia dehydration in the Adams County Jail on

August 29, 2023. Defendants Officers Cleophus Robinson ("Robinson"), Wanila Williams

("Williams"), and Vatisha Collins ("Collins") were scheduled for the overnight shift on August 28-29,

2023, the night of Decedent's death. Throughout the night, and to varying degrees, each officer

interacted with Decedent and came to the same conclusion – she is a mental patient that is acting the

way mental patients often act. Nowhere in Plaintiffs' amended complaint is it alleged that any of the three (3) officers both had facts before them that would allow for the inference that Decedent was in serious need of medical attention and that they, in fact, made the inference. Instead, in Plaintiffs' complaint and attached videos, each Defendant is consistent – they believed she was mentally disturbed, not in any medical danger. The only relevant inquiry is what judgment they made; the quality of the judgment is irrelevant.

Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." The shield of qualified immunity cannot be pierced by simple negligence, or even gross negligence, and in the context of denial of medical care, a plaintiff must show that defendants were deliberately indifferent to a serious medical need. Plaintiffs' complaint fails to allege facts that Defendants had information by which they could have inferred Decedent was having a medical emergency and that each Defendant actually made the inference.

Because Plaintiffs fail to allege facts that pierce the qualified immunity shield, Defendants Officer Wanila Williams, Officer Vatisha Collins, and Officer Cleophus Robinson are entitled to qualified immunity and must be dismissed.

## II.    INTRODUCTION

Plaintiffs bring three (3) claims against the named Defendants before the Court on this motion. First is a is a state law claim of negligence, alleging that the Defendants should have known Decedent needed serious medical help but failed to provide it. Second is a state law claim of gross negligence, alleging basically the same thing as the negligence claim. Lastly, Plaintiffs bring a 1983 claim for unconstitutional denial of medical care, alleging that the Defendants were deliberately indifferent to Decedent's serious medical needs.

All claims against the present Defendants must be dismissed. First, the claims for negligence and gross negligence are not cognizable under Mississippi law. The Mississippi Torts Claims Act, *Miss. Code Ann.* §11-46-1, et al., clearly holds that the state and its employees are immune from any claim arising while the plaintiff – or decedent – was an inmate at a jail. Second, and to the extent Plaintiffs are bringing a claim against the named Defendants in their official capacity, those claims must be dismissed as duplicative of the *Monell* claims Plaintiffs bring against the County. Lastly, the named Defendants are entitled to qualified immunity. It is well settled that a failure to provide medical care claim requires both that each defendant have sufficient information by which they could infer that the plaintiff had a serious medical need and that each defendant *actually made the inference.* Plaintiffs have not done so, and these Defendants should be dismissed..

## III.    STATEMENT OF FACTS

As only Defendants Officers Cleophus Robinson, Vatisha Collins, and Wanila Williams are before the Court for this motion, the facts below will adhere only to the events of August 28-29, 2023 for which the Defendants were actually present, which occurs from roughly 17:51:00 on August 28, 2023 when Robinson and Collins arrive until Robinson – the last officer present – left at 06:02:00 on August 29, 2023.[1] As Plaintiffs attached all security footage and interviews to their complaint, Defendants will reference to Plaintiffs' exhibits throughout and will reference the video in military time, as Plaintiffs have.

At or around 17:51, Robinson and Collins arrived at the control station.[2]   Shortly after

---

[1] *See Meadours v. Ermel*, 483 F.3d 417, at 421 (5th Cir. 2007)(citing to well-established law that where it is not alleged the defendants acted in unison, a court must "examine each individual defendant's entitlement to qualified immunity separately."); *See also*, Plaintiffs' Exhibit D, Control Room Video.
[2] Plaintiffs' Exhibit D, Control Room Video.

arriving, the day shift officers informed Robinson and Collins of Decedent's status.[3]  The day shift officers reported nothing about a potential medical problem.[4]  Williams arrived for her shift at or around 18:15:15.[5]

Defendants first interacted with Decedent when they heard her yelling to the control room at or around 19:43:15.[6]  Robinson tried to communicate in return but appeared to not understand her, so he went to check on her.[7]  She asked him for toilet paper, and he provided her some.[8]

At or around 20:43:40, Decedent appeared to hear the control room door open and called for an officer.[9]  She asked for 911, to go to bed, and apologized for what she posted on Facebook.[10]  She saw Robinson and said, "**Officer I'm sorry. Please come talk to me I'm scared**."[11]  Robinson and Decedent had a five (5)-to-seven (7) minute conversation where Decedent revealed that she was at the jail because she approached an officer with a loaded gun and asked for his help unloading it, and the officer believed that Decedent was a danger to herself and others because her kids were in the car.[12]

Decedent explained to Robinson that she was recently diagnosed with OCD and depression and that her new antidepressants had been working, but she stopped taking them six (6) days prior.[13]

---

[3] *See Id.* (Guard One: "You're in for one tonight." Guard two: "Crazy ass woman in the cell. She gonna [sic] get buck naked and then put all her clothes back on.")

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] Plaintiffs' Exhibit E, Booking Hallway Video, at 19:43:15.

[8] Plaintiffs' Exhibit D, Control Room Video, and Exhibit E, Booking Hallway Video, at 19:43:19-19:54:55.

[9] Plaintiffs' Exhibit C, Holding Cell Video, and Exhibit E, Booking Hallway Video.

[10] *Id.*

[11] *Id.*

[12] *Id.*, at 20:46:00.

[13] *Id.*

Decedent told Robinson that she has night terrors that had been making it difficult for her to sleep and that while the new medication had been working, "**it takes six weeks for antidepressants to work, and that's what's wrong with me**."[14]  Decedent further explained that she was scared, and when she gets scared she becomes paranoid.[15]  When Robinson moved to go back to the control room, Decedent became noticeably agitated and asked Robinson not to leave.[16]  Robinson left to attend to other duties.[17]

Almost immediately, Decedent began yelling again, which can be heard in the control room.[18] She yelled for help, she needs to use the restroom, about being pepper sprayed, and again apologized "for everything she's done."[19]  She expressed a desire to go to bed and asked for her antidepressants, which were not provided to jail staff.[20]

Not long after, Decedent began yelling out a series of conspiracy theories related to her family and apologized for what she has posted on Facebook.[21]  Her yelling is clearly heard in the control room.  Robinson thought that Decedent sounded "pissed off" but did not express concern for her health.[22]

---

[14] *Id.*

[15] *Id.*, at 20:51:40.

[16] *Id.*, at 21:02:51.

[17] *Id.*

[18] Plaintiffs' Exhibit D, Control Room Video, at 21:03:00.

[19] *Id.*, at 21:03:30.

[20] *Id.*; *See also*, Plaintiffs' Exhibit J, Interview of Celophus Robinson and Beginning of Interview of Wanila Williams, at 18:25 (Officer Williams reports knowing Decedent asked for her meds but that the jail never received them).

[21] *See Id.*, at 21:05:15-21:31:19 (yelling that she wants to go to bed, that her cousin is pregnant with her husband's baby, that C-Spire hacked her phone so that her cousin could sell the Handjis children on the black market, that divorce is hard and that she still loves her husband. She also yells that her husband hurts her and their children. She also accuses her husband of killing her father with fentanyl, of being accused of being unvaccinated for Hepatitis-B, and being afraid she is going to lose her house because she is in jail. Officers Robinson and Williams are present in the control room and are able to hear everything she yells.)

[22] *Id.*, at 21:15:24.

5

At or around 21:21:20, Officer Kracek arrived at the control room, and Decedent can be heard yelling in the background.  Kracek, while observing the video monitors with Robinson, suggested that "she's gotta be high. She wouldn't be talking this much. Ain't no way."[23]  Robinson responded, "she would have her []shirt on too."[24]  Robinson explained that Decedent recently began taking antidepressants and suggested that if she had them, she'd probably sleep.  Both Robinson and Kracek agreed that Decedent"[s]ounds like she's talking crazy," because "she keeps changing the subject."[25]  Kracek left the control room to talk to Decedent and was gone for approximately thirty (30) minutes, during the entirety of which Decedent was calm and could not be heard in the control room by Robinson and Williams.[26]

 Collins came in to use the elevator, she does not appear to check cameras, and Decedent cannot be heard in the control room.[27]  Robinson and Williams did not say anything to her.[28]  Robinson commented to Williams that "[Kracek] is talking to crazy sitting on the floor. He must know her or something."[29]  Williams responded that she is unsure, and Robinson pivoted to discussing other jail business.[30]

Kracek returned to the control room and asked if Decedent can have a mat and hygiene supplies, as she is complaining about being uncomfortable.[31]  Williams called over the radio to check

---

[23] *Id.*, at 21:25:59.
[24] *Id.*
[25] *Id.*, at 21:25:15.
[26] *Id.*, at 21:42:04-22:12:20.
[27] *Id.*, at 21:46:00.
[28] *Id.*
[29] *Id.*, at 22:02:15.
[30] *Id.*
[31] Plaintiffs' Exhibit D, Control Room Video, at 22:13:00.

if Decedent was on suicide watch or if she could have a mat, towel, and other toiletries.[32]  Williams

confirmed that Decedent was not "on papers", and Williams, Robinson, and Kracek set to work

getting Decedent the comfort items.[33]

Williams approached Decedent's cell and told her to put her clothes back on and to stand

away from the door so they can open the cell.[34]  Decedent apologized, insisted she is not trying to get

anyone in trouble, and again complained about the effects of pepper spray.[35]  Robinson, Williams, and

Kracek appeared with a sleeping mat and the hygiene supplies.[36]

At or around 22:38:20, Robinson and Kracek checked the cameras, and Robinson remarked

that "[Decedent's] reacting bad to that pepper spray with all that water."  Decedent can be seen on

camera repeatedly drinking water and pouring water on herself.[37]  Kracek remarked to Robinson and

Williams that he thinks Decedent is actually just high, not having a mental episode or experiencing

the effects of pepper spray and that she is coming down and trying to hydrate herself.[38]

At 22:42:40, Robinson and Kracek commented on Decedent's water intake:

"R: 'I gave her a cup of water when I got here, you just gave her a cup.'
K: 'She's just guzzling water.'
W: 'Doesn't she get transported tomorrow?'
K: **'She's trying to make herself sick, that's what she's trying to do.'**
R: **'She's trying to get sent to the hospital, but they're supposed to be sending
her somewhere to ... what are they sending her for?'**
K: '[Somewhere for her mental health?]'
R: 'Yeah. Trying to send her to, to the facility. Ain't nothing wrong with her, but her
family sending her.'

---

[32] *Id.*
[33] *Id.*
[34] Plaintiffs' Exhibit E, Booking Hallway Video, at 22:23:15.
[35] *Id.*
[36] *Id.*, at 22:27:30.
[37] Plaintiffs' Exhibit D, Control Room Video.
[38] *Id.*, at 22:42:30.

K: 'Year, she'll be evaluated ... might need to go over there and tell her to stop drinking all that water, it's just gonna make her sick.'
K: '[Seems like she's just having a panic attack.]'
W: '[Yeah. I get 'em [sic] bad too.]'"[39]

Decedent can be heard asking for 911 because she's "having an allergic reaction to the pepper spray."[40] Robinson left to tell Decedent that she should not be drinking the sink water and that water will only exacerbate the effects of pepper spray.[41] Decedent said that she is thirsty and that is why she keeps drinking the water.[42] Robinson got Decedent fresh water.[43] Kracek left the control room at or around 22:49:16, and as he left, he told Williams to call him if Decedent "gets crazy crazy."[44]

At or around 22:53:30, Robinson left the control room, and Williams remained at her computer.[45] Decedent can be heard yelling that she has thrown up blood.[46] Williams was the only one in the control room at the time.[47] Decedent put water that appeared pink in color on the ground outside her cell and threw her pants out of the chute as well.[48]

At or around 22:55:06, Collins entered the control room and checked the security cameras.[49] Williams left to attend to some other duty.[50] At 23:01:14, Williams returned to the control room, and Collins told her, "[Decedent's] just in there trying to make herself throw up, **she's not throwing up**

---

[39] *Id.* At 22:42:40.
[40] *Id.*, at 22:44:14.
[41] Plaintiffs' Exhibit E, Booking Hallway Video, at 22:44:50.
[42] *Id.*
[43] *Id.*, at 22:45:10.
[44] Plaintiffs' Exhibit D, Control Room Video.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] Plaintiffs' Exhibit E, Booking Hallway Video, at 22:56:40.
[49] Plaintiffs' Exhibit D, Control Room Video.
[50] *Id.*

**blood**."[51]  Collins then left the control room to go back upstairs.[52]

At or around 23:02:00, Robinson entered the frame at the end of the hallway, still processing the individual that turned himself in.[53]  Robinson and the individual walked down the hallway, past the pool of water and Decedent's cell.[54]  Decedent was not making any noticeable sound.[55]  Five (5) minutes later, Robinson re-entered the hallway and spoke to Decedent, who continued to complain about pepper spray bothering her.[56]  Robinson told Decedent that being pepper sprayed is not cause for the hospital, and Decedent replied, "I guess I'll just go to sleep."[57]

From the control room, Robinson and Williams could hear Decedent yell, "I know I've been fussing at y'all, but I do love my husband and I'm sorry for everything I've done. Can you help me officer? I was pepper sprayed today and my skin is burning ... Help me! I am going numb. **OK, I'm gonna lay down. It's just the pepper spray.**"[58]

Robinson checked the cameras and saw Decedent naked, standing in water she has placed on the floor, and noticed that Decedent had put her clothes in the toilet.[59]

At or about 00:53:22, Williams checked the security cameras, and Decedent was sitting on the toilet.[60]  Collins briefly appeared in the control room to grab something from her bag, then she returned to her duties upstairs without checking any cameras.[61]

---

[51] *Id.*
[52] *Id.*
[53] Plaintiffs' Exhibit E, Booking Hallway Video.
[54] *Id.*, at 23:21:00.
[55] *Id.*
[56] *Id.*, at 23:26:35.
[57] *Id.*
[58] Plaintiffs' Exhibit D, Control Room Video, at 23:35:50.
[59] *Id.*, at 23:35:40.
[60] *Id.*
[61] *Id.*, at 00:57:07.

At or around 02:09:30, Robinson checked the security cameras, noticed that Decedent appeared to be sleeping in her feces, and told Williams to go check.[62] Williams left the control room and went to Decedent's cell, where she could hear Decedent breathing.[63] Williams returned to the control room and reported that Decedent was breathing normal.[64]

At 02:13:40, Robinson reported that Decedent stood up but slipped because the floor was wet.[65] Robinson did not express any concern that Decedent was having a medical emergency.[66] Robinson got up to check the cameras again at 02:29:30 and saw Decedent still asleep.[67]

Williams left for the night at or around 02:47:50, and Robinson got up, sat in a different chair, pushed it to the corner, and appeared to go to sleep.[68] Neither Robinson nor Collins checked the cameras again until the shift change at or around 05:55:40.[69] Relief Officer Brysana Conner entered the control room at or around 05:55:40.[70] Collins reported it was a quiet night then left.[71] Robinson reported that Decedent had defecated and urinated on the floor, took out the trash, and left at or around 06:02:00.[72]

Later in the day, Officers Robinson, Williams, and Collins were all recalled to the jail for interviews with County investigators. In Robinson's interview, he denied thinking Decedent was experiencing a serious medical emergency and instead, believed her behavior was consistent with

---

[62] Id.
[63] Plaintiffs' Exhibit E, Booking Hallway Video, at 02:10:43; Plaintiffs' Exhibit C, Holding Cell Video, at 02:10:43.
[64] Plaintiffs' Exhibit D, Control Room Video, at 02:11:45.
[65] Plaintiffs' Exhibit D, Control Room Video, at 02:13:40.
[66] Id.
[67] Id.
[68] Id.
[69] Id.
[70] Id.
[71] Id.
[72] Id.

behavior he has seen in other inmates also on Chancery Holds.[73] Robinson explained that he did not

check on Decedent after Williams left because he believed she was sleeping.[74]

In Collins's interview, she similarly denied believing that Decedent was having a serious

medical emergency and that she simply thought Decedent was a Chancery Hold inmate, behaving the

way Chancery Hold inmates often behave.[75] Collins, like Robinson, never once reported believing

Decedent was having a serious medical episode that required immediate care.[76]

Officer Williams was also interviewed.[77] In her interview, Williams also reported her belief

that Decedent was a mental patient on a Chancery Hold behaving the way mental patients on

Chancery Holds behave.[78] Williams, like Robinson and Collins, never developed the subjective belief

that Decedent was in serious need of medical attention.[79]

## IV.    STANDARD

"A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as

a motion to dismiss under Rule 12(b)(6)."[80] To survive a motion to dismiss, "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[73] Plaintiffs' Exhibit J, Interview of Celophus Robinson and Beginning of Interview of Wanila Williams, at 04:00-05:00.
[74] *Id.*, at 08:20.
[75] *See*, Plaintiffs' Exhibit I, Interview of Officer Collins, at 03:50 (stating that the screaming, getting naked, throwing water around the cell that Collins observed was regularly seen behavior by other mental hold inmates), at 09:45 ("I assumed she got tired from being hyper forever. Mental patients sleep in all kinds of ways. I thought 'maybe she asleep [sic].")
[76] *See generally, Id.*
[77] Plaintiffs' Exhibit J includes the first eight (8) minutes of the interview with Officer Williams. The final ten (10) minutes, which were not attached as an exhibit to Plaintiffs' complaint, are attached here as Defendants' Exhibit A. Citation to Williams's interview will include the portion attached as Plaintiffs' Exhibit J.
[78] Defendants' Exhibit A, Remainder of Interview of Wanila Williams, at 3:19.
[79] *See generally,* Plaintiffs' Exhibit J, Interview of Celophus Robinson and Beginning of Interview of Wanila Williams, and Defendants' Exhibit A, Remainder of Interview of Wanila Williams.
[80] *Robinson v. Midland Cnty*, 80 F.4th 704, 709 (5th Cir. 2023).

face.'"[81] The Court "[accepts] all well-pled facts as true' and '[construes] all reasonable inferences ... in the light most favorable to the plaintiff.'"[82] The Court does not "however, accept as true legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement."[83] The Court "considers only 'the facts stated in [the pleadings] and the documents either attached to or incorporated in the complaint[.]'" "Where 'there is video evidence that "blatantly contradicts" the plaintiffs' allegations, the court should not adopt the plaintiffs' version of the facts; instead, the court should view those facts 'in the light depicted by the videotape.'"[84]

In the qualified immunity context, a plaintiff must adequately "plead facts which, if proved, would defeat the claim of immunity.'"[85] While qualified immunity "'is nominally an affirmative defense, the plaintiff bears a heightened burden to negate the defense once properly raised.'"[86] In other words, a plaintiff seeking to overcome qualified immunity must show "'(1) that [each] official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'"[87] "[E]ven where plaintiff adequately pleads the violation of a federal right, plaintiff still must adequately plead that 'defendant's conduct was objectively unreasonable in light of clearly established law.'"[88]

---

[81] *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[82] *Id.* (quoting *White v. U.S. Corr. L.L.C.*, 996 f.3d 302, 306-07 (5th Cir. 2021).

[83] *Carmona v. City of Brownsville*, 126 F.4th 1091, 1096 (5th Cir. 2025).

[84] *Hodge v. Engelman*, 90 f. 4th 840, 846 (5th Cir. 2024)(quoting *Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022); *See also, Anderson v. Estrada*, 140 F.4th 634, 642 (5th Cir. 2025)(holding that video evidence referenced in the complaint is properly considered over the plaintiffs' narrative in a 12(b)(6) motion).

[85] *Carmona*, 126 F.4th at 1096 (5th Cir. 2025).

[86] *Id.* (quoting *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019).

[87] *Id.*

[88] *Id.* (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001))(cleaned up).

V.    ARGUMENT

Plaintiffs bring assorted state and federal law claims alleging that Defendants are liable for Decedent's death while in the custody of Adams County. Plaintiffs' state law claims fail as a matter of law because Decedent's claim arises out of alleged conduct while she was detained at the Adams County Jail. Mississippi immunity law forecloses such a claim.

As to the 1983 claim for unconstitutional denial of medical care, the Plaintiffs have failed to plead facts sufficient for a jury to find both that each Defendant was subjectively aware "'of facts from which an inference of substantial risk of serious harm could be drawn' and that '[each Defendant] actually drew that inference.'"[89] Plaintiffs' failure to plead subjective deliberate indifference on the part of each individual Defendant before the court on this motion entitles them each to qualified immunity. These Defendants must be dismissed.

A.    Plaintiffs' State Law Claims Fail, as Defendants are Immune.

Decedent was in the Adams County Jail on a Chancery Hold due to concerns she was a danger to herself and to others.[90] Plaintiffs allege that Defendants were negligent in failing to provide her medical care under a state law negligence and gross negligence theory.[91] Mississippi law is well established – no person may bring a claim based on negligence where "at the time the claim arises [the claimant] is an inmate of any ... jail ... regardless of whether such claimant is or is not an inmate of any ... jail ... when the claim is filed."[92] Because this immunity is absolute for any claim brought by

---

[89] *Ford v. Anderson Cnty.* 102 F.4th 292, 317 (5th Cir. 2024)(quoting *Thompson v. Upshur County,* 245 F.3d 447, 459 (5th Cir. 2001)).
[90] *See* [Doc. 23-1] Amended Complaint Exhibit A.
[91] [Doc. 23] Amended Complaint, at 31-32.
[92] *Miss. Code Ann.* §11-46-9(1)(m); *See also, Webb v. DeSoto County*, 843 So. 2d 682, 684 (Miss. 2003)(dismissing wrongful death claim where the deceased died in the custody of the DeSoto County jail, finding 11-46-9(1)(m) clearly applicable).

a claimant – or a claimant's estate – where the claim arose while incarcerated, Plaintiffs' negligence and gross negligence claims against the Defendants must be dismissed.[93]

**B.    To the Extent Plaintiffs Bring Claims Against Defendants in Their Official Capacity, Those Claims are Duplicative of Plaintiffs' *Monell* Claims.**

Plaintiffs bring suit against the present Defendants in their individual and official capacities, alleged to have been in the course and scope of their duties at all relevant periods.[94] Plaintiffs also bring a claim against Adams County.[95] The official capacity claims are duplicative of Plaintiffs' claims against the County and must be dismissed.[96]

**C.    Defendants are Entitled to Qualified Immunity.**

Plaintiffs acknowledge that Decedent was a pretrial detainee at the time of her death.[97] Thus, the relevant standard is that of subjective deliberate indifference under the Fourteenth Amendment.[98]

Qualified immunity is intended to shield government officials not only form liability but "from the concerns of litigation, including avoidance of disruptive discovery."[99] Once pled by a defendant, a qualified immunity defense "must be adjudicated at the earliest possible opportunity."[100] Courts should not allow discovery prior to adjudicating a qualified immunity defense "[u]nless the plaintiff's

---

[93] *See* [Doc. 23], Amended Complaint, at 31-32.

[94] [Doc. 23], at ¶10-12.

[95] [Doc. 23], at ¶ 3.

[96] *See Brookwood Dev., LLC v. City of Ridgeland*, 2022 U.S. Dist. LEXIS 96422, at *5 (S.D. Miss. May 31, 2022)("Official capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent. If the claims against an official in his official capacity seek identical relief as claims against a governmental entity, the official capacity claims may be dismissed as duplicative.")(citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690 n. 55 (1978); *Castro Romero v. Becken*, 256 F. 3d 349, 355 (5th Cir. 2001)(internal citations omitted).

[97] [Doc. 23], at 25, ¶ 156.

[98] *Sims v. Griffin*, 35 F. 4th 945, 949-950 (5th Cir. 2022).

[99] *Carswell v. Camp*, 54 F.4th 307, 312 (5th Cir. 2022).

[100] *Id.*

allegations state a claim of violation of clearly established law."[101] This is because "'the driving force' behind qualified immunity is 'a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery[.]'"[102]

A pretrial detainee is protected by the Fourteenth Amendment's promise of procedural and substantive due process.[103] Included in those rights is the right of a pretrial detainee to have their basic needs met, including the "right not to be denied, by deliberate indifference, attention to [their] serious medical needs."[104] A serious medical need is "'one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required.'"[105] A jail official "violates a pretrial detainee's constitutional right to be secure in [her] basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference."[106] "In other words, the state official must know of and disregard an excessive risk to inmate health and safety."[107] Where the conduct of multiple defendants is alleged to have been deliberately indifferent to a serious medica need, "each defendants' entitlement to qualified immunity must be considered on an *individual* basis."[108] Deliberate indifference "is an extremely high standard to meet."[109]

Qualified immunity is a two-step analysis:

---

[101] *Id.*, at 312-13.

[102] *Id.,* at 313.

[103] *Ford*, 102 F.4th at 307.

[104] *Hartzog v. Hackett*, 2017 U.S. Dist. LEXIS 228749, at *9 (S.D. Miss. Feb. 28, 2017).

[105] *Robinson*, 80 F.4th at 709 (5th Cir. 2023)(quoting *Gobert v. Caldwell* 463 F.3d 339, 345 n.12 (5th Cir.2006)).

[106] *Hartzog*, 2017 U.S. Dist. LEXIS 228749 at *10.

[107] *Id.*

[108] *Id.*, at *11.

[109] *Carmona*, 126 F.4th at 1097.

"To survive a motion to dismiss, plaintiffs must plead the two prongs of a qualified immunity claim: First that there has been a violation of a constitutional right, and second, that 'the right was "clearly established" at the time of defendant's alleged misconduct.'"[110]

Courts have discretion to determine which prong to analyze first.[111] In the context of a denial of medical care claim, Plaintiffs must "show that the official 'refused to treat [decedent], ignored [her] complaints, intentionally treated [her] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[112] Plaintiffs must show that each Defendant was "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and that [each Defendant] 'actually drew the inference,' and that [each Defendant] disregarded that risk by failing to take reasonable measures to abate it."

### i.    Plaintiffs Do Not Allege a Constitutional Violation.

#### a.    *Officials Must Be Subjectively Aware of the Extent of the Injuries.*

The lodestar of a deliberate indifference analysis is an official's subjective knowledge.[113] Plaintiffs must affirmatively show that each Defendant *knew* that Decedent was in serious need of medical attention and "[responded] to that risk with deliberate indifference."[114] It is not enough to allege that a "defendant was aware that a *potential* for serious harm existed[.]"[115] Obviously, "mere negligence does not rise to the level of deliberate indifference[,]" and "'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation,' does

---

[110] *Robinson*, 80 F.4th at 711(5th Cir. 2023)(quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).
[111] *Id.*
[112] *Id.*
[113] *See, Carmona*, 126 F.4th at 1097.
[114] *Hartzog*, 2017 U.S. Dist. LEXIS 228749 at *10.
[115] *Carmona*, 126 F.4th at 1097.

not amount to the requisite subjective knowledge of a substantial risk."[116] Liability attaches "only if the officials actually knew - not merely should have known - about the risk."[117]

A plaintiff with invisible injuries struggles to show deliberate indifference.[118] In *Carmona*, the plaintiff (Carmona) was arrested after being involved in four automobile collisions while driving impaired.[119] Carmona's final collision was so severe that her airbags deployed, and officers responding to the scene noted visible injuries like abrasions, contusions, and lacerations to her arms and legs.[120]

The officers on scene decided to transport her to the jail rather than seek medical attention.[121] This, in spite of the fact that on the drive to the jail, Carmona intentionally banged her head against the glass partition, behavior the court described as "bizarre."[122]

Once at the jail, officers still did not seek to have Carmona examined and left her in a cell unattended.[123] Officers found her unresponsive four hours later, and she was pronounced dead on the scene.[124] She died as a result of internal bleeding caused by lacerations to her liver sustained in the crash.[125] Carmona's estate sued, pursuing only a 1983 claim alleging that the defendants violated her constitutional rights by being deliberately indifferent to her obvious need for medical care.[126]

Defendants filed, and the District Court granted, a 12(b)(6) motion to dismiss, finding in part that there is no constitutional violation "when an injured person's injuries are not visually apparent

---

[116] *Id.*
[117] *Id.*
[118] *See, Id.*
[119] *Id.*, at 1095.
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*

and that person's complaints are **non-existent or do not reveal the full extent of the injuries**, then the responding official's inaction does not amount to deliberate indifference."[127]

The *Carmona* Court rejected allegations that "merely [restated] the standard required to demonstrate the requisite subjective knowledge" required for deliberate indifference.[128] The Court specifically rejected the proposition that because "automobile accidents *can* cause massive internal bleeding," the officers were deliberately indifferent in taking Carmona to the police station rather than the hospital.[129]

Deliberate indifference asks what the official believes *is* happening, not whether they are abstractly aware that something *could* happen.[130] The *Carmona* Court looked past "conclusory statements masquerading as factual allegations" and concluded that the pleadings only alleged:

> "Officers: arrived at the scene of the final accident knowing Carmona had been in several automobile collisions earlier in the day; observed she had crashed her automobile into a brick apartment building with enough force to deploy the suburban's airbags; observed she had visible physical injuries, including contusions, abrasions, and lacerations; and, despite these observations, did not call EMS, take her to a hospital, or seek any other medical attention on her behalf."[131]

The Court concluded, based on these facts, that even though automobile accidents *"can* cause massive internal bleeding," Carmona had failed to plausibly allege that the defendant officers "were *subjectively aware* of facts which demonstrated Carmona was suffering from internal injuries."[132]

---

[127] *Id.* (emphasis added).

[128] *Id.*, at 1097.

[129] *Id.*, at 1098.

[130] *See, Id.*, at 1098 (finding insufficient allegations that officer training would "likely lead" to the conclusion that Carmona needed medical attention, focusing instead on the failure to sufficiently plead that the officers actually knew) (quoting *Rogers v. Jarrett*, 63 F.4th 971, 976 (5th Cir. 2023).

[131] *Id.*, at 1098.

[132] *Id.* (emphasis added).

Without a subjective belief that there is a serious medical need, an official is not deliberately indifferent for failing to seek medical treatment.[133] In *Robinson*, inmate Savion Hall ("Hall") died from complications of asthma.[134] Several days before his death, while still an inmate, Hall had been transported to the hospital for asthma related issues and discharged with instructions that he be taken back to the hospital if his symptoms worsened.[135] He was to receive breathing treatments every four (4) hours that included tests of his blood oxygen levels.[136]

Midland County had contracted with a private health provider to care for inmates, and nurses for said company had repeatedly fabricated Hall's blood oxygen readings.[137] Additionally, at least forty-three (43) breathing treatments were skipped, and Hall often had to administer his own treatments when they were provided.[138]

On July 11, 2019, at approximately 12:30 a.m., Hall reported to the jailer on duty, Officer Stickel, that he was having trouble breathing and was "wheezing for air."[139] Stickel confirmed that Hall had received a breathing treatment in the last four (4) hours and refused him another until it was scheduled.[140] Stickel checked on Hall "throughout the night, "saw he was breathing, although with difficulty, and "apologized for not allowing Hall to go to medical," because of his treatment plan.[141] Hall received his next breathing treatment around 4:10 a.m.[142]

---

[133] *Robinson*, 80 F.4th 704.
[134] *Id.*, at 708.
[135] *Id.*
[136] *Id.*
[137] *Id.*, at 709.
[138] *Id.*
[139] *Id.*, at 708
[140] *Id.*
[141] *Id.*
[142] *Id.*

At 6:15 a.m., Hall again asks Stickel to go to the hospital, stating that he "was not gonna make it."[143] Because Hall appeared responsive, Stickel did not believe Hall was experiencing a medical emergency, despite observing Hall struggling to stand and nearly passing out.[144] At some point in the early morning, Stickel called the infirmary to confirm Hall's breathing treatments but did not reach anyone and did not try again.[145]

Stickel was relieved around 7:00 a.m., and the relieving officer quickly sent Hall to medical where he was transported to the hospital with a blood oxygen saturation critically low.[146] Hall died several days later, and his estate sued the private care company, Midland County, and Officer Stickel.[147] After settling with the private parties, the government defendants filed a 12(c) motion to dismiss, which the District Court granted, and plaintiffs appealed.[148]

The Fifth Circuit upheld dismissal, finding that, as to Stickel, the plaintiffs failed to allege the requisite subjective awareness of Hall's severe medical distress.[149] The Court assumed as factual the following allegation:

> "Stickel observed Hall experiencing a critical medical crisis over the course of six and a half hours and in response made the conscious decision not to request emergency assistance for Hall unless Hall lost consciousness or stopped breathing."[150]

Despite the allegation and ample facts supporting it, the Court found as a matter of law that Stickel's actions were not "so deliberately indifferent to Hall's need for emergency assistance that it amounts

---

[143] *Id.* (internal citations omitted).
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.*, at 709.
[148] *Id.*
[149] *Id.*, at 711-12.
[150] *Id.*, at 711.

to a constitutional violation."[151] The Court found that because Stickel apprised himself of Hall's medical plan, took some - albeit insufficient - steps to help, and gave his relief officer a report on Hall's status, his conduct did not meet the Fifth Circuit's bar for deliberate indifference.[152]

Consider also, *Hartzog v. Hackett*.[153] There, inmate Steven Hartzog ("Steven") died of dehydration and a Methamphetamine overdose while in custody at the Lawrence County jail.[154] Steven was initially reported missing by his mother and was found by sheriff's deputies trying to climb an embankment on the side of the road.[155] Responding officers suspected he was under the influence of drugs.[156] After remanding him to his mother's custody, police received a call hours later and discovered Steven shirtless in a field disoriented and struggling to stand.[157] Officers "[assumed] that [Steven] was simply under the influence of an intoxicant" and took him to the detox cell of the county jail.[158]

Steven's family ("The Hartzogs") went to the jail shortly after Steven was booked and asked for him to be taken to the hospital out of concern that he was dehydrated after being in a field overnight.[159] Officers refused, citing the need to get permission from the sheriff.[160] The Hartzogs decided to leave and bring a doctor back themselves.[161] While gone, Steven became unresponsive and

---

[151] *Id.*
[152] *Id.*, at 712.
[153] 2017 U.S. Dist. LEXIS 228749.
[154] *Id.*, at *4
[155] *Id.*, at *2.
[156] *Id.*
[157] *Id.*, at *2-3.
[158] *Id.*, at *3.
[159] *Id.* (Steven's mother testified that Steven was stretched out in a wheelchair like he'd had a stroke, was unable to form any words, and was gasping for breath. Steven's sister also testified that he was spasming with his head all the way back and his mouth wide open. Jail officials would not allow his mother and sister to take him to the hospital.)
[160] *Id.*
[161] *Id.*

was transported to the local hospital where he was declared dead.[162] His family brought suit alleging, among other things, deliberate indifference to his obvious medical needs.[163]

Three (3) defendants were sued in their individual capacities, and all were found to be entitled to qualified immunity.[164] The *Hartzog* Court undertook an analysis of what each defendant knew and did for the duration of their respective interactions with Steven, mindful not to mix the knowledge and actions of one with the knowledge and actions of another.[165]

Defendant Hackett ("Hackett") was the officer that brought Steven to jail.[166] Hackett testified that he believed Steven was merely under the influence and needed to sleep it off, specifically foreclosing a belief that Steven needed emergency medical care.[167] Hackett initially refused the Hartzogs' request to take Steven to the hospital, citing a belief it was not necessary and that he would need the Sheriff's permission first.[168]

After the Hartzogs left to get a doctor, Hackett called Under-Sheriff Ray Smith, noting that Steven appeared to be more intoxicated than when he first arrived.[169] Hackett asked Smith if he was on any substances and was told by Ray Smith not to take Steven to the hospital, since the Hartzogs were bringing a doctor to the jail.[170] Hackett gave Steven some water, which Steven drank sparingly.[171] Hackett attempted to replace Steven's restraints with softer ones when Steven became

---

[162] *Id.*, at *3-4.
[163] *Id.*
[164] *Id.*, at *26-27.
[165] *See generally*, *Id.*, at *12-25 (Court analyzing each defendant's experience with Steven from their first interaction through their last).
[166] *Id.*, at *12.
[167] *Id.*
[168] *Id.*, at *15.
[169] *Id.*
[170] *Id.*, at 16.
[171] *Id.*

unresponsive, Hackett requested an ambulance, and while waiting, noted that Steven had a pulse and was still breathing.[172]

The Court, in considering Hackett's involvement, concluded that there was no evidence that Hackett actually drew the inference that Steven had serious medical needs "until he became unresponsive," at which point he called an ambulance.[173] As a matter of law, he was not deliberately indifferent to Steven's serious medical needs.[174]

The next defendant the Court analyzed was the jailer on shift when Steven arrived, Officer Devin Mullins ("Mullins").[175] Mullins testified that he was instructed to book Steven in "under a Chancery Writ" and to "just keep an eye" on him.[176] Over the roughly six-hour period Mullins was observing Steven, he saw Steven "sitting on the toilet backwards and lying on his back, picking at his skin, sitting up, screaming, picking at his skin."[177] Mullins noted that, while strange, Steven's behavior was not substantially different from the behavior he encountered from other inmates under the influence of narcotics.[178]

The Court found that even if Mullins "could draw an inference of substantial risk of serious harm," based on his observations of Steven, "there [was] no evidence that he actually drew such an inference."[179] This was all the more true considering Mullins's belief that Steven was simply intoxicated, had observed other intoxicated inmates acting "worse than [Steven] was," and that if he

---

[172] *Id.*
[173] *Id.*, at 17.
[174] *Id.*
[175] *Id.*, at *18.
[176] *Id.* (internal quotations omitted)(internal citations omitted).
[177] *Id.*, at 18-19 (Internal quotations omitted)(internal citations omitted).
[178] *Id.*
[179] *Id.*, at *21.

believed Steven needed medical care, "[Mullins] would have did [sic] everything he could to get him medical attention."[180]

The final individual defendant was Josh Earl ("Earl"), the jail supervisor.[181] Earl testified that when he got to work at 8:00 a.m., he went to check on Steven and saw him:

> "Partially sitting on the bench, then sliding down ... towards the floor, then he was just kind of sitting up. His mouth was open ... [he] had several scratches all over his face, arms and his feet ... [Steven] seemed to be intoxicated ... His eyes were open very wide. He had moments where his mouth was open and you know, his head would go back and would move back and forth ... I noticed him ... sliding down. At some point he would kind of sit back on his hands up against the wall and then later on, just kind of slope back down."[182]

Earl testified that he instructed Mullins to keep an eye on Steven via the surveillance video feed in the control room.[183] When the Hartzogs arrived to check on Steven, Earl and Mullins went to Steven's cell and found him "on the floor crawling around."[184] Earl and Mullins placed him in a wheelchair and took him to the interrogation room for his family, where Earl witnessed Steven "[keep] sliding down" out of the wheelchair.[185] Earl was able to have a conversation with Steven and eventually left the jail, leaving Steven with Mullins and the Hartzogs.[186]

The Court found that Earl, like Mullins and Hackett, had never subjectively inferred that Steven was having a medical emergency that required immediate care.[187] The court recognized that Earl believed Steven was fine earlier in the day and that while he agreed Steven needed care early in

---

[180] *Id.*
[181] *Id.*
[182] *Id.*, at 22-23.
[183] *Id.*, at 23.
[184] *Id.*
[185] *Id.*
[186] *Id.*, at *24.
[187] *Id.*

the afternoon, Earl believed that was already being arranged.[188] Holding that "the accuracy of [these beliefs was] irrelevant," without a showing that Earl actually inferred that Steven was in need of serious medical attention, he could not have acted with deliberate indifference towards that need.[189]

Compare the above cases with *Dyer v. Houston*.[190] There, officers arrested the decedent Graham Dyer ("Graham") after receiving calls of an individual acting erratically.[191] Officers and paramedics on scene learned that Graham had ingested LSD and "sustained a visible and serious head injury."[192] Paramedics treated Graham on scene and remanded him to the custody of the officers, who transported him to the local jail.[193] While en route, Graham began "[slamming] his head multiple times against the interior of the car."[194]

Officer Heidelburg ("Heidelburg") - the transporting officer - pulled over and attempted to prevent Graham from further injuring himself.[195] Two (2) other officers, Officer Scott ("Scott") and Officer Gafford ("Gafford"), pulled over to help Heidelburg restrain Graham, tasing him multiple times before Graham could be restrained.[196] Despite being restrained, Graham managed to smash his head against the car at least 27 more times before arriving at the jail[197].

Removing Graham from the car required all three (3) officers.[198] Graham "continued kicking and screaming as jail personnel tried to secure him."[199] Graham was placed in a restraint chair and

---

[188] *Id.*
[189] *Id.*
[190] 964 F.3d 374 (5th Cir. 2020).
[191] *Id.*, at 377.
[192] *Id.*
[193] *Id.*, at 378.
[194] *Id.*
[195] *Id.*
[196] *Id.*, at 379.
[197] *Id.*
[198] *Id.*
[199] *Id.*

given a padded cell.[200] The arresting officers did not report Graham's injuries, despite knowing that Graham had already suffered a head injury, had consumed mind-altering drugs, and had intentionally slammed his head against a hard surface dozens of times.[201] They told staffers that Graham was "medically cleared at the scene."[202]

Two (2) hours later, jail staff observed Graham struggling to breathe and called EMS.[203] Graham died at the hospital later that night.[204] An independent autopsy confirmed that Graham died of blunt force trauma and cranial hemorrhaging. Graham's family ("The Dyers") sued the county, the paramedics, and the three (3) officers for violating Graham's Fourteenth Amendment rights by being deliberately indifferent to his serious medical needs.[205]

The Fifth Circuit found none of the officers were entitled to qualified immunity.[206] Each officer testified to knowing that Graham was intentionally smashing his head against the interior of the patrol car.[207] Each officer testified to knowing Heidelburg had to pull over and attempt to restrain Graham so that he would stop.[208] And each officer knew that intentionally smashing your head into a hard surface carried with it "some inherent dangers," that "certainly could" cause a head injury.[209] The Court concluded that Graham's injuries were so severe, and their "cause so plainly evident," that the

---

[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.*
[206] *Id.*, at 381.
[207] *Id.*, at 382.
[208] *Id.*
[209] *Id.*

officers were deliberately indifferent in failing to get him care and failing to report his condition to jail staff.[210]

Plaintiffs here fail to allege, in light of clear and obvious video evidence, that Robinson, Collins, and Williams knew of Decedent's uncommon and internal injuries and failed to act in spite of that knowledge.

                        b.     *Plaintiffs Fail to Plausibly Allege that Defendants Had Subjective Knowledge.*

Plaintiffs allege facts similar to *Carmona* and *Hartzog*, not *Dyer.* Like *Carmona*, Plaintiffs' complaint alleges a medical emergency with only internalized injuries.[211] Whereas in *Camrona* the plaintiff was known to have been involved in a series of increasingly violent automobile collisions,[212] Decedent suffered no external injuries or trauma that could support an inference of serious medical needs.[213]

Also similar to *Carmona*, Decedent's complaints did not reveal the extent and seriousness of her internal injuries.[214] Plaintiffs allege that Decedent called for help throughout the night[215] but cannot allege that Defendants knew that Decedent was actually in serious danger, rather than behaving as other "people ... that are [having a mental episode]" behave.[216] Throughout the complaint, the only injury Decedent revealed or any officer knew of was related to her poor reaction to pepper spray earlier that day.[217] Defendants even tried to help by providing her with cold water and

---

[210] *Id.*
[211] [Doc. 23], Amended Complaint, at 19 ¶ 133.
[212] *Carmona*, 126 F. 4th at 1095.
[213] [Doc. 23], at 19, ¶ 133.
[214] *Carmona*, 126 F.4th, at 1095.
[215] *See generally,* [Doc. 23], Amended Complaint, at ¶ 49-99.
[216] *Hartzog*, 2017 U.S. Dist. LEXIS 228479, at *19.
[217] *See* [Doc. 23], at ¶ 37, 48, 49, and 50.

personal hygiene supplies, which Plaintiffs do not allege they did with any awareness that her underlying medical issue was the result of drinking too much water.[218]

In *Hartzog*, Officers were actually aware that Steven was likely suffering from dehydration and were subjectively aware that he was intoxicated.[219] They observed increasingly erratic behavior and were aware of multiple superficial injuries.[220] Yet each officer denied Steven professional medical care because they either "did not 'know if Steven was dehydrated or not,'"[221] did not think Steven was behaving any worse than other heavily intoxicated inmates,[222] or that some other party was getting him care.[223]

Plaintiffs' complaint does not allege that the Defendants subjectively knew that Decedent was in need of serious medical attention. Instead, like *Hartzog*, it alleges that each Defendant treated her symptoms as though they were not as serious as they turned out to be.[224] But as the *Hartzog* Court

---

[218] [Doc. 23], at 10, ¶ 50.

[219] *Hartzog*, 2017 U.S. Dist. LEXIS 228749, at *3.

[220] *Id.*, at *18.

[221] *Id.*, at *16 (Hackett testified that he did not think Steven's condition was serious).

[222] *Id.*, at *19 (Mullins testified that he had observed many other intoxicated inmates behaving in a similar manner).

[223] *Id.*, at *24 (Earl testified that he thought others were getting Steven medical care, so he took no steps. The Court specifically held that "[t]he accuracy of this belief is irrelevant," and that Earl subjectively holding the belief entitled him to qualified immunity.)

[224] *See*, [Doc. 23], Amended Complaint, at ¶ 138-141 (Collins, in an interview with superiors the day of Decedent's death, said, "We didn't speak much about it. Like, as far as we know, she was just a mental patient[]" and that "[Collins] thought she was tiring herself out and went to bed. She was a mental patient. They'll sleep how they want to sleep. They don't know no better. She had been up all night and was tiring herself. Like, she was fine[]" and "[y]ou know how a person be hyper all day long and just burn herself out? Assumed she got tired because she was a ticking time bomb." When specifically asked if she was concerned about Decedent's condition, Collins responded, "I thought she had everything she needed outside of medicine. She had water. She had clothes. She had soap for her to wash up. She was like [other inmates on mental holds]."); ¶ 143-145 (Officer Robinson, in an interview with superiors the day of Decedent's death, said about Decedent's behavior: "Yeah, I thought it was normal. Since eight months I been here, we had [other inmates] - they take off their clothes, and piss. [Other inmate], he done did it before. I didn't think nothing of it." His subjective belief of her actions was that she was having a mental - not medical - episode: "...getting noisy all the way to about

made clear, being wrong about the severity or nature of an inmate's symptoms is not a constitutional violation.[225]

Compare those cases with *Dyer*, where the defendants each witnessed the plaintiff violently smash his head against the vehicle, each participated in subduing him, each assisted in carrying him inside - witnessing his visible head injury, and each reported no medical concerns.[226] The knowledge defendants held in *Dyer* was sufficient to overcome qualified immunity.[227] Plaintiffs here, however, have not alleged that Defendants had *Dyer* levels of subjective awareness of the severity of Decedent's condition.

Here, the Plaintiffs' complaint fails to plausibly allege that Officers Robinson, Collins, and Williams were each "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' – the serious harm being [hyponatremia dehydration] in this instance – 'and actually drew the inference.'"[228] Plaintiffs' narrative attempts to hold Defendants liable by virtue of them being on shift that night and making ultimately incorrect inferences about Decedent's condition. Yet the complaint does not plausibly allege any Defendant *subjectively knew* that Decedent was experiencing severe internal injuries.

Instead, all that the complaint alleges is that Collins, Robinson, and Williams all had the same knowledge of Decedent's condition because all were "assigned to the Adams County Jail overnight

---

12:30 this morning. She just kept talking. She said she needed to get out. Said that her husband killed somebody. She was saying all kinds of stuff. When I hear that, I say, she's crazy.")
[225] *See generally*, *Hartzong*, 2017 U.S. Dist. LEXIS 228749, at *12-25 (discussing the subjective knowledge of each individual officer as making inferences about Steven's status that were ultimately incorrect, but not deliberately indifferent)..
[226] *See Generally*, *Dyer*, 964 F.3d at 385.
[227] *Id.*
[228] *Carmona 126 F.4th* at 1099-1100 (quoting *Rogers*, 63 F.4th at 976.).

shift on August 28-29, 2023," and each was supposed to "monitor the continuous video surveillance feed coming from the Holding Cell where Decedent was being held and to periodically check on Decedent."[229]

What the complaint does not plausibly allege, however, is that each officer "made the inference" that Decedent was suffering from a serious medical condition like hyponatremic dehydration and needed immediate medical attention. At best, the complaint weaves a narrative of Decedent's gradual decline, then faults the Defendants for not recognizing the complexity of her condition because of the nature of her erratic complaints throughout the night.[230]

> c.    *Video Evidence Clearly Contradicts Allegations that Any Defendant Subjectively Believed Decedent Was in Medical Distress.*

"'[W]here video recordings are included in the pleadings, as is the case here, the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video "blatantly contradicts" those allegations'"[231]

Plaintiffs alleges in equal measure that: (1) Decedent's visible deterioration was so obvious that any person could see she needed medical attention;[232] (2) each Defendant was tasked with monitoring Decedent so they must have known about her condition and behaviors at all times;[233] and (3) Defendants were not watching the security feed or checking on Decedent as often as they should

---

[229] [Doc. 23], Amended Complaint, at 29-30 ¶ 170-172.

[230] *See*, [Doc. 23], at ¶39.

[231] *Anderson v. Estrada*, 140 F.4th 634, 642 (5th Cir. 2025).

[232] *See*, [Doc. 23], Amended Complaint, at 7 ¶ 32, 75-115, 120-126, 135 (pin citing to moments in the security footage where Decedent is acting bizarrely or appearing to be unwell to support the claim that Defendants knew Decedent was deteriorating and in need of medical help).

[233] *See* [Doc. 23], ¶ 169-174 (alleging that the defendants were tasked with monitoring and providing care to Decedent, and that they were aware of her condition the entire night).

have, leading Decedent to not get the care she needed.[234] The Court does not need to take allegations as true where video evidence "blatantly contradicts" the plaintiff's account. Such is the case here.

   The video evidence upon which Plaintiff rely shows jail personnel that want to help make Decedent comfortable;[235] had heard her yelling about a range of conspiracy theories including a belief that her husband and cousin were attempting to sell her children,[236] that C-Spire had hacked her phone,[237] that someone had hacked her credit cards,[238] and that her husband killed her father with

[234] *See* [Doc. 23], at 75, 79, 82, 96, 98, 106, 107, 111. 120, 127 169-174 (attempting to juxtapose what Decedent does on screen with various levels of inattentiveness of the Defendants. Of course, as deliberate indifference requires subjective knowledge, Plaintiffs, in effect, admit that Defendants were not subjectively aware of the behavioral changes Decedent exhibited).
[235] *See* Plaintiffs' Exhibit D, Control Room Video, at 22:13:00 hours (In the control room, Robinson and Williams discuss with Kracek whether they can provide Decedent a mat and some hygiene products to make her more comfortable. Williams calls a supervisor to make sure Decedent is not on suicide watch, then Robinson and Williams both help get her comfort items.); Plaintiffs' Exhibit E, Booking Hallway Video, at 19:43:15 hours (Decedent asks Robinson if she can have some toilet paper, and Robinson promptly goes and gets her the hygiene item), at 20:44:51 (Robinson has a long conversation with Decedent in which he listens to her personal problems like her divorce and her concern for her kids, Robinson learns that Decedent is here on a Chancery Hold, and he explains to her that she's in the jail because she needs help, and that they are going to get her help), at 22:23:15 (Williams talks to Decedent, understanding that Decedent is hot and trying to get her to put her clothes back on so they can provide her comfort items), at 22:44:50 (Robinson comes into the frame to tell Decedent that continuing to drink and pour sink water on herself is going to make the pepper spray worse, he reassures Decedent that he is not made at her, and that he is just trying to help calm her down. Decedent becomes significantly less distressed when talking to people), at 23:26:25 (Robinson talks with Decedent, again being told that her only complaint is a bad pepper spray reaction, and Robinson sympathizes but says pepper spray is not a reason to need medical attention, Decedent accepts this answer calmly and says that she'll just try to sleep instead). Collins never personally interacts with Decedent.
[236] Plaintiffs' Exhibit C, Holding Cell Video, & Exhibit D, Control Room Video, at 21:06:10 hours and 21:17:00 hours (Decedent is yelling that her husband and cousin are selling her children on the black market, and the yells can be heard in the control room).
[237] Plaintiffs' Exhibit C, Holding Cell Video, & Exhibit D, Control Room Video, at 21:20:04 (Decedent can be heard in the control room yelling, "My phone was hacked by C-Spire but nobody believes me.")
[238] Plaintiffs' Exhibit C, Holding Cell Video, & Exhibit D, Control Room Video, at 21:26:17 (Decedent can be heard in the control room yelling, "My credit cards have been hacked or stolen and I don't know why.")

Fentanyl;[239] and that finally she grew tired and fell asleep.[240] Being wrong about the ultimate facts of an inmate's condition is not a constitutional violation, and the Defendants should be dismissed.[241]

> ### ii. Even if They Do Allege a Constitutional Violation, Plaintiffs Do Not Allege That it is Well-Established.

Here, the Court has two (2) options. It may address this prong first as Plaintiffs simply cannot demonstrate an "'existing precedent [that] place[s] the . . . constitutional question[s] *beyond debate*,'"[242] or it may determine that it need not reach this analysis as Plaintiffs have failed state any constitutional violation whatsoever. Either way, qualified immunity is appropriate here.

To overcome qualified immunity, Plaintiffs must show that each Defendant's own, individual "actions were objectively unreasonable in the light of clearly established law at the time of the conduct in question."[243] "A clearly established right is one that is 'sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right.'"[244] "Clearly established law must be particularized to the facts of a case."[245]

---

[239] Plaintiffs' Exhibit C, Holding Cell Video, & Exhibit D, Control Room Video, at 21:16 (Decedent can be heard from the control room yelling that "they killed my daddy with Fentanyl," talking about her husband and cousin. Robinson, in an incredulous tone, responds to Williams and Kracek, "Fentanyl? Killed her dad with Fentanyl?", and Williams replies "I don't know what she's doing.")

[240] *See,* Plaintiff's Exhibit I, Interview of Vatisha Collins, at 09:45 (reporting that she thought Decedent had finally worn herself out and gone to sleep); *See also*, Plaintiffs' Exhibit J, Interview of Celophus Robinson and Beginning of Interview of Wanila Williams, at 06:20 (Robinson reporting that he stopped checking on her around 3:00 a.m. because she appeared to be resting); *See also*, Defendant's Exhibit A, Remainder of Interview of Wanila Williams, at 04:15 (reporting that she checked on Decedent after she stopped yelling, and it appeared that she had just finally gone to sleep).

[241] *See*, *Hartzog*, 2017 U.S. Dist. LEXIS 228479, at *25 (In considering Defendant Earl's failure to get medical care believing someone else already had but was incorrect, the Court held that "[t]he accuracy of this belief is irrelevant.").

[242] *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (emphasis in original) (en banc).

[243] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

[244] *Mullenix,* 577 U.S. at 11 (citation omitted) (emphasis added).

[245] *Id.* (quotations and citation omitted).

Courts in the Fifth Circuit "are bound by the restrictive analysis of 'clearly established' set forth in numerous Supreme Court precedents."[246] A right is "clearly established" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[247] Courts must not "define clearly established law at a high level of generality"; instead, their "inquiry must be undertaken in light of the specific context of the case."[248] If law enforcement officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized."[249] "Broad general propositions are not enough to overcome qualified immunity."[250] Courts in the Fifth Circuit "do not require that an official demonstrate that[s]he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."[251]

"It is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality."[252] The Fifth Circuit requires plaintiffs to "'identify a case' – usually, a 'body of relevant case law' – in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'"[253] Furthermore, "[c]ases that are 'too factually distinct to speak *clearly* to the *specific circumstances* **here**' are not enough to deny qualified immunity."[254] The precise

---

[246] *Cope v. Cogdill*, 3 F.4th 198, 204-207 (5th Cir. July 2, 2021).
[247] *Mullenix v. Luna*, 577 U.S. 7, 11(2015) (per curiam) (internal quotation marks and citation omitted).
[248] *Id.* at 12 (internal quotation marks and citations omitted).
[249] *Malley v. Briggs*, 475 U.S. 335, 341(1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995).
[250] *Cope*, 3 F.4th at 205.
[251] *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (internal quotations and citations omitted).
[252] *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam) (internal quotation marks and citation omitted)).
[253] *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018)) (other internal citations omitted).
[254] *Cleveland v. Bell*, 938 F.3d 672, 677 (5th Cir. 2019) (quoting *Mullenix*, 136 S. Ct. at 312) (emphasis added).

33

question is "whether a reasonable officer could have believed [his conduct] to be lawful, in light of clearly established law and the information the officer[] possessed."[255]

While there need not be a case directly on point, the unlawfulness of the conduct must be **beyond debate**.[256] Namely, "[w]hen deciding whether the right allegedly violated was 'clearly established,' the court asks whether the law *was so clearly* and ***unambiguously*** **prohibited the conduct** that *every* reasonable official would understand that what he is doing violates the law."[257] To meet this high burden, Plaintiffs must "point to controlling authority — or a robust consensus of persuasive authority — that defines the contours of the right in question with a high degree of particularity."[258] This, Plaintiffs cannot do as the law is exceedingly clear: there was no constitution violation.

## VI.    CONCLUSION

Plaintiffs' complaint fails to state a claim for which relief can be granted against Defendants Officer Wanila Williams, Officer Vatisha Collins, and Officer Cleophus Robinson. These Defendants must be dismissed.

**NOW, THEREFORE,** Defendants pray that this Court grant the following relief:

(A)    That this Court dismiss Plaintiffs' Complaint with prejudice; and

(B)    That this Court deny Plaintiffs the relief prayed for in Plaintiffs' Complaint, and that Plaintiffs be denied any relief whatsoever.

---

[255] *Keller v. Fleming*, 952 F.3d 216, 225 (5th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)) (cleaned up).
[256] *Bartlett*, 981 F.3d at 330 (citations omitted).
[257] *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (citing *Morgan* 659 F.3d at 371)) (emphasis in original) (emphasis added).
[258] *Jamison v. McClendon*, 476 F. Supp. 3d 386, 416 (S.D. Miss. 2020) (quoting *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017)).

**RESPECTFULLY SUBMITTED,** this the 7th of November, 2025.

**JACKS GRIFFITH LUCIANO, P.A.**

By: */s/ Nicholas J. McClain*
     Nicholas J. McClain, MS Bar No. 106991
     Arnold U. Luciano, MS Bar No. 99198
     Daniel J. Griffith, MS Bar No. 8366
     Attorneys for Defendants Officer Vatisha
     Collins, Officer Cleophus Robinson, and
     Officer Wanila Williams

Of Counsel:

**JACKS GRIFFITH LUCIANO, P.A.**
150 North Sharpe Avenue
P. O. Box 1209
Cleveland, MS 38732
Telephone: 662-843-6171
Fax: 662-843-6176
Email: nick@jlpalaw.com
     aluciano@jlpalaw.com
     dgriffith@jlpalaw.com

## CERTIFICATE OF SERVICE

I, Nicholas J. McClain, attorney of record for Defendants Officer Vatisha Collins, Officer Cleophus Robinson, and Officer Wanila Williams, do hereby certify that I have this day caused a true and correct copy of the above and foregoing *Memorandum of Authorities in Support of Defendants Officer Wanila Williams, Officer Vatisha Collins, and Officer Cleophus Robinson's Motion for Judgment on the Pleadings* to be delivered by the ECF filing system, which gave notice to the following:

Eric Dillon, Esq.
Eric Dillon Law Firm, PLLC
216 W Jackson Street
Ridgeland, MS 39157
Telephone: 601-906-5336
Email: eric@ericdillonlawfirm.com
**Attorney for Plaintiffs**

Jonathan P. Barrett, Esq.
Barrett Law, PLLC
121 Colony Crossing, Suite D
Madison, MS 39110
Telephone: 601-790-1505
Email: jpb@barrettlawms.com
**Attorney for Plaintiffs**

William Robert Allen, Esq.
Lance W. Martin, Esq.
Butler Snow, LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Telephone: 601-985-4240
Email: will.allen@butlersnow.com
       lance.martin@butlersnow.com
**Attorneys for Defendants Adams County, Mississippi;**
**Adams County Mississippi Sheriff's Department;**
**Sheriff Travis Patten; and Chief Stanley Searcy**

**DATED** this the 7th of November, 2025.

      */s/ Nicholas J. McClain*
      Nicholas J. McClain