**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

**RUSSELL HANDJIS, INDIVIDUALLY, AND ON BEHALF**
**OF THE WRONGFUL DEATH BENEFICIARIES OF**
**LACEY ROBINETTE HANDJIS; AND**
**SHERRY HANDJIS, ON BEHALF OF JACK HANDJIS**
**AND TYLER HANDJIS, MINOR CHILDREN OF**
**LACEY ROBINETTE HANDJIS**                                                          **PLAINTIFFS**

            **v.**                                                **CAUSE NO. 5:25-cv-00005-DCB-BWR**

**ADAMS COUNTY, MISSISSIPPI; ADAMS COUNTY**
**MISSISSIPPI SHERIFF'S DEPARTMENT; SHERIFF**
**TRAVIS PATTEN; CHIEF STANLEY SEARCY;**
**OFFICER WANILA WILLIAMS; OFFICER VATISHA**
**COLLINS; OFFICER CLEOPHUS ROBINSON;**
**JOHN DOES 1-5; AND ABC CORPS. 6-10**                         **DEFENDANTS**


**PLAINTIFFS' MEMORANDUM AND RESPONSE TO DEFENDANTS OFFICER WANILA**
**WILLIAMS, OFFICER VATISHA COLLINS, AND OFFICER CLEOPHUS**
**ROBINSON'S MOTION FOR JUDGMENT ON THE PLEADINGS**

COME NOW, Russell Handjis, individually, and on behalf of his minor children, Jack

Handjis and Tyler Handjis, as the wrongful death beneficiaries of Lacey Robinette Handjis,

deceased; and Sherry Handjis, also on behalf of Jack Handjis and Tyler Handjis, the minor

children of decedent Lacey Robinette Handjis, and hereby file this, their Memorandum in

Response to Defendants Williams, Collins, and Robinson's Motion for Judgment on the

Pleadings.

## I.    INTRODUCTION

Lacey Handjis was married and the mother of two young children. She was also a nurse.

Tragically, Lacey died while she was in a holding cell at the Adams County Jail. She had been

placed in the holding cell approximately fourteen (14) hours prior to her death. Lacey was in the

holding cell because she simply needed a place to go where she would be safe and in good care

1

while she was awaiting to appear before the chancery judge that next day, at which point she may have been transported to Mississippi State Hospital at Whitfield for treatment. Lacey did nothing illegal or even wrong. She just needed to be in a safe place for a short while and get the mental help she needed.

Lacey's cause of death was hyponatremia dehydration. And, her death should have never happened. Shockingly, the video footage taken from the holding cell, the control room, and the hallway tells the story. The story of three officers on duty--Officers Robinson, Williams, and Collins—who were charged with the responsibility of monitoring Lacey, and who observed Lacey's obvious and serious medical distress and who heard her begging for medical care, knew she was exhibiting signs of medical distress and, in response, took no action to provide medical care for Lacey.

These officers observed the blood Lacey vomited in the holding cell sink (clearly present for twenty-one (21) minutes) and on the floor in the holding cell; the officers observed the blood Lacey placed in the hallway floor (clearly present for fifty-one (51) minutes) to prove to them that she was in urgent need of medical care; they observed the feces Lacey released on the holding cell floor and also Lacey laying in it; and they heard loud and clear all of Lacey's many pleas for medical care and her good reasons for it. In response, these officers took no action, whatsoever, to obtain medical help for Lacey despite their awareness of Lacey's obvious and serious medical distress.

These officers were plainly incompetent. They *knew* that Lacey was in serious need of medical care from the very fact that Lacey's serious need of medical care was obvious. Even a laymen would have recognized that medical care was required for Lacey.

2

In response to Lacey's family's Amended Complaint, the officers have filed their Motion for Judgment on the Pleadings, which is based on the defense of qualified immunity.  In it, the officers brush off the operative complaint by claiming that Lacey was nothing but a crazy person acting crazy.  (ECF Doc. 43, p. 1).  Incredibly, they claim that the Plaintiffs' do not allege in their Amended Complaint any of the three (3) officers both had facts before them that would allow for the inference that Lacey was in serious need of medical attention and that they, in fact, made the inference.  (ECF Doc. 43, p. 2).  These Defendants in their motion claim that the Plaintiffs' Amended Complaint fails to allege facts that these Defendants had information by which they could have inferred that Lacey was having a medical emergency and that each of them actually made the inference.  (ECF Doc. 43, p. 2).

However, these officers were plainly incompetent.   And, they *knew* that Lacey was in serious need of medical care from the very fact that Lacey's serious need of medical care was obvious.

These officers claims set forth in their subject Motion are obviously against the weight of the credible evidence here.  The Plaintiffs' well-pled Amended Complaint satisfies every requirement under the law.  Consequently, these Defendants' subject Motion should be denied.

**Lacey's family urges the Court to please watch the videos of the holding cell, the control room and the hallway.**  The Amended Complaint sets forth with particularity the moments in the videos which demonstrate the Plaintiffs' claims in their case.  The Plaintiffs have recently condensed all of these identified moments into one video, so that the Court may more easily watch and hear these moments.[1]  <u>This video exhibit is marked as **Exhibit 1** to the</u>

---

[1] The video clip numbers correspond with the paragraph numbers in the Amended Complaint.

<u>Plaintiffs' response to these Defendants' Motion now before the Court.</u>  Please also review the

digital stills marked as exhibits to the Amended Complaint.

## II.    STATEMENT OF FACTS ALLEGED IN THE AMENDED COMPLAINT

The Exhibits Referenced in this Section are Those Exhibits to the Amended Complaint

and Condensed on the Previously-Mentioned Exhibit 1 marked as an Exhibit to Plaintiffs' subject

Response.

Plaintiffs set forth, in part, in their Amended Complaint the following statement of facts:[2]

18.    This case arises out of the death of Lacey Robinette Handjis ("Lacey") while she was being held at the Adams County Mississippi Jail in Natchez, Mississippi.  Lacey was being held overnight there due to a mental health crisis she was experiencing.  She was scheduled to appear at a hearing the following afternoon before the Chancery Court of Adams County where that court would determine whether to enter an Order of Commitment, so that Lacey could receive psychiatric care at the Mississippi State Hospital at Whitfield.  *See* Chancery Court of Adams County's Order to Hold, attached hereto as <u>Exhibit A</u>.

19.    At the time of her death, Lacey was a resident of Natchez, Mississippi, and was married with two young children.

20.    As a background matter, Lacey was a graduate of Trinity Episcopal Day School in Natchez, Mississippi.  Thereafter, she attended Central Louisiana Technical Community College where she earned a degree in nursing.   She served as a nurse in her community.  At the time of her death, Lacey was employed as a hospice care consultant for Hospice Compassus in Natchez. Prior to that, Lacey worked at the Adams County Correctional Facility as a nurse.

21.    Unfortunately, Lacey suffered from a mental health condition, bi-polar disorder, that became symptomatic in August 2023.

22.    Lacey had traveled to Winona, Mississippi sometime in mid-August with her children.  During this time, Lacey was exhibiting symptoms of her aforesaid mental health condition.

23.    On August 23, 2023, Lacey arrived at her brother's house in the Mississippi Delta. She spent two nights at her brother's house during which time she exhibited signs of being manic and paranoid.

24.    On August 24, 2023, Lacey took a drug test at a clinic in Sumner, Mississippi, which was negative for illicit substances.

---

[2] The exhibits listed in this section are those attached to the Amended Complaint.

25.     On August 25, 2023, Lacey returned to Winona and continued exhibiting symptoms of a mental health condition, which caused the Winona Police to conduct a wellness check.

26.     On August 26, 2023, the decision was made to take Lacey into custody, so that a mental hold order could be obtained.

27.     On August 28, 2023, a Monday, Lacey's brother attempted to get a mental hold order from the Montgomery Chancery Clerk.  But, the Clerk directed him to the Adams County Chancery Clerk, who directed him back to Montgomery County.  Eventually, the Adams County Chancery Clerk accepted the mental hold affidavit.

28.     Montgomery County contacted the Adams County Jail to advise them of Lacey's mental condition and that they were going to transport her to the Adams County Jail.  The Adams County Jail accepted the transfer and understood that Lacey was being held due to a mental condition.

29.     Later the same day, Lacey was transported by a Winona Police Sargent to the Adams County Jail.

30.     Lacey was booked in the Adams County Jail, mugshots were taken, and she was given a jail issued suit by 14:27 hours.  *See* Adams County Sheriff's Department Jail Administrator Incident Statement of Master Seargent Brenda Russell, attached hereto as <u>Exhibit B</u>.

31.     The Plaintiffs obtained via Initial Disclosures of the Defendants named in the original Complaint video surveillance footage of the Holding Cell in which Lacey was placed. This video captures the entire time Lacey was in the Holding Cell.  Plaintiffs also obtained surveillance footage of the Control Room and the Hallway of the Jail.  Military time is referenced throughout each video.  So, Military time will be referenced in the First Amended Complaint.  Due to the graphic nature of the video of Holding Cell, it is being filed under seal.  It will be marked as <u>Exhibit C</u>.  The Control Room and Hallway videos, which capture video and audio, as well, will also be submitted under seal as exhibits to this Complaint.  They will be marked as <u>Exhibits D and E</u>, respectively.

32.     It is evident from these videos that Lacey became in dire need of medical attention while she was in the Holding Cell.  It is also evident that the Defendants deliberately ignored Lacey's serious medical conditions and needs and refused to provide her with the medical care, to which she was entitled.

33.     She was placed in a Holding Cell at or around 15:05 hours.  There, she was under the exclusive care, custody, and control of Defendants.

34.     At or around 15:20, Lacey announced that she needed her medicine, and that she was having withdrawals from not haven taken it.

5

35.     At or around 15:43, Lacey had removed her clothes; she washing in the toilet water. And, she was talking through the Holding Cell door to a black male officer and a black female officer. She states at or around 15:51 that she had been off her medications for the previous three days.

36.     At or around 16:33, Lacey, again, announces that she needs her medications.

37.     At or around 16:33, Lacey states that she had been pepper sprayed three times the previous night, which was when she was in the custody of the Grenada County Sheriff's Office.

38.     At or around 17:03, Lacey announces, again, that she needed her medications.

39.     At or around 20:42 hours, Lacey yelled for an officer to help her. She asked that someone call 911. She screamed that her chest was hurting.

40.     At or around 20:44, Officer Robinson can be seen talking with Lacey. She tells him about needing her medication. Officer Robinson tells her she put herself in this situation and would not be in the cell if she was not supposed to be.

41.     At or around 21:42, Corporal Kracek is seen through the Hallway video sitting outside of the Holding Cell door talking to Lacey. Lacey tells him she is afraid of dying in the cell and he reassures her she will not die tonight. During this time, Lacey tells Kracek that she needs to take her medications.

42.     At or around 22:13, Kracek tells her that he'll check on her later.

43.     At or around 22:14, she began drinking water at a substantial rate and in a substantial amount. She vomited water within a minute thereafter and continued to drink water. She vomited water, again, at or around 22:15 and continued to drink water. At or around 22:16, she was coughing water; and within a minute thereafter she vomited water. Still, she continued to drink water. Over the following two minutes, she repeated the pattern of vomiting and drinking water in an excessive amount. Officers Robinson and Williams are in the control room with Kracek watching the monitor and discussing getting her hygiene supplies and a mat.

44.     She took her shirt off and her pants off her body at or around 22:18, at which point she was nude. At or around 22:18, she yelled for an officer to help her. Officer Williams was watching the monitor at that time. At or around 22:19, she continued drinking water heavily. At or around 22:21, she exclaimed that she felt dizzy. Around this time, the Hallway video shows Officer Robinson enters the Hallway. Lacey tells him that she does not feel good at all. Officer Robinson, in response, tells her to put her clothes back on. She tells him her heart is racing and she feels dizzy.

45.     At or around 22:22, she screamed that she needed to go to the hospital because she felt so bad. At or around 22:23, she was drinking more water.

46. Around this time, Officer Williams can be seen and heard in the Hallway video. Officer Williams enters the Hallway and tells Lacey to put her clothes back on. Lacey yelled that she felt dizzy and asked someone to call 911 because her heart was racing. At or around 22:25, she screamed that her heart was racing. Seconds later, she vomits and, thereafter, continues to drink water.

47. At or around 22:29, Lacey exclaims that she feels dizzy. At or around 22:30, she hollered that she needed to go to the hospital, and pleaded that the Jail staff call 911 for her. Lacey said that she could feel her heart racing. She said this to Officers Williams and Robinson.

48. At or around 22:38, Lacey says, "Officer, I need to go to the hospital. I am hot." At or around 22:39, Lacey vomited again. At or around 22:40, Lacey vomits and also dry heaves. Corporal Kracek, who is observing Lacey from the Control Room, comments at or around 22:40, "She'll be hurting for a while with the pepper spray." At or around 22:42 she vomits. Again, at or around 22:43, she vomits.

49. At or around 22:43, Lacey yelled, "Officer, call 911. I had an allergic reaction to pepper spray." At or around 22:44, she exclaimed, I am having an allergic reaction because I am thirsty and throwing up." She also said, "I am thirsty and throwing up and sweating so bad." At this time Corporal Kracek and Officer Robinson, who were both in the Control Room, and who had both been listening to Lacey and watching her through the video surveillance camera(s), talked. Corporal Kracek tells Officer Robinson that Lacey was merely having a panic attack, and that she was drinking lots of water in order to make herself sick, so that she could be taken to the hospital. Officer Robinson said, "Ain't nothing wrong with her." Corporal Kracek told Officer Robinson to tell her to stop drinking water because it will make her sick.

50. At or around 22:44, Officer Robinson tells Lacey, "Pepper spray will make you throw up." He goes on to say, "*We aren't going to take you anywhere tonight*." And, he tells Lacey to drink *more* water. At or around 22:45, Officer Robinson gives Lacey *more* water to drink. Lacey is fanning herself because she is so hot.

51. At or around 22:48, Lacey washes her hair again in the sink, which she did to most likely to cool herself.

52. At or around 22:49, Corporal Kracek, still in the Control Room, says for the jail staff to call him "if she gets *crazy* crazy," and he will talk to Lacey.

53. At or around 22:52, Lacey vomits again.

54. At or around, 22:53, Lacey vomits blood in the sink. This blood filled the sink bowl. At this time, she yells out, "I am throwing up blood, officer! Officer, I'm throwing up blood!" The blood is clearly visible in the sink bowl. And, the blood remains in the sink bowl. Lacey scoops a handful of the bloody water out of the sink bowl and places that hand full of bloody water through the hole in the door to show the jail staff. She obviously did this to prove that she was, in fact, experiencing a significant health issue in the hopes that she would be provided medical care. Lacey says, "Officer Mike, I am throwing up blood! I'm throwing up blood! Officer Mike, I need to go to the ER! I am throwing up blood!" The blood remains in the

sink bowl. While this is occurring, Officer Williams, who hears Lacey's words, chooses to ignore Lacey. Instead of even looking at the Holding Cell video monitor too see if Lacey had vomited blood, Officer Williams, instead, ignores Lacey's obvious and urgent need for medical care. Officer Willaims, who had been sitting at her desk, merely gets up to staple some papers and returns to her chair.

55.     At or around 22:54, Lacey exclaims, "I am dying in here."

56.     As Lacey is trying her best to communicate to the jail staff these things, Officer Robinson is at the end of the hallway from the Control Room and does not address Lacey's pleas. Williams is in the control room, ignoring Lacey's cries for help at this time.

57.     At or around 22:54, Lacey is own her knees next to the door. She has positioned her head, so that she may see through the door hole and also be heard even more. Then and there, she repeats, "Help me, Officer Mike. I'm throwing up blood, Officer Mike! Please help me. I am fixing to die in here!"

58.     At or around 22:55, Officer Vatisha Collins signs in at the Control Room and watches the monitors. Lacey's blood is still clearly visible at this time in sink of the Holding Room. And, her blood is clearly visible at this time on the Hallway floor along the outside of the door of the Holding Room. In response, Officer Collins ignores Lacey's obvious and urgent need for medical care.

59.     Lacey continues to gulp water out of the cup provided to her by Officer Robinson.

60.     At or around 22:57, Lacey places her blood from the sink bowl and her bloody clothes in the hallway, which she most likely does to show the jail staff that she was in need of urgent medical care.

61.     At or around 22:59, Lacey, for the second time, vomits blood in the Holding Cell sink bowl. The blood is clearly visible in the surveillance video. She also vomits blood onto the Holding Cell floor. This, too, is visible in the video. Lacey's vomiting blood can clearly be heard from the Control Room. There, Officer Collins is watching Lacey in the Holding Cell through the surveillance monitor.

62.     At or around 23:00, Lacey vomits blood for a third time into the sink. This time, the amount of blood is especially heavy. This blood in the sink bowl is clearly visible in the video surveillance camera. The sink full of blood remains for a period of time and can easily be seen through the Holding Cell surveillance video and on the control room video. Officer Collins provides no help to Lacey in response. Officer Wanila Williams, who is also in the Control at this time, looks at the surveillance monitor and does nothing to help Lacey in response to witnessing all of the blood and hearing Lacey's pleas for medical care.

63.     At or around 23:14, Lacey is breathing very heavily. This is seen and heard by all of the people in the Control Room charged with the duty of monitoring Lacey.

8

64.     Lacey's blood she vomited in the Holding Cell sink remained clearly visible there and also on the floor of the Holding Cell from 22:53 until 23:14—a total of twenty-one (21) minutes.  During this period of time, Officers Robinson, Williams, and Collins all observed this blood and heard Lacey telling them, repeatedly, that she had been throwing up blood and needed medical care.  Yet, they did nothing to help her.

65.     At or around 23:17, Lacey vomits again.

66.     At or around 23:21, Officer Robinson is seen in the Hallway video monitor walking past Lacey's blood that she had placed on the Hallway floor outside of the Holding Cell to show Defendants that she was in urgent need of medical care.  Laceys' blood is clearly visible.

67.     The sequence of events set forth heretofore in paragraphs 57 through 71 (Lacey's vomiting blood, telling the officers repeatedly that she had vomited blood, the officers seeing the blood, and the officers providing no medical care to Lacey in response--are captured in Exhibit F, which is a collection of digital stills of the Holding Cell, Hallway, and Control Room videos.

68.     Lacey breathes very heavily again at or around 23:26.

69.     At or around 23:28, Officer Robinson goes to the outside of Holding Cell door and talks to Lacey.  Lacey tells him, "I am sick.  I am dying in here.  My heart is racing.  My mouth is numb.  I am throwing up blood."  Robinson tells her, "I don't know what to do."  In response, Lacey says to him, "I need your help.  Call 911."  Robinson replies, "I can't."

70.     At or around 23:29, Robinson returns to the Control Room and announces to the others there, "She says she is dying," and resumes his place in his chair.

71.     Lacey continues to beg for help, which can be heard in the Hallway and also heard and seen through the surveillance monitor located inside the Control Room.

72.     At or around 23:32, Lacey says, "I am sick.  My heart's beating.  I'm getting really weak.  My mouth is numb."

73.     At or around 23:32, Lacey begs, "Help me.  I am going to die in here.  Please, help me."  Williams and Robinson remain in their chairs.

74.     At or around 23:35, Lacey either sneezes into her right arm.  She wipes her nose with her hand.  Then, Lacey notices blood in her hand.  And, she says, "Oh, God, more blood."  She checks her pulse rate.  Lacey recites The Lord's Prayer.  Robinson is watching this unfold on the monitor.  Officer Robinson tells Officer Williams that Lacey is naked and stepping in water.  He says to Officer Williams, "there is something wrong with her," but does nothing to help her.  Neither does Officer Williams.

75.     At or around 23:37, Lacey checks her pulse rate, again.

76.     At or around 23:40 Officer Robinson is eating food and returns to his chair around 23:44.

77.     At or around 23:47, Lacey checks her pulse rate on her wrist.  And, she checks her pulse rate on her chest.  Lacey's hands are visibly shaking at this time.

78.     Lacey's blood she placed in the Hallway is clearly visible there from 22:56 until 23:47—a total of fifty-one (51) minutes.  During this period of time, Officers Robinson, Williams and Collins all observed this blood and heard Lacey's telling them that she had been throwing up blood and needed medical care.  Yet, they did nothing to help her.

79.     At or around 23:50, Lacey cries out, "My heart rate is stopping.  Officer, I need help!"  Lacey begins to pray, again.  Meanwhile, Officer Robinson is eating food in the Control Room and watching the monitors.  Officer Williams is also sitting in her chair in the Control Room.   They are observing Lacey.

80.     At or around 23:51, Lacey checks her pulse.  She says a prayer for her two young children.

81.     At or around 23:56, Lacey checks her pulse, again.

82.     At or around 23:59, Officer Robinson is, as he has been, in the Control Room; he is still enjoying a meal while he is watching and listening to Lacey suffer in the Holding Cell through the surveillance monitor.

83.     At or around 00:00, Lacey sits on the toilet seat and checks her pulse.

84.     At or around 00:29, Lacey prays the following: "God forgive them, they know not what they do."  Lacey then says another prayer to her two young children.

85.     At or around 00:31, Lacey exclaimed, "I'm fixing to die in here.  I'm losing consciousness.  Someone, call 911 immediately.  I can't breathe!  I'm having a heart attack."

86.     At or around 00:32, Lacey screams, "I barely have a pulse.  I guess y'all don't care."

87.     At or around 00:33, Lacey says another prayer.  She says, "I barely have a heartbeat."

88.     At or around 00:34, Lacey screams, "I'm dying! I can't breathe."

89.     At or around 00:36, Lacey again screams, "Help me, I'm dying in here.  I'm getting dark."

90.     At or around 00:40, Lacey says, "I'm losing consciousness.  My heart rate is barely palatable."

10

91.     At or around 00:42, Lacey says, "I can't breathe."  Lacey prays, again.

92.     At or around 00:43, <u>Lacey screams, "Someone, call 911.  I'm losing my bowels. I'm losing consciousness."</u>  Lacey pounds her chest.

93.     At or around 00:51, Lacey prays.

94.     At or around 00:53, Lacey pounds on the left side of her chest.

95.     At or around 00:54, she wipes toilet water on herself, while still pounding her chest.

96.     At or around 00:57, Lacey says, "I'm too weak.  I'm losing feeling in my legs." By this time, Officer Robinson was sleeping in the control room and Officer Williams was still sitting in her chair.

97.     At or around 00:58, Lacey yells, "I'm dying!  Someone, call 911.  My ears are ringing.  Death is near.  Someone, call 911!"

98.     At or around 00:58, she smears her defecation onto her body.  Meanwhile, Officer Robinson, after finishing his meal, has gone to sleep.

99.     At or around 01:05, Lacey exclaims, "please call 911!  I need an ambulance.  I'm fixing to throw up."

100.    At or around 01:07, Lacey prays, "I'm fixing to die for my sins.  Lord, please forgive me for my sins.  I am not perfect.  Please forgive me for my sins and all that sin against me.  Messiah, forgive me.  I love you, Lord."

101.    At or around 01:10, Lacey is standing and pounding her chest.

102.    At or around 01:13, Lacey is making the motion with her arm as if pounding her chest, but her arm is no longer making contact with her chest.

103.    At or around 01:14, Lacey frantically bangs on the door of the Holding Cell.

104.    At or around 01:14, Lacey is now speaking incoherently.  She is praying, incoherently.

105.    At or around 01:18, Lacey, again, bangs on the door of the Holding Cell.

106.    Officer Robinson has awakened from his sleep and goes to get a snack.  Officer Williams remained in her chair.

107.    At or around 01:23, Lacey is marching in place at the door and is being watched on the monitor by Officer Robinson.

108.    At or around 01:24, Lacey is speaking in what seemingly sounds like a language other than English.

109.    At or around 01:28, Lacey vomits.  She is mumbling.

110.    At or around 01:28, Lacey defecates loose stool onto the floor while standing there on the floor.

111.    At or around 01:29, Lacey defecates, again, loose stool onto the floor while she is standing there.  Lacey begins to loose her balance while standing. Officer Robinson is sitting in his chair.

112.    At or around 01:30, Lacey vomits, again.  Her body sways.  She sits on the mat on the floor of the Holding Cell.

113.    At or around 01:33, Lacey lays down on the mat.

114.    At or around 01:38, Lacey appears unconscious.  She is taking very shallow breaths.

115.    At or around 02:09 Officer Robinson is watching the monitors and calls Officer Williams over to look at says, "Why is she laying there in the water?  I think her head hit the door." Officer Williams leaves the Control Room.  Officer Robinson says, "she shit on the floor" and again proclaims, "she has a serious problem."

116.    At or around 02:12, Officer Williams is now in the Hallway; she approaches the Holding Cell door.  There, she looks through port hole of the door.  She sees the horrible and graphic scene.  She sees Lacey laying nude on the floor in her feces.  Lacey is obviously in urgent need of medical care.  *See* the digital still images of Officer Williams peering into the Holding Cell and seeing Lacey on the floor in dire need of medical care, a copy of which is being submitted under seal, due to its graphic nature—marked as <u>Exhibit G</u>.

117.    Incredibly, and with deliberate indifference to Lacey's medical needs, Officer Williams never attempted to communicate with Lacey, or help her in any way.  Instead, Officer Williams merely walks back to the Control Room, sits down and does nothing else.

118.    At or around 02:15, Lacey remains on her stomach in the loose feces on the floor, with her head on the floor facing the door of the Holding Cell.  Officer Robinson, still watching the monitor, says "she is wallowing in it; she has a serious problem; I never seen anyone wallowing in their shit." Officer Robinson tells Officer Williams, "you can smell it out in the hall," then proceeds to resume his position in his chair.

119.    At or around 02:29, Officer Robinson, again, looks at Lacey through the video monitor for several minutes, but does nothing to help her.

120.    Around 02:51, Officer Williams leaves the Control Room for the night.  Officer Robinson then moves to her chair, so he can apparently slide it out of camera view.  He proceeds to go to sleep and remains sleeping until around 05:00.

121.    At or around 03:27, Lacey appears to be barely breathing.

122.    At or around 03:37, Lacey is breathing, but in a convulsive-like manner.

123.    At or around 03:47, Lacey continues to breath, but, still in a convulsive-like manner.

124.    At or around 04:08, Lacey is breathing very lightly.

125.    At or around 04:30, Lacey remains on her belly, face down.  Her movement is very slight.

126.    At or around 04:25, Lacey begins to grunt loudly.  Her loud grunting continued until around 04:38.

127.    At or around 05:00 Officer Robinson awakes from his slumber.

128.    At or around 06:26, a jail guard closes the port opening of the door of the Holding Cell.

129.    At or around 06:49, a jail staff member attempts to open the Holding Cell door.

130.    The Jail staff finally entered Lacey's room and discovered she was dead some time later.

131.    The September 7, 2023, toxicology report was negative for any illicit substances.

132.    In the Mississippi Crime Lab autopsy report the cause of death is listed as undetermined.  But, her labs show a hyponatremic dehydration pattern, which would be consistent with the symptoms she was experiencing in the cell prior to her death.

133.    An independent autopsy report prepared on March 20, 2024, found the cause of death to be hyponatremia dehydration (low sodium).  *See* Independent Autopsy Report prepared on March 2024, attached hereto as Exhibit H.

134.    Lacey's cause of death could have been easily prevented had the Defendants timely provided medical treatment for her.

135.    The video footage taken from the Holding Cell, the Control Room, and the Hallway show that Officers Robinson, Williams, and Collins observed Lacey's obvious and serious medical distress and heard her begging for medical care and, in response, took no action to provide medical care for Lacey.

13

136.    After Lacey died, and in the late evening of August 29, 2023, investigators within the Adams County Sheriff's Department interviewed each of the employees of the County who worked at the Jail that night and who were responsible for Lacey's safety, health, and well-being. These interviews were recorded.  Plaintiffs obtained a copy of each of them in the Initial Disclosures.

137.    In addition to her actions and inactions as documented in the videos of the Holding Cell, the Control Room, and the Hallway, it is clear from the statements made by Officer Collins in her interview that pre-trial detainees such as Lacey who had mental conditions are not to be provided medical care.  The following statements of Officer Collins evidence these things. When asked if Lacey appeared to have a medical condition or health issues, Collins responded, "She was just like a mental patient.  Would scream.  Took off clothes.  Throwing water in the cell." *See* Adams County Sheriff's Department Jail Administrator Incident Statement of Officer Collins, attached hereto as Exhibit I, beginning at or around the 3:50 mark of the video.

138.    Another alarming statement was in response to when she was asked if she ever spoke with Officer Robinson about what was going on with Lacey while Officer Collins was in the Control Room.  Collins responded, "We didn't speak much about it.  Like, as far as we know, she was just a mental patient." *See* Exh. I, beginning at or around the 10:30 mark of the video. At another point during this interview, after being asked if anybody ever said anything about what was going on with Lacey, about taking it seriously, Officer Collins said, "we get mental patients all the time, and you just don't know what you gonna get with these people." *See* Exh. I, beginning at or around the 11:50 mark of the video.

139.    And, when asked if there was anything about Lacey that caused Officer Collins concern, she said, "I thought she was tiring herself out and went to bed.  She was a mental patient.  They'll sleep how they want to sleep.  They don't know no better.  She had been up all night and was tiring herself.  Like, she was fine." *See* Exh. I, beginning at or around the 13:15 mark of the video.

140.    Further, when asked if she noticed Lacey's mood had changed during Officer Collins' work shift, Collins responded, "Between 2:00 and 4:00 o'clock, I think maybe she had just burnt out and wanted to rest.  She kind of went down." *See* Exh. I, beginning at or around the 6:25 mark.  Officer Collins went on to state in her interview "You know how a person be hyper all day long and just burn herself out?  I assumed she got tired because she was a ticking time bomb." *See* Exh. I, beginning at or around 9:45 mark of the video.  Officer Collins went on to say, "Being a mental patient, you never know how they will go to sleep.  Some go to sleep naked.  Some go to sleep with pants on or shirt on.  I just thought, she is a mental patient, she might be asleep." *See* Exh. I, beginning at or around 10:00 mark of the video.

141.    Further, Officer Collins was asked the following question: "So, when she was laying on the floor and all that, you didn't have any reason to be concerned, or you weren't concerned.  You just thought she had burned herself out, to used your words?"  Officer Collins answered, "I thought she had everything she needed outside of medicine.  She had water.  She had clothes.  She had soap for her to wash up.  She was like Shawn Keith or Michael

14

Washington.  One of those inmates.  And, you never know what you are gonna get with them."
*See* Exh. I, beginning at or around the 14:35 mark of the video.  Officer Collins also said, "You are supposed to take it serious every time they say something.  But, they'll burn you out after a while when they continue to call you to a cell and ain't nothing wrong.  They'll do that."  *See* Exh. I, beginning at or around the 15:15 mark of the video.

142.     Officer Collins also stated in her interview that, "We can't move nobody at night time.  We are not allowed to move people at night time…".  *See* Exh. I, beginning at or around the 16:15 mark of the video.

143.     Officer Robinson---In addition to his actions and inactions as documented in the videos of the Holding Cell, the Control Room, and the Hallway, and as set forth heretofore, it is clear from the statements made he made in the interview that pre-trial detainees such as Lacey who had mental conditions are to be provided with no medical care.  For example, Officer Robinson said, "We have people come in here who take off their clothes and act crazy.  Say they ain't supposed to be here and all that stuff."  *See* Adams County Sheriff's Department Jail Administrator Incident Statement of Officer Robinson, attached hereto as Exhibit J, beginning at or around the 4:25 mark of the video.  Officer Robinson was then asked, "You thought that was normal?"  He replied, "Yeah, I thought it was normal.  Since eight months I been here, we had Mike and couple other guys--they take off their clothes, and piss.  Watson, he done did it before. I didn't think nothing of it."  *See* Exhibit J, beginning at or around the 4:30 mark of the video.

144.     Officer Robinson went on to say in his interview that Lacey was, "getting noisy all the way to about 12:30 this morning.  She just kept talking.  She said she needed to get out. Said that her husband killed somebody.  She was saying all kinds of stuff.  When I hear that, I say, she's crazy."  *See* Exh. J, beginning at or around the 5:15 mark of the video.

145.     Officer Robinson wrote in the Incident Report that night following his interview that when Lacey told him that she needed to see a doctor, he responded to her, "that she would have to check with morning shift because we could not get her a doctor tonight."  A copy of Robinson's Incident Report is attached hereto as Exhibit K.

ECF Doc. 23.

### III.     LAW AND ARGUMENT

#### A.  Standard of Review

##### 1.  12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a

"short and plain statement ... showing that the pleader is entitled to relief." Fed. R. Civ. P.

8(a)(2).  Each claim must include enough factual allegations "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Motions for judgment on the pleadings under Rule 12(c) are subject to the same standard of review as a motion under Rule 12(b)(6).  *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010).  "To be plausible, the complaint's factual allegations must be enough to raise a right to relief above the speculative level.*"  Great Lakes,* at 2010.  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This is a "context-specific task that requires the reviewing court to draw on its judicial expertise and common sense."  *Ashcroft v. Iqbal,* at 679.

The Court must "accept all well pleaded facts as true and construe the complaint in the light most favorable to the plaintiff."  *Great Lakes*, at 210.

"This standard 'simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements."  *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008)(citing *Twombly*, at 556).

"The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Ironshore Europe DAC v. Schiff Hardin, LLP*, 912, F.3d 759, 763 (5th Cir. 2019).  The Court may also consider matters of public record, *Davis v. Bayles*, 70 F.3d 367, 372

16

n.3 (5th Cir. 1995), and any other matters of which it may take judicial notice. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

## 2.  Doctrine of Qualified Immunity---12(b)(6)

When "a qualified immunity defense is asserted in an answer or a motion to dismiss, the district court must – as always – do no more than determine whether the plaintiff has filed a short and plain statement of his complaint, a statement that rests on more than conclusions alone." *Anderson v. Valdez*, 845 F.3d 580, 589-90 (5th Cir. 2016).  This is not a heightened pleading standard, *Anderson*, at 590; but the plaintiff must "plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and defeat a qualified immunity defense with equal specificity." *Hinojosa v. Livingston*, 807 F.3d 657, 664 (5th Cir. 2015).  The Court treats qualified immunity arguments at the pleading stage no different than the typical 12(b)(6) standard of review. *Turner v. Lieutenant Driver*, 848 F.3d 678, 684–85 (5th Cir. 2017).

## B.      Doctrine of Qualified Immunity in the Context of Medical Care to Pretrial Detainees

Pre-trial detainees have a constitutional right to medical care and protection from harm during their confinement.   Indeed, it is a well-established concept that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

The Fourteenth Amendment to the U.S. Constitution guarantees pretrial detainees a right to not have their serious medical needs met with deliberate indifference on the part of confining officials. "A serious medical need is one for which … the need is so obvious that even laymen

17

would recognize that care is required." *Kitchen v. Dallas County, Tex.* 759, F.3d 468, 482 (5th Cir. 2014), citing *Gobert v. Caldwell,* 463, F.3d 339, 345, n.12 (5th Cir. 2006).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A right is "clearly sufficient" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullinex v. Luna*, 577, U.S. 7, 11 (2015)(per curiam)(internal quotation marks and citation omitted). Court must not "define clearly established law at a high level of generality"; instead, their "inquiry must be undertaken in light of the specific context of the case." *Mullinex*, at 12.

Generally, to satisfy this standard, there must be "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371-72(5th. Cir. 2011)(en banc) (internal quotation marks and footnote omitted). However, where the defendant's conduct is extreme and obviously unlawful, an analogous case is not required. *Taylor v. Riojas*,141 S.Ct.52, 53-54 (2020) (explaining that Supreme Court precedents allow for "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear." (cleaned up). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Easter v. Powell*, 467 F. 3d 459, 465 (5th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).

18

For claims related to the medical treatment of a pretrial detainee, courts in this circuit will find a constitutional violation where an officer: (1) subjectively knew of a substantial risk of serious harm to the detainee; and (2) responded to that risk with 'deliberate indifference. *Ford v. Anderson County, Tex.*, 102 F.4th 292, 307 (5th Cir. 2024), citing *Cope v. Cogdill*, 3 F.4th 198, 206–07 (5th Cir. 2021).

A detainee can establish a jail official's deliberate indifference by showing that the official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *See Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

To be clear, <u>qualified immunity does not shield plainly incompetent officers from individual liability</u>. *Malley v. Briggs*, 475 U.S. 335, 340 (1986). <u>Moreover, a factfinder may conclude that a jail official knew of a substantial risk from the very fact that the risk was obvious.</u> *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *see Kelson v. Clark*, 1 F.4th 411, 419 (5th Cir. 2021), citing *Easter v. Powell*, 467 F.3d 459, 467 (5th Cir. 2006); *see* also *Attenberry v. Nocona Gen Hosp.*, 430 F. 3d 245, 254 (5th Cir. 2005), citing *Hernandez v. Tex Dep't of Protective & Regulatory Servs.*, 380 F. 3d 872, quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), where the courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."

### IV.    ARGUMENT

#### A. Defendants are not Entitled to Qualified Immunity because Plaintiffs have met their burden of proof via their Amended Complaint.

##### i.    Plaintiff's Sufficiently Allege a Constitutional Violation.

Plaintiffs have set forth facts in their Amended Complaint which evidence that Officers Williams, Collins, and Robinson each subjectively knew that Lacey was in serious need of

medical care and; and that each of these officers responded to Lacey's serious need of medical care with deliberate indifference. The facts asserted in the following paragraphs, in Unconstitutional Episodic Acts and Omissions section of the Amended Complaint demonstrate this, as well as the other paragraphs in the other sections of the Amended Complaint.

167. **Officer Robinson**: Officer Robinson was assigned to the Adams County Jail overnight shift on August 28-29 of 2023, which was when Lacey was being held overnight at the Jail as she was awaiting her commitment hearing on the afternoon of August 29, 2023. His primary job was to monitor the continuous video surveillance feed coming from the Holding Cell where Lacey was being held and to periodically check on Lacey. As evidenced throughout this Complaint, Officer Robinson observed Lacey's obvious medical distress via the surveillance video coming from the Holding Cell. This included the blood in the Holding Cell sink and floor that Lacey had vomited; it included the blood Lacey placed in the Hallway Floor by Lacey to prove she was in urgent need of medical care; it included the feces Lacey released on the Holding Cell floor and Lacey laying in it; and it included, through audio, all of Lacey's pleas for medical care. However, Officer Robinson took no action to obtain medical help for Lacey despite his awareness of Lacey's obvious and serious medical distress.

168. **Officer Williams** was assigned to the Adams County Jail overnight shift on August 28-29 of 2023, which was when Lacey was being held overnight at the Jail as she was awaiting her commitment hearing on the afternoon of August 29, 2023. Officer Williams' primary job was to monitor the continuous video surveillance feed coming from the Holding Cell where Lacey was being held and to periodically check on Lacey. As evidenced throughout this Complaint, Officer Williams observed Lacey's obvious medical distress via the surveillance video coming from the Holding Cell. This included the blood on in the Holding Cell sink and floor that Lacey had vomited; it included the blood Lacey placed in the Hallway Floor by Lacey to prove she was in urgent need of medical care; it included the feces Lacey released on the Holding Cell floor and Lacey laying in it; and it included, through audio, all of Lacey's pleas for medical care. However, Officer Williams took no action to obtain medical help for Lacey despite her awareness of Lacey's obvious and serious medical distress.

169. **Officer Collins** was assigned to the Adams County Jail overnight shift on August 28-29 of 2023, which was when Lacey was being held overnight at the Jail as she was awaiting her commitment hearing on the afternoon of August 29, 2023. One part of Officer Collins' job was to monitor the continuous video surveillance feed coming from the Holding Cell where Lacey was being held and to periodically check on Lacey. As evidenced throughout this Complaint, Officer Collins observed Lacey's obvious medical distress via the surveillance video coming from the Holding Cell. This included the blood on in the Holding Cell sink and floor that Lacey had vomited; it included the blood Lacey placed in the Hallway Floor by Lacey to prove she was in urgent need of medical care; it included the feces Lacey released on the Holding Cell floor and Lacey laying in it; and it included, through audio, Lacey's pleas for medical care. However, Officer Collins took no action to obtain medical help for Lacey despite her awareness of Lacey's obvious and serious medical distress.

ECF Doc. 23.

Officer Robinson was aware of facts from which an inference could be drawn that Lacey was in need serious need of medical care, and he actually drew the inference. This is evidenced in Paragraph 115 of the Amended Complaint. It states as follows:

At or around 02:09 Officer Robinson is watching the monitors and calls Officer Williams over to look at says, "**Why is she laying there in the water? I think her head hit the door**." Officer Williams leaves the Control Room. Officer Robinson says, "she shit on the floor" and again proclaims, **"she has a serious problem."** ECF Doc. 23.
It is also evidenced in Paragraph 118 of the Amended Complaint.

At or around 02:15, Lacey remains on her stomach in the loose feces on the floor, with her head on the floor facing the door of the Holding Cell. Officer Robinson, still watching the monitor, says "she is wallowing in it; **she has a serious problem**; **I never seen anyone wallowing in their shit."** Officer Robinson tells Officer Williams, "you can smell it out in the hall," then proceeds to resume his position in his chair.

As the Court must "accept all well pleaded facts as true and construe the complaint in the light most favorable to the plaintiff," *Great Lakes*, at 210, supra, here, Officer Robinson's statement "she has a serious problem," which he says twice while he was observing Lacey while she was in urgent need of medical care, demonstrates that Officer Robinson was aware of facts from which an inference could be drawn that Lacey was in serious need of medical care, and that he actually drew the inference; therefore, he was subjectively aware. Of course, and as the Amended Complaint sets forth, he did nothing to provide Lacey with medical care.

Importantly, and as previously stated in this memorandum, qualified immunity does not shield plainly incompetent officers from individual liability. *Malley v. Briggs*, at 340. And, a factfinder may conclude that a jail official knew of a substantial risk from the very fact that the risk was obvious. *Farmer v. Brennan*, at 842; *see* also *Kelson v. Clark*, at 419, citing *Easter v. Powell*, at 467; s*ee* also *Attenberry v. Nocona Gen Hosp.*, at 254, internal citations omitted.

21

The Amended Complaint sets forth a multitude of facts which show that each of these three jail officers were plainly incompetent.  Paragraphs 167, 168, and 169, cited above, which summarize the earlier paragraphs in the Amended Complaint show that each of these jail officers were plainly incompetent.

Plaintiffs have also alleged facts which demonstrate that each of these jail officers *knew* (were subjectively aware) that Lacey was in serious need of medical care from the very fact that Lacey's serious need of medical care was obvious.  Again, see Paragraphs 167, 168, and 168 cited heretofore.  Note, too, that Paragraph 64 accurately states that the blood Lacey vomited in the holding cell sink was clearly present in the video for twenty-one (21) minutes.  Paragraph 78 of the Amended Complaint accurately states that blood Lacey cupped in her hands and placed onto the hallway floor immediately outside of the holding cell room was clearly present for fifty-one (51) minutes to prove to them that she was in urgent need of medical care.  This blood, alone, was enough to show these three officers that Lacey was in need of urgent medical care.  Certainly, the blood, and all of Lacey's pleas for medical care and her reasons for it, along with all of the other symptoms Lacey was displaying in the holding cell, made it so obvious that Lacey needed medical care, that even laymen would have recognized that care was required for Lacey.  *Kitchen v. Dallas County, Tex.,* at 482, citing *Gobert v. Caldwell,* at 345, n. 12, supra.

The Amended Complaint demonstrates, with particularity, that each of these plainly incompetent officers responded to Lacey's serious need of medical care with deliberate indifference by not providing her with medical care.  They, again, ignored the blood in the sink Lacey vomited; they ignored the blood in the hallway Lacey had placed there to show them she was in urgent need of medical care.  *See Johnson v. Treen*, at 1238, supra, where that court held that a detainee can establish a jail official's deliberate indifference by showing that the official

22

ignored her complaints, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."

As stated heretofore, Lacey died from hyponatremia dehydration (low sodium). All of the symptoms she was experiencing and exhibiting in the holding cell were consistent with this cause of death.

**Itemization in chronological order of Lacey's pleas for medical care and her reasons for it; Lacey's actions/symptoms; and Robinson's and Williams' plain incompetence displayed.**

- Vomiting blood multiple times in sink bowl
- Says repeatedly that she is vomiting blood
- Says she needs to go to ER
- Says she is dying in here
- Places blood in the hallway that she had vomited into sink bowl to prove to these officers that she needed medical care
- Breathing very heavily---seen and heard in the control room
- Tells Robinson she is sick and that she is dying in the holding cell. Robinson replies that he doesn't know what to do. I response, Lacey says to him, "I need your help. Call 911."
- Says she is getting weak.
- Says her mouth is numb.
- "Help me. I'm going to die in here."
- "Please help me!"
- She checks her pulse rate, again.
- Checks her pulse rate on her wrist.
- Her hands are visibly shaking.
- Says her heart rate is stopping.
- "Officer, I need help."
- She prays.
- She checks her pulse.
- She says a prayer for her two young children.
- Checks her pulse, again.
- She prays, "God forgive them, they know not what they do."
- Lacey then says another prayer to her two young children.
- "I'm fixing to die in here."
- "I am losing consciousness."
- "Someone, call 911 immediately."
- "I can't breathe!"
- "I'm having a heart attack."
- "I barely have a pulse."

23

- "I guess y'all don't care."
- "Says another prayer."
- "I barely have a heartbeat."
- "I'm dying.  I can't breathe."
- "Help me, I'm dying in here."
- "I'm getting dark."
- "I'm losing consciousness."
- "My heart rate is barely palatable."
- "I can't breathe."
- Prays again.
- Screams, "Someone call 911.  I am losing my bowels.  I am losing consciousness."
- She pounds her chest.
- Prays again
- Pounds her chest
- "I'm too weak.  I'm losing feeling in my legs."
- "I'm dying!"
- "Someone call 911."
- "My ears are ringing."
- "Death is near."
- "Someone call 911!"
- "Please call 911!"
- "I need an ambulance."
- "I'm fixing to throw up."
- "I'm fixing to die for my sins.  Lord, please forgive me for my sins.  I'm not perfect.  Please forgive me for my sins and all that sin against me.  Messiah, forgive me.  I love you, Lord."
- Lacey stands and pounds her chest
- She makes a motion with her arm as if pounding her chest, but her arm is no longer making contact with her chest.
- She frantically bangs on the door of the holding cell.
- She is speaking incoherently
- She prays incoherently
- Lacey is marching in place.
- She vomits.
- She is mumbling.
- She vomits, again.
- Her body sways.
- She lays down on the mat.
- She appears unconscious.
- She is taking very shallow breaths.
- She is laying in her feces, facedown.
- Williams looks into the holding cell.  She sees Lacie.  She then simply leaves for the night.

24

- Robinson goes to sleep.
- Lacey is barely breathing, but in a convulsive-like manner
- She is breathing very lightly
- She remains on her belly in her feces
- She grunts loudly.
- She dies.

ECF. Doc. 23

  **B. The Fifth Circuit caselaw provides existing precedent which demonstrates that Lacey's constitutional right to receive medical care was clearly established.**

As stated heretofore, the doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, at 231. A right is "clearly sufficient" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullinex v. Luna*, at 11. Court must not "define clearly established law at a high level of generality"; instead, their "inquiry must be undertaken in light of the specific context of the case." *Mullinex*, at 12.

Generally, to satisfy this standard, there must be "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, at 371-72. However, where the defendant's conduct is extreme and obviously unlawful, an analogous case is not required. *Taylor v. Riojas*, at 53-54. "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Easter v. Powell*, at 465 (quoting *Hope v. Pelzer*, at 740).

In *Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020), the plaintiff died after slamming his head into the interior of a patrol car. *Id* at 374. When the officers arrived on scene the observed the decedent's erratic behavior and restrained him. *Id* at 378. While being transported to jail, the decedent slammed his head into the interior of the patrol car. *Id* at 379. The decedent was eventually placed in a padded cell. The officers did not report to the jailer that the decedent slammed his head into the patrol car. Instead, the officers only reported the decedent had been medically cleared at the scene. *Id*. Two hours later the decedent was found with labored breathing and summoned paramedics. *Id*. The decedent died later that evening of blunt force trauma and cranial hemorrhage. The Court held that that qualified immunity did not apply because a reasonable jury could find the injuries to the decedent were so severe and plainly evident to the officers that the officers acted with deliberate indifference by failing to seek medical attention. *Id* at 382.

Here, and like in *Dyer*, the officers watched Lacey experiencing a serious medical emergency and did nothing. Lacey told them of the serious need for medical care. Lacey was a nurse by trade and was telling the officers what was wrong with her. For instance, she told them about being dizzy, having a faint pulse, vomiting blood, having chest pains, and defecating in her cell.

In *Austin v. Johnson*, 328 F.3d 204 (5th Cir. 2003), a minor was convicted of shoplifting and sentenced to a penal boot camp. The minor was having trouble performing the physical activities required at the boot camp and the counselors believed him to be lazy. The minor complained of being sick but was told to continue. He collapsed several times and was taken to the school building between 2 and 4 p.m. While in the school building, the minor "fell out" at 3 p.m., vomited, and became unconscious. *Id* at 206. The counselors did not call for EMS until 4:42 p.m. The minor suffered from the serious condition of hyperpyrexia and acute rhabdomyolysis and was hospitalized for two weeks. *Id*. The court found that, "their failure to call an ambulance for almost two hours while [minor] lay unconscious and vomiting rises to the

26

level of deliberate indifference." *Id*.  The Court further found the "defendants' contention that no case has specifically proscribed the withholding of medical treatment for boot camp attendees reads the right too narrowly; officers need only have 'fair warning' that their conduct is unlawful." *Id*.  Still further, the Court correctly found "Given the serious medical consequences of dehydration, a reasonable person would not have waited nearly two hours to call an ambulance once [minor] became unconscious." *Id*.

In Lacey's case, she was dehydrated, vomiting blood multiple times, the blood was visible in the cell and in the hallway, she defecated in the cell, begged for help at least 22 times, and became unconscious.  She was unconscious when Officer Williams peered into the holding cell, but Williams did not even attempt to see if she was responsive. What did the Officers do? Nothing.

In *Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2022), the decedent had been taken to the hospital for chest pain, agitation, and tachycardia. *Id* at 948. He was arrested at the hospital for public intoxication. *Id*.  Once in his cell, the decedent's medical condition steadily worsened. He did not eat or sleep and was calling out for a hospital and stating that he was sick. *Id*.  After ten hours, the decedent began vomiting a dark black liquid and smeared it around on the floor. He remained lying in his vomit. *Id*.  When the officers picked him up to clean up the vomit, he screamed in pain. *Id*.  The decedent continued to vomit black liquid two more times. *Id*.  While cleaning up the second vomit a small bag was found in the vomit. *Id*. The decedent cried out to officers and made noises of pain but no one helped him. *Id*.  Five hours later he was dead. *Id*.

These facts are similar to this case, with the exception of drug intoxication and a drug bag and with the exception that Lacey was able to convey her symptoms to the Officers and beg for medical help.

27

The *Sims* Court found that Sims identified a "case or body of relevant case law holding that an officer acting under similar circumstances violated the Constitution" sufficient to show the decedents rights were clearly established. *Id* at 951. Sims relied on *Easter* for this proposition and the Court agreed. Similarly, the Plaintiffs rely on *Easter* and *Sims,* as well as the other cases, to show Lacey's rights were clearly established at the time of when she was in serious need of medical care.  Lacey had a constitutional right to not "have [her] serious medical needs met with deliberate indifference on the part of the [officers]." *Id* at 949.

In *Easter v. Powell,* 467 F.3d 459 (2006), the plaintiff was a prison inmate that sought treatment for a known heart condition from the prison infirmary. The plaintiff informed the defendant he had been experiencing chest pain for approximately twenty minutes. *Id* at 461. The defendant refused to treat the plaintiff and sent him back to his cell. *Id* at 461. After four hours the plaintiff returned to the infirmary and was treated by a different medical professional. The plaintiff suffered ruptured blood vessels in his eye due to the delay in treatment. *Id* at 461. The Court found the defendant was not entitled to qualified immunity because she knew of the plaintiff's heart condition, that he was experiencing chest pain, and refused to treat him. *Id* at 463.

Similar to *Easter,* the Defendants knew Lacey was in medical distress. She told them numerous times and begged for help and medical care. The physical observations clearly showed she was in dire need of medical care. She was vomiting blood and defecating on the floor of the holding cell.  Officers Robinson and Williams agreed she had a "serious problem." They ignored Lacey's pleas for help and actually refused to call 911 or otherwise provide medical care.

In *Kelson v. Clark,* 1 F.4th 411 (5th Cir. 2021), a homeless man who suffered from schizophrenia was assaulted and robbed.  He was punched in the head and hit his head on a wall. *Id* at 414.  Officers arrived and the decedent told the officers that he needed medical attention for his head injuries, which were alleged to be visible. Instead of providing medical care, the

28

decedent was arrested for public intoxication. *Id* at 415. The decedent continued to complained of his head injuries and the need for medical assistance while in transit to the jail and at booking. *Id.* While in his cell, the decedent laid under a mattress and was ignored by officers who passed by his cell. He was found dead the next morning due to a hemorrhage. The defendants asserted they could not be expected to diagnose internal bleeding, which the Court rejected and held "our court has emphasized that an 'official's knowledge of a substantial risk of harm may be inferred if the risk was obvious.'" *Id* at 419. The Court found that instead of treating the decedent, the officers mocked the decedent and did not provide medical treatment, then falsified reports to cover their tracks. *Id* at 419. "Taken together, this is enough to allege that the officials 'refused to treat him,' 'ignored his complaints' and engaged in conduct that 'clearly evidenced a wanton disregard for any serious medical needs.'" *Id.* The Court affirmed the denial of qualified immunity.

Here, like in *Kelson*, Lacey's symptoms were visible, and she asked for medical treatment, and her pleas for medical care were summarily ignored by these Defendants.

### C. Defendants' Motion for Judgement on the Pleadings based on Qualified Immunity Motion Falls Short.

For all of the following reasons, Defendants' subject Motion falls short of shielding them from Qualified Immunity because Plaintiff's well-pled Amended Complaint satisfies every requirement under the law. Nonetheless, there are some parts of it that Plaintiffs will address here.

Defendant officers state in their Memorandum that "At 23:01:14, Williams returned to the control room and Collins told her, '[Decedent's just in there trying to make herself throw up, **she's not throwing up blood**." (ECF 44, p. 8-9). But, review of the control room video shows that this is not accurate. Collins didn't make that statement. It was another woman, presumably

Williams. Meanwhile, the video of the holding cell at that time clearly shows a significant amount of blood in the sink. This is yet another example of plain incompetence of the officers.

Curiously, these Defendant officers rely on some of Lacey's comments for their truthfulness when they believe it helps them escape under the shield of Qualified Immunity; but, they dismiss all of Lacey's pleas for medical care and her actions which clearly evidence that she was in serious need of medical care. For example, in their Memorandum they state that Lacey told Robinson that she had been recently diagnosed with OCD and depression, and that her new antidepressants had been working but she had stopped taking them six (6) days prior. (ECF Doc. 44, p.4). They state that Lacey told Robinson that she has night terrors that had been making it difficult for her to sleep, and that while the new medication had been working, 'it takes six weeks for antidepressants to work, and that's what's wrong with me." (ECF Doc. 44, p.4). These defendants write in their Memorandum that Robinson explained that Decedent recently began taking antidepressants and suggested that if she had them, she'd probably sleep. (ECF Doc. 44, p. 6). Another example is where they set forth, "Decedent can be heard asking for 911 because she's 'having an allergic reaction to pepper spray.'" (ECF Doc. 44, p.8). They go on to state that "Robinson left to tell Decedent that she should not be drinking the sink water and that water will only exacerbate the effects of the pepper spray.'" (ECF Doc. 44, p.8). Again, these officers take as true Lacey's telling Robinson that she was having an allergic reaction to pepper spray. Yet another example is where these officers quote Lacey as saying before midnight: "Help me! I am going numb. OK, I'm gonna lay down. It's just the pepper spray." These officers believe Lacey's words here.

However, again, these three officers dismiss all of Lacey's pleas for medical care and her actions which clearly evidence that she was in serious need of medical care.

30

Defendant officers also set forth in the Memorandum a dialogue between Robinson and Corporal Kracek. (ECF Doc. 44, p.7). Corporal Kracek tells Robinson that Lacey is trying to make herself sick, so that she could then be taken to the hospital. This actually demonstrates the clear inference that if Lacey did drink too much water, then she would become sick and need to go to the hospital. Plaintiffs' also point to Paragraph 49 of their Amended Complaint, where they set forth that Corporal Kracek told Officer Robinson to tell her to stop drinking water because it will make her sick. (ECF Doc. 23). What did Robinson do after that? He proceeded to continue to give Lacey more water to drink. (ECF Doc. 23, Paragraph 50). This is more evidence establishing that Officer Robinson was plainly incompetent.

These Defendants in their Memorandum make many references to the video footage in the holding cell, control room and hallway. What they don't do is include any of the video footage between 00:53 and 02:09. (ECF Doc. 44). Here is what took place during that 1hour and fifteen-minute period, which was when Lacey was clearly in serious need of medical care.

- "I'm too weak. I'm losing feeling in my legs."
- "I'm dying!"
- "Someone call 911."
- "My ears are ringing."
- "Death is near."
- "Someone call 911!"
- "Please call 911!"
- "I need an ambulance."
- "I'm fixing to throw up."
- "I'm fixing to die for my sins. Lord, please forgive me for my sins. I'm not perfect. Please forgive me for my sins and all that sin against me. Messiah, forgive me. I love you, Lord."
- Lacey stands and pounds her chest
- She makes a motion with her arm as if pounding her chest, but her arm is no longer making contact with her chest.
- She frantically bangs on the door of the holding cell.
- She is speaking incoherently
- She prays incoherently
- Lacey is marching in place.

31

- She vomits.
- She is mumbling.
- She vomits, again.
- Her body sways.
- She lays down on the mat.
- She appears unconscious.

ECF Doc. 23, Paragraphs 96-114.

No wonder these officers didn't want to bring this to the Court's attention.

The Defendant officers discussed a few cases in their Memorandum.  The Defendants rely primarily on *Carmona* and *Hartzog* (an unpublished opinion) in support of their claim for qualified immunity.  Both cases are easily distinguishable from this case.

In *Carmona*, 126 F.4th 1091 (2025), the decedent was intoxicated and rammed her suburban into a sign, two vehicles, and an apartment building. She had visible superficial injuries, and the responding officers did not provide medical care. Enroute to the Brownsville jail, the decedent banged her head on the partition panel in the patrol car and was exhibiting bizarre behavior.  Almost four hours after being booked the decedent was found dead due to internal bleeding caused by a lacerated liver. *Id* at 1095. Of course, the defendants filed a motion for qualified immunity.  The 5th Circuit affirmed the district court's dismissal for failure to state a claim the officers were deliberately indifferent. In making its decision, the 5th Circuit noted that "liability attaches only if the officials actually knew-not should have known-about the risk." *Id* at 1096.

The Carmona complaint alleged that because of the multiple crashes "it would be apparent to officers that Carmona was in tremendous pain." *Id* at 1097.  The Court noted that this allegation was not based on anything Carmona said or did such as clutching her abdomen or saying she was in pain. *Id* at 1098.  Ultimately, the Court's decision was based on the fact that Carmona was not complaining of pain and not asking for medical attention so the officers could

32

not know she had a lacerated liver. Importantly, the Court noted "Arguably, had Plaintiff alleged Carmona complained of abdominal pain or clutched her abdomen, such conduct would have allowed an inference that officers were aware she was suffering from internal injuries." *Id* at 1099.

The difference between *Carmona* and this case is the officers in *Carmona* had nothing to indicate a serious medical condition.  In this case, Lacey was actively complaining of symptoms associated with hyponatremia and was exhibiting signs of a serious medical need.  She told the officers she vomited blood on more than one occasion and begged for medical care no less than 22 times.  Officer Robinson and Williams were in the control room together when Officer Robinson concluded "she has a serious problem" and her head hit on the door. Similar to the cased discussed in *Carmona*, *Nerren v. Livingston Police Dep't*, 86 F.3d 469 (5th Cir. 1996)(denying qualified immunity where officers knew of the automobile crash and Nerren told the officers he was in pain and requested medical attention), Officers Robinson, Williams, and Collins all were "subjectively aware that Lacey was facing serious medical needs and wanted medical care because she explicitly stated as much." *Carmona* at 1099.

The Defendants also rely on the unpublished opinion of *Hartzog v. Hackett* 2017 WL 5640842, to support their claim they are entitled to qualified immunity.  Importantly, the Hartzog opinion uses the wrong standard to establish deliberate indifference. The Hartzog opinion includes a third element of "(3) each defendant's response to the risk indicates that the [defendant] subjectively intended the harm to occur." *Id* at 4. At least by 2020 the 5th Circuit rejected the third element of subjectively intended the harm to occur.  In *Dyer v. Houston*, 964 F.3d 374 (2020), the Court stated, "We note that some of our cases have posited a third element – that the official 'subjectively intended that harm occur.'" *Id* at 380.  The Court rejected the third

33

element in writing "A panel of our court, however, recently wrote that it 'cannot endorse [this] analysis' because it 'depart[s] from controlling Supreme Court and Fifth Circuit law.'" *Id.*

Notwithstanding the *Hartzog* case using the wrong standard and not being precedent, the case is easily distinguished from this case.  In *Hartzog*, the decedent was under the influence of drugs and was acting as an intoxicated person would.  There was some speculation the decedent may have been dehydrated, but the decedent's family was bringing a doctor to the jail to examine the decedent.  However, before the doctor arrived the decedent became unresponsive and the officers called for EMS.  The decedent never requested medical care or complained of any symptoms that would suggest a serious medical issue. Instead, he exhibited signs of intoxication.

Contrary to the Hartzog case, Lacey begged for help, begged for the jailers to call 911 to get her some help, and described her symptoms to the officers.  She exhibited physical signs of severe medical distress which any reasonable person would recognize as a medical emergency. The officers subjectively knew Lacey was in serious medical distress because she told them she was and showed signs of medical distress.  The jailers even commented that Lacey had "serious problems" and hit her head.  Yet, they did nothing to help her.  They didn't even attempt to see if she was responsive or not.

The Defendants further rely on *Robinson v. Midland County, Texas*, 80 F.4th 704 (5th Cir. 2023), which is distinguishable from this case.  In *Robinson*, the decedent, who had asthma, complained of breathing problems and was prescribed breathing treatments every 4 hours. *Id* at 708.  The officer checked with the medical staff and could not administer breathing treatments until four hours had elapsed.  The officer attended to and checked on the decedent who was responsive and allowed his breathing treatments when due. *Id*.  The office also made sure the

34

decedent had his inhaler and alerted the incoming relief office of the decedent's complaint. *Id.*

The Court found these facts did not rise to the level of deliberate indifference.

*Robinson* is different from this case in that the officer in *Robinson* did something and was

following a medical plan.  In Lacey's case, the officers did nothing in the way of providing

medical care to Lacey.

## V.    CONCLUSION

For all of the following reasons, Plaintiffs respectfully request that the Court Deny

Defendants Motion For Judgment on the Pleadings.

Respectfully submitted,


 /s/ *Jonathan P. Barrett*
Jonathan P. Barrett, MSB#102426
Barrett Law, PLLC
121 Colony Crossing, Suite D
Madison, MS 39110
Tel: 601-613-9141
Fax: 769-300-0922
jpb@barrettlawms.com

-AND-

 /s/ *Eric Dillon*
Eric Dillon
Eric Dillon Law Firm, PLLC
216 West Jackson Street
Ridgeland, Mississippi 39157
601.906.5336
eric@ericdillonlawfirm.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2025, I electronically filed the above and foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Jonathan P. Barrett*